UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOSEPH A. POGGIOLI,

                     Plaintiff,

          -against-

ANTHONY MURPHY, individually, KEVIN
KEALY, individually, PATRICK J. CARROLL,
individually, MYRON JOSEPH, individually,
and the CITY OF NEW ROCHELLE, New York,

                   Defendants.

-----------------------------------------------------------------x

06 Civ. 12893 (CLB)

**PLAINTIFF'S
COUNTERSTATEMENT
PURSUANT TO RULE 56.1**

Plaintiff JOSEPH A. POGGIOLI by his attorneys, Lovett & Gould, LLP states the

following in response to Defendants' Statement Pursuant to Rule 56.1 of the Local Rules of this

Court.[1]  In addition, as set forth below, Plaintiff contends that there are material facts which are

not disputed and genuinely disputed issues of material fact that preclude the granting of

summary judgment.

      This motion is brought pursuant to the procedures set forth in paragraph 3(d) of the Civil

Case Discovery Plan and Scheduling Order, entered on January 5, 2007.

### PLAINTIFF'S RESPONSE TO
### DEFENDANTS' STATEMENT OF FACTS

**The Parties**

      1.     Plaintiff Joseph A. Poggioli ("Poggioli") is, and at all relevant times, has been a

Police Officer with the New Rochelle Police Department ("NRPD").

---

[1] Defendants have brought this motion pursuant to this Court's individual rules relating to qualified immunity. It is respectfully submitted that the motion is premature. Defendants' depositions have not taken place.

**Response:**    Admits except he is employed by the City of New Rochelle.

2.    Poggioli served as the president of the New Rochelle Police Association prior to, but not since, January 1, 2004.

**Response:**    Denies (Poggioli Dep. p. 55, annexed to the Affidavit of Drita Nicaj as Exhibit 1 (hereinafter after "Nicaj Aff." followed by the exhibit number).

3.    Defendant Anthony Murphy ("Murphy") is currently the Deputy Commissioner of Police of the City of New Rochelle. At certain relevant times in the past, Murphy served as a Captain with the NRPD.

**Response:**    Admits.

4.    Defendant Kevin Kealy, serves, and at all relevant times has served, as a Captain with the NRPD.

**Response:**    Admits.

5.    Defendant Patrick J. Carroll ("Carroll") is, and at all relevant times has been, the Commissioner of Police the City of New Rochelle.

6.    Defendant Myron Joseph ("Joseph") serves as a Sergeant with the NRPD.

**Response:**    Admits.

7.    Defendant the City of New Rochelle is a municipal corporation created by and duly existing under the laws of the state of New York.

**Response:**    Admits.

8.    On or about November 16, 1994, Poggioli initiated a federal lawsuit in this Court entitled: *JOSEPH A. POGGIOLI, JR. - against - PA TRICK J. CARROLL, individually and as*

2

*Police Commissioner of the City of New Rochelle, DOMINIC CAPIO, individually and as a Lieutenant in the Police Department of the City of New Rochelle, ANTHONY MURPHY, individually and as a Captain in the Police Department of the City of New Rochelle, JOSEPH F SCHALLER, individually and in his capacity as a Captain in the Police Department of the City of New Rochelle, Police Officer John Doe and/or Mary Roe individually, the CITY OF NEW ROCHELLE, NEW YORK and JOSEPH MATTONE, individually, 94 CIV 8313* (BDP)(MDF) *("Poggioli 1"). See Ex. C.*

>    **Response:**    Admits.

9.    The complaint in *Poggioli I* alleged that defendants in that action violated Poggioli's rights under the Fourth Amendment by breaking into his departmental locker for the alleged purpose of reviewing notes that Poggioli had made of communications with his PBA attorney. Ex. C, at ¶8. Those notes allegedly related to a proceeding then pending against Poggioli in which Poggioli was charged with violating certain departmental rules and regulations relating to off-duty, non-departmental work. *Id.*

>    **Response:**    Admits the facts set forth in the first sentence of the foregoing paragraph but denies the remainder of the paragraph. In <u>Poggioli I</u>, the complaint alleges that there were no departmental rules and regulations concerning off-duty, non-departmental work (Def. Ex. C ¶27).

10.    On or about November 16, 1996, a jury returned a verdict in Poggioli's favor.

>    **Response:**    Admits that a jury verdict was entered in Plaintiff's favor in the amount of $155,000 (Poggioli Dep. p. 9, Nicaj Aff. Ex. 1).

11.    On May 20, 1997, the [sic.] district court (Parker, J ) found the punitive damages award to be excessive and ruled that the Poggioli could either accept a reduced award or elect to have a new trial. Ex. D.

**Response:**    Admits.

12.    Poggioli elected to have a new trial. However, on September 15, 1997, the [sic.] district court issued an order indicating that the court had been advised by the parties that the case had settled and discontinuing [sic.] the case pending consummation of the settlement. Ex. E.

**Response:**    Admits.

13.    The parties executed a general release and settlement on October 30, 1997, which was So-Ordered by the Court on December 4, 1997.

**Response:**    Denied since Defendants fail to cite anything in support.

14.    The NRPD maintains a program regarding special-duty work assignments (details) in which members of the Department work off duty, but in uniform, for various private employers.

**Response:**    Denied since Defendants fail to cite anything in support.

15.    The private employers pay the City for the services provided and the City, in turn, pays the officers who accept and perform the off-duty assignments.

**Response:**    Denied since because Defendants fail to cite anything in support.

16.    A special-duty detail is created when a private employer seeks to employ a police officer in uniform. Typically, such details relate to security or traffic.

**Response:**    Denied since because Defendants fail to cite anything in support.

4

17.    Before an officer may report to a special-duty detail, he or she must first report to headquarters and "sign out" on a document referred to as the special-duty assignment log, a/k/a the "PD-59D." Poggioli Dep. (Ex. F) at 104:19-107:24.

**Response:**    Denies since Defendants' citation does not support the foregoing contention (Def. Ex. F page 104:19-107:24).

18.    A supervisor, usually the "desk officer," must initial the PD-59D to confirm that the officer has signed out for all special-duty details. Poggioli Dep. (Ex. F) at 104:19-107:24.

**Response:**    Denied since Defendants' citation does not support the foregoing contention that a supervisor "must" initial (Def. Ex. F page 104:19-107:24).

19.    The PD-59D form records the day and date, the officer's name, the assignment (detail), the job hours, the check-out time, the check-in time and the police radio number. Poggioli Dep. (Ex. F) at 104:19-107:24, and Ex. G.

**Response:**    Admits.

20.    The PD-59D form has two columns for the supervisor (desk officer) to initial "out" and "in" to confirm the information supplied by the officer working the special assignment, including when the officer leaves and returns to headquarters. Ex. G.

**Response:**    Denies since nothing cited by Defendants evidences that the term supervisor means "desk officer". Furthermore, nothing cited to by Defendants supports their contention concerning what "in" and "out" in Defendants' Exhibit G means.

21.    In April 2005, Poggioli was regularly assigned to the third tour of duty, which runs from 4:00 p.m. to 12:00 midnight. Poggioli Dep. (Ex. F) at 99:23-100:9.

**Response:**    . Admits and adds that Plaintiff has worked other shifts too (Poggioli Dep. p. 100, Nicaj Aff. Ex. 1).

22.    Sometime during the morning of April 20, 2005, Sgt. Merganthaler of the NRPD called Poggioli at his home in Carmel, New York, and asked if Poggioli wanted to fill a special-duty detail that day for Persico Construction (the "Persico Assignment"). Poggioli Dep. (Ex. F) at 130:14-132:2.

**Response:**    Denies.

23.    The Persico Assignment called for an officer to direct traffic around a construction project at the intersection of Coligni and Webster Avenues in New Rochelle. Poggioli Dep. (Ex. F) at 14:6-20.

**Response:**    Admits only it was a "traffic detail" in New Rochelle as per Defendants' citation (Def. Ex. F p. 14).

24.    Poggioli said he wanted to work the Persico Assignment. Poggioli Dep. (Ex. F) at 132:3-4.

**Response:**    Denies.

25.    According to Poggioli, it takes about 40-45 minutes to drive from his home in Carmel, New York to New Rochelle Police Headquarters. Poggioli Dep. (Ex. F) at 130:10-14.

**Response:**    Admits.

26.    Poggioli made an entry on the PD-59D for April 20, 2005, representing that he signed out from NRPD headquarters to fill the Persico Assignment at 12:00 noon. Ex. G.

**Response:**    Admits.

27.    However, the desk officer did not initial the PD-59D when Poggioli left headquarters for the Persico Assignment. Ex. G. Hence, the "Supervisor Out" column remained blank. *Id.*

**Response:**    Denies.

6

28.    Poggioli did not return to headquarters at any time during the course of the Persico Assignment on April 20, 2005. Poggioli Dep. (Ex. F) at 16:1-8.

**Response:**    Admits.

29.    Poggioli returned to headquarters, after the conclusion of the Persico Assignment, and checked in at 15:30, or 3:30 p.m. Ex. G.

**Response:**    Admits.

30.    Lieutenant Childs, who was then assigned as the desk officer, initialed the PD59D in the "Supervisor (In)" column, confirming Poggioli's return to headquarters. Poggioli Dep. (Ex. F) at 107:19-24.

**Response:**    Admits that only that Childs initialed the form confirming Poggioli's return as evidenced by Defendants' citation.

31.    On April 20, 2005, Poggioli submitted a request for overtime compensation for the Persico Assignment. Poggioli Dep. (Ex. F) at 15:8-5; 116:5-20; and Ex. H.

**Response:**    Admits.

32.    Poggioli claimed compensation for 3 and 1/2 hours, from 12:00 noon until 15:30, for the Persico Assignment. Poggioli Dep. (Ex. F) at 116:5-117:8.

**Response:**    Admits.

33.    Sergeant Myron Joseph was the head of the Traffic Unit on April 20, 2005, and remains in that position to date. Joseph Hear. Test., 1/20/06 (Ex. K), at 4:19-5:7.

**Response:**    Admits.

34.    Joseph had received telephone calls complaining about traffic conditions at the intersection of Webster and Coligni. Joseph Hear. Test., 1/20/06 (Ex. K), at 6:2-13.

**Response:**    Admits that is what is claimed.  But Defendants fail to mention that Joseph did not receive the complaints on April 20th, the day in which Plaintiff was assigned to the site. (1/20/06 Poggioli Disc. Tr. p. 25, Nicaj Aff. Ex. 2).  Joseph received the complaints purportedly on April 18 and 19, 2005 (1/20/06 Poggioli Disc. Tr. p. 25, Nicaj Aff. Ex. 2).  It was not until the 20th that Joseph decided to look at the intersection (1/20/06 Poggioli Disc. Tr. p. 25).  Although he purportedly sent an officer to the site at approximately 8:00 a.m. on April 19th, he could not identify the officer (1/20/06 Poggioli Disc. Tr. p. 29, Nicaj Aff. Ex. 2).  He did not preserve or maintain any voicemail complaints that he purportedly received.  In fact when he received the complaints about the traffic on April 18th, Joseph admittedly failed to do anything about them (1/20/06 Poggioli Disc. Tr. p. 25, Nicaj Aff. Ex. 2).

35.    Joseph went to the intersection on April 20, 2005, at about 2:15 p.m., and observed that construction operations had ceased, traffic was moving well and that no police officers were present. Joseph Hear. Test., 1/20/06 (Ex. K), at 6:14-7:22.

**Response:**    Admits that is what is claimed by Joseph and adds that Joseph was at that location for approximately five to ten minutes (Def. Ex. I pg. 16).

36.    Subsequently, Joseph spoke with Captain Kealy, and inquired whether, and if so when, the Persico Assignment had been filled. Kealy Hear. Test., 2/4/06 (Ex. I), at 100:14-101:21.

**Response:**    Denies.  Kealy testified about the foregoing but Joseph testified he "just happened to be looking at the off duty sign-out sheet" and "just happened" to notice that Plaintiff had signed out for the Persico job at noon and signed in at approximately 3:00 p.m. (1/20/06 Poggioli Disc. Tr. pp. 23, Nicaj Aff. Ex. 2).  Joseph, then reported his observation as to the sign out sheet to Captain Kealy (1/20/06 Poggioli Disc. Tr. pp. 23).  Incidentally, Joseph

8

knew that Plaintiff had successfully sued Kealy years earlier as well as then Captain Murphy, Lt. Capio and the City of New Rochelle (1/20/06 Poggioli Disc. Tr. pp. 18, 19, Nicaj Aff. Ex. 2).

37.    Kealy was the division commander of the Staff Services Division of the NRPD on April 20, 2005, and remains in that position to date. Kealy Hear. Test., 2/4/06 (Ex. I), at 99:14-23.

**Response:**    Admits.

38.    Kealy checked the overtime compensation requests, and saw that Poggioli had claimed to be on the Persico Assignment from 12:00 noon until 3:30 p.m. Kealy Hear. Test., 2/4/06 (Ex. I), at 101:20-102:8.

**Response:**    Admits Kealy testified to the foregoing.

39.    Kealy had reservations about Poggioli's overtime compensation request because he recalled that the department was looking for someone to fill the Persico Assignment even in late morning of April 20, 2005, and because Kealy had the impression that the job may not have been filled at all on that day. Kealy Hear. Test., 2/4/06 (Ex. I), at 101:20-102:17.

**Response:**    Denies. Kealy never stated that the department was looking for someone to fill the Persico Assignment in the "late" morning – he simply said morning (Id.)

40.    Kealy reviewed the PD-59D for April 20, 2005. Kealy Hear. Test., 2/4/06 (Ex. I), at 102:9-17. He saw that Poggioli had signed out for the Persico Assignment at 12:00 noon, but that the desk officer did not initial the "Supervisor Out" column for Poggioli. *Id.*

**Response:**    Admits that Kealy claims the foregoing but denies that a desk officer did not initial "out" – Kealy testified it was a "detective officer" that did not sign Plaintiff in or out (Id.). Kealy's supposed concern was just that. Kealy was overheard by the President of the

9

City's PBA discussing in a hallway a self-evident dilemma they faced - - how to explain prosecuting Plaintiff for requesting overtime money for time allegedly not worked when numerous Police Officers routinely engaged in the same conduct with respect to which Plaintiff stands accused (Def. Ex. A ¶16; Poggioli Dep. p. 27, 30-31, Nicaj Aff. Ex. 1). Indeed, as set forth *infra*, the hearing officer barred Plaintiff from introducing the PBA President concerning the foregoing.

Moreover, a cursory examination of the PD-59D form on that day alone reveals that one other police officer that accepted an off-duty assignment did not have a supervisor sign him "out" (Def. Ex. G). Furthermore, on that day alone three other police officer who accepted an off duty assignment signed "in" without the benefit of a supervisor's initial – that is returning from their off-duty assignment (Id.). Given the Plaintiff's contention that police officers regularly put in for time that they did not in fact work which was known by members of the department, including Kealy, at minimum, additional discovery is necessary. Plaintiff's deposition simply does not suffice.

41.    Kealy spoke with Lieutenant Feery, the desk officer on assignment at 12:00 noon on April 20, 2005. Feery told Kealy that he did not remember seeing Poggioli. Kealy Hear. Test., 2/4/06 (Ex. I), at 103:25-104:6.

**Response:**    Admits.

42.    Kealy next reviewed Poggioli's access card report, which shows when the access card assigned to Poggioli is used to gain entrance to headquarters. The report (Ex. K) showed that Poggioli's access card was used at 1:03 p.m. and again at 3:37 p.m. on April 20, 2005. Kealy Hear. Test., 2/4/06 (Ex. I), at 104:7-16; 105:12-20.

10

**Response:**      Disputes.  Detective Jude Donald had responsibility for insuring that the hard and

software for the Department's security system was functioning (2/4/06 Poggioli Disc. Tr. p. 74,

Nicaj Aff. Ex. 3).   Prior to April 20, 2005, Donald learned that Detective Landau had tampered

with Plaintiff's access card and as a result Donald told Landau to stop (2/4/06 Poggioli Disc. Tr.

p. 86, Nicaj Ex. 3). Donald thereafter told Kealy about Landau's misconduct and was asked to

fill out a report (2/4/06 Poggioli Disc. Tr. p. 87, 96, Nicaj Ex. 3).  He then altered Respondent's

access card so that he could "access the doors" (2/4/06 Poggioli Disc. Tr. p. 87, Nicaj Ex. 3).

Landau admittedly had the technical capability of creating an access card that would falsely

show that Respondent had entered a door in the Department (2/4/06 Poggioli Disc. Tr. 96-7,

Nicaj Ex. 3).

As to the door access records concerning Respondent for April 20, 2005, Donald could

not say whether Landau had used a card to gain access under circumstances where it would

appear that Plaintiff had entered the doors at issue (2/4/06 Poggioli Disc. Tr. p. 97, Nicaj Ex. 3).

Donald was required, on at least three occasions, to re-program Plaintiff's access card by

reason of Landau's tampering with it (2/4/06 Poggioli Disc. Tr. p. 88, Nicaj Aff. Ex. 3). Donald

never had occasion to testify against Landau with respect to these acts of tampering (2/4/06

Poggioli Disc. Tr. p. 89, Nicaj Ex. 3).

At no time was Donald asked to generate records to show that, during the period

Plaintiff's access card had been the subject of tampering, Plaintiff was denied access to any door

in the Department (2/4/06 Poggioli Disc. Tr. p. 88, Nicaj Ex. 3).

43.      The information he had gleaned to this point, prompted Kealy to ask for a review of

the NRPD internal video system for April 20, 2005 to determine if Poggioli appeared on any

11

portion of the video taken within headquarters on that date. Kealy Hear. Test., 2/4/06 (Ex. I), at 106:1-113:6.

**Response:**    Admits that is what is claimed and denies materiality.

44.    Sergeant D'Andrea, the officer in charge of the video system, informed Kealy that he saw Poggioli on the recording taken from the camera located near the booking desk. Kealy Hear. Test., 2/4/06 (Ex. I), at 113:7-12.

**Response:**    Denies materiality.

45.    Kealy requested that a copy of the relevant portions of the recording be made onto a CD-Rom (the "Booking Desk Video"). Kealy Hear. Test., 2/4/06 (Ex. I), at 113:13-24.

**Response:**    Clarifies that the testimony is that the recording was be copied onto a "disc." (Def. Ex. I p. 113).

46.    A certified copy of the NRPD Booking Desk Video is annexed as Exhibit L. (The Video should play on "Windows Media Player" software.)

**Response:**    Denies materiality.

47.    The portion of the Booking Desk Video that starts at 1:03:53 p.m. shows Poggioli carrying a brown paper bag with a radio on top of the bag walking through the booking desk area of NRPD headquarters. (A female officer is also visible on the video.)

**Response:**    Denies materiality.

48.    Still photos of the relevant portion of the Booking Desk Video are annexed as Exhibit M. The time on these photos is 13:04:11.

**Response:**    Denies materiality.

12

49.    The time on the Booking Desk Video is demonstrated in two ways. First, the video itself has an internal clock, which shows the date and time. Second, the video image captures an electric clock on the wall behind the booking desk. Exs. L, M.

**Response:**    Denies materiality.

50.    The internal clock on the Booking Desk Video and the electric clock on the wall behind the booking desk are within about a minute of each other. Exs. L, M.

**Response:**    Denies materiality.

51.    The male figure depicted in the Booking Desk Video at about 1:04 p.m. is Poggioli. Kealy Hear. Test., 2/4/06 (Ex. I), at 113:23-114:24; 115:9-14.

**Response:**    Admits that is what is claimed but denies materiality.

52.    Officer Dina Moretti is visible in the Booking Desk Video at the same time as Poggioli. Kealy Hear. Test., 2/4/06 (Ex. I), at 114:3-12; 116:10-15.

**Response:**    Admits that is what is claimed but denies materiality.

53.    Departmental records show that, in fact, Officer Moretti brought lunch to a female inmate around 1:00 p.m., corroborating the time of the Booking Desk Video. Kealy Hear. Test., 2/4/06 (Ex. I), at 116:10-19.

**Response:**    Admits that what is claimed but denies materiality.

54.    In his sworn deposition, taken February 1, 2007, Poggioli admitted that the male figure shown in the Booking Desk Video at about 13:04:10-11 "looks like me." Poggioli Dep. (Ex. F) at 125:22.

**Response:**    Admits but denies materiality.

55.    In addition to the above, Sergeant Joseph spoke with Al Carniero, the foreman from Persico Construction in charge of the Persico Assignment. Joseph Hear. Test., 1/20/06 (Ex. K), at 8:13-9:25.

**Response:**    Admits that is Joseph's testimony but denies materiality.

56.    Carniero told Joseph that Poggioli did not arrive at the Persico Assignment until after 1:00 p.m. Joseph Hear. Test., 1/20/06 (Ex. K), at 10:5-13:3.  He also told Joseph that construction activity ceased at 2:00 p.m. *Id.*

**Response:**    Inadmissible hearsay.  In any event, admits that Joseph claims the foregoing.

57.    After speaking with Carniero, Joseph observed from the special-duty assignment log that Poggioli had checked out at 12:00 noon, and checked in at "approximately 3:00." Joseph Hear. Test., 1/20/06 (Ex. K), at 13:9-13.

**Response:**    Denies since according to the entry, Poggioli checked in at 3:30 p.m. (Def. Ex. G).

58.    Joseph brought this information to the attention of Captain Kealy. Joseph Hear. Test., 1/20/06 (Ex. K), at 13:22-14:4.

**Response:**    Admits.

59.    On May 4, 2005, Joseph prepared a memorandum addressed to Captain Kealy describing his conversation with Carniero. Ex. N.

**Response:**    Admits.

60.    Captain Kealy, with Sgt. Joseph present, interviewed Poggioli about the Persico Assignment on May 6 and again on May 19, 2005. Kealy Hear. Test., 2/4/06 (Ex. I), at 116:20-118:4, and Poggioli Dep. (Ex. F) at 110:3-16.

14

**Response:**    Admits but no satisfactory answer was provided by Kealy as to why

Joseph was present for Poggioli's interview and not Lieutenant Fortunato, who was the internal

Affairs officer.   By way of explanation, Kealy claimed the following: Lt. Fortunato was

"preoccupied", or he was "busy", or his "door was closed", or he was "somewhere else". Kealy

did not, however attempt to contact Fortunato by telephone (3/9/06 Poggioli Disc. Tr. p. 285,

Nicaj Aff. Ex. 4)

61.    On May 19, 2005, Captain Kealy preferred disciplinary charges against Poggioli

alleging violations of certain departmental rules and regulations concerning the Persico

Assignment and Poggioli's claim for overtime compensation. A certified copy of the charges

and specifications is annexed as Exhibit O.

**Response:**    Admits.   The decision was a collective one, involving Deputy

Commissioner Murphy, who later related to Kealy that he in turn had reported the circumstances

to the Commissioner and that disciplinary charges would be drawn up (3/9/06 Poggioli Disc. Tr.

p. 294, Nicaj Aff. Ex. 4).

Despite purportedly knowing that Plaintiff did not work, the City paid Plaintiff and

retained a portion of the $67 an hour which Persico paid for an hour of service, and no moneys

were ever refunded to Persico (3/9/06 Poggioli Disc. Tr. p. 305-06, Nicaj Aff. Ex. 4).

62.    Prior to the start of the hearing on the disciplinary charges against Poggioli, there

was an offer to settle the charges if Poggioli would accept a [sic.] 30-day suspension without

pay, and 6 months suspension from special duty detail work. Poggioli Dep. (Ex. F) at 94:21-

95:10. Poggioli refused to settle the charges.

**Response:**    Objects on the basis of Federal Rule of Evidence 408.

63.    By letters dated July 18 and September 9, 2005, Commissioner Carroll appointed Robert Ponzini, Esq., to act as the Hearing Officer on the charges brought against Poggioli. Ex. P.

**Response:**    Admits.

64.    Poggioli has no independent basis to believe that Robert Ponzini is biased against him and in favor of the City of New Rochelle. Poggioli Dep. (Ex. F), at 20:8-24:18.

**Response:**    Admits but *see* Jacqueline Byrnes v. County of Westchester, 07 Civ 0633 (CLB) concerning same hearing officer.

65.    A disciplinary hearing on said charges was held over eight separate dates commencing on December 15, 2005 and concluding on July 10, 2006.

**Response:**    Admits.

66.    As of this date, a decision on the hearing of the disciplinary charges preferred against Poggioli has not been rendered.

**Response:**    Admits.

67.    Poggioli served as president of the New Rochelle Police Association ("PBA") during the calendar years 2000, 2001, 2002 and 2003. Ex. Q.

**Response:**    Plaintiff was elected four times the President of the City of New Rochelle Police Benevolent Association ("PBA") during the period from 2001 and ending on December 31, 2004 (Poggioli Dep. p. 54-55, Nicaj Aff. Ex. 1).

68.    While serving as PBA president, Poggioli appeared at meetings of the New Rochelle City Council on the following dates: July 10, 2001, February 12, 2002, March 12, 2002, April 9, 2002, October 8, 2002, November 12, 2002 and December 12, 2002. *See* Affidavit of Dorothy Allen, sworn to February 22, 2007.

**Response:**     Admits.


## FOLLOWING ARE MATERIAL UNDISPUTED FACTS AND GENUINELY DISPUTED ISSUES OF MATERIAL FACT THAT PRECLUDE THE GRANTING OF SUMMARY JUDGMENT

### Plaintiff's Protected Activity

*1.*     *Prior Lawsuit*

69.     In 1994, Plaintiff filed a civil rights action in this Court alleging *inter alia* a violation of his Fourth Amendment rights by Carroll, Murphy (then a police Captain), the City of New Rochelle, and other high ranking members of the City's Police Department. Poggioli v. Carroll, 94 Civ. 8313 (BDP)(hereinafter "Poggioli I")(Def. Ex. C).

70.     At trial in Poggioli I resulted in a Plaintiff's verdict evidence adduced demonstrated that the Defendants in Poggioli I intentionally destroyed Plaintiff's personal property, broke into his departmental locker, and unlawfully reviewed/copied Plaintiff's privileged notes of a meeting he had with his then PBA attorney (Poggioli Dep. pp. 7-8, Nicaj Aff. Ex. 1 ). None of the Defendants in Poggioli I was arrested, prosecuted and/or subjected to disciplinary action for their unlawful conduct (Def. Ex. C).

71.     On November 26, 1996, a jury verdict was entered in Plaintiff's favor in the amount of $155,000 in compensatory and punitive damages as a result of which Murphy and Carroll were both infuriated and determined to retaliate against Plaintiff in the event an opportunity arose to do so (Poggioli Dep. p. Nicaj Aff. Ex. 1 pp. 9-10; Def. Ex. A ¶ 10).

72.     The action was settled in September 1997 and the Court discontinued the action (Def. Ex. E).


17

*2. Plaintiff's Protected Activities as PBA President*

73.    Plaintiff was elected four times as President of the City of New Rochelle Police

Benevolent Association ("PBA") during the period from 2001 and **ending on December 31,**

**2004** (Poggioli Dep. p. 54-55, Nicaj Aff. Ex. 1).

74.    During Poggioli's tenure as PBA President, he had clashes with the

administration (Poggioli Dep. p. 29-30, Nicaj Aff. Ex. 1).  In that connection, on numerous

occasions as PBA President, Poggioli publicly criticized the Police Department and

Commissioner Carroll in the various media outlets, including in newspapers, television and radio

(Poggioli Dep. p. 72, Nicaj Aff. Ex. 1).  He also addressed his concerns before the City Council

(Poggioli Dep. pp. 72-73, Nicaj Aff. Ex. 1).

75.    Apart from appearing before the City Council with respect to contract

negotiations, Poggioli appeared before the City Council to express his concern about the

administration (Poggioli Dep. p. 73-74, Nicaj Aff. Ex. 1).

*Defendants' Retaliatory Actions*

76.    In April of 2005 for the first time an opportunity arose for retaliation against

Plaintiff on the basis of a complaint made by Joseph to Kealy regarding an incident where

Poggioli was accused of having submitted an overtime slip for an off-duty police assignment for

approximately one hour of time that he claimed to have worked but which Joseph, Kealy,

Murphy and Carroll collectively agreed to accuse him of not working (Def. Ex. A ¶11).

77.    In that connection the amount of money in controversy was approximately $67, a

portion of which Defendants knowingly retained (despite their allegation that the private sector

contractor [Persico Construction] who paid for the services Poggioli claimed to have worked

18

should not have paid that money to the City at all) for expenses incurred in the Police Department. The balance of that sum was paid by Defendants to Plaintiff - - notwithstanding their allegation that he was not entitled to be paid (Def. Ex. A ¶12; Poggioli Dep. p. 19, Nicaj Aff. Ex. 1).

78. On May 19, 2005, Kealy preferred against Plaintiff civil service disciplinary charges accusing him of having submitted the referenced overtime request for time that he allegedly did not perform services (Poggioli Dep. pp. 19-20, Nicaj Aff. Ex. 1; Def. Ex. A ¶14; Disciplinary Charges, Def. Ex. 5). Carroll discussed the charges against Poggioli before they were filed with Murphy (6/19/06 Poggioli Disc. Tr. p. 582, Nicaj Aff. Ex. 6).

79. In that connection: a) Defendants agreed to retain the services of a "hearing officer" well known in the legal community to not only always rule in favor of the municipal corporation paying his fees but to actually fabricate evidence to bolster his findings of "fact"; and b) both Joseph and Kealy agreed with their co-defendants to testify against Plaintiff with a view towards terminating his employment (Poggioli Dep. pp. 20-21, 23, Nicaj Aff. Ex. 1; Def. Ex. A ¶15).

80. During the disciplinary proceeding, the hearing officer refused to admit the City PBA President's testimony (5/16/06 Poggioli Disc. Tr. p. 525, Nicaj Aff. Ex. 7).

81. In particular, the PBA President would have testified that during the course of that prosecution Kealy was overheard by him (President) discussing in a hallway a self-evident dilemma they faced - - how to explain prosecuting Plaintiff for requesting overtime money for time allegedly not worked when numerous Police Officers routinely engaged in the same conduct with respect to which Plaintiff stands accused (Def. Ex. A ¶16; Poggioli Dep. p. 27, 30-31, Nicaj Aff. Ex. 1)

82.    Over a period of months Defendants then prosecuted, at a cost of substantially in excess of $50,000, the retaliatory disciplinary proceeding having pre-determined that Plaintiff will be found guilty and terminated from the City's employ (Def. Ex. A ¶16).

83.    Police Officers Colotti, Pitzeo and Vasquez were paid for off-duty work which they had not performed and they were not disciplined (Poggioli Dep. p. 33-34, Nicaj Aff. Ex. 1). Plaintiff reported Colotti and Vasquez to Captain Pozzoli (Poggioli Dep. p. 39-40, Nicaj Aff. Ex. 1). No disciplinary action was taken against them (Poggioli Dep. p. 34-40, Nicaj Aff. Ex. 1).

84.    In engaging in that retaliatory plan Defendants knowingly and deliberately failed to take law enforcement action, with respect to on-going criminal wrongdoing that permeated both the Police Department and the New Rochelle City Court (claimed by the City to be one of its "Departments") (Def. Ex. A ¶17; Poggioli Dep. p. 40-41, Nicaj Aff. Ex. 1).

85.    Police Detective Robert D'Andrea was not arrested, criminally prosecuted, and/or disciplined for stealing evidence (a computer) from the Department's Property Clerk's Office and when caught discarding the evidence in the garbage. Subsequently D'Andrea, who was recruited by Defendants to testify against Plaintiff in the disciplinary proceeding, was reassigned as the Department's Communications Supervisor in charge of intra-departmental security systems (Def. Ex. A ¶17; Poggioli Dep. p . 40-41, Nicaj Aff. Ex. 1).

86.    The City Marshall, an attorney, openly operates a private law practice out of the Courthouse using, at taxpayers' expense, on-duty City and State employees' services to draft his private clients[ wills and contracts for the sale of real property - - stealing in that process government-owned paper, copiers, computer equipment, and other office supplies (Def. Ex. A ¶17) (12/22/05 Gina Lepore Disciplinary Hearing Tr. p. 20-21, 25-26, Nicaj Aff. Ex. 8) (hereinafter "12/2205 Lepore Disc. Tr.").

87.    One female employed in the Court Clerk's Office openly and admittedly has repeated engaged with impunity in the felonious sale of controlled substances (Vicodin and Valium) in that Office to other employees (Def. Ex. A ¶17).

88.    That same female while working in the Clerk's Office has also openly and admittedly engaged with impunity in felony possession of controlled substances (Vicodin and Valium) that had been feloniously sold to her by certain of her co-workers (Def. Ex. A ¶17).

89.    That female employee's multiple co-workers, who have under oath been identified by name as having engaged in the felony sale of controlled substances to that female, have neither been arrested, prosecuted nor subjected to disciplinary charges with a view towards termination (Def. Ex. A ¶ 17).

90.    Another female employee working in the City Court Clerk's Office has openly and admittedly engaged in grand larceny, stealing in excess of $3,000 from funds received by and belonging to the Court - - later bragging in testimony that she was "never charged" with that theft (Def. Ex. A ¶17; 12/2205 Lepore Disc. Tr. p 31-2, Nicaj Aff. Ex. 8).

91.    Police Detective Landau repeatedly tampered with Plaintiff's security door access card to the Police Department, disabling the card and preventing Plaintiff from entering Headquarters. Although that conduct constituted a crime, no arrest, criminal and/or disciplinary prosecution resulted, and *inter alia* (Def. Ex. A ¶17; 2/4/06 Poggioli Disc. Tr. p. 86-7, 96-7, Nicaj Aff. Ex. 3).

92.    A male Court Officer employed in the City Court has also openly and admittedly engaged in the same grand larceny - - committed with his now-fiancé - - as a result of which he was never arrested, charged and/or brought up on disciplinary charges with a view towards termination (Def. Ex. A ¶17).

Wherefore, upon the foregoing Plaintiff's Statement made pursuant to local Rule 56.1, the Affidavit of Drita Nicaj with annexed exhibits thereto, and the Memorandum of Law in opposition to Defendants' motion, Defendants' motion for summary judgment should in all respects, be denied.

Dated: White Plains, N.Y.
      April 2, 2007

LOVETT & GOULD, LLP
By: _Drita Nicaj_
Drita Nicaj (DN 0966)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401