STATE OF NEW YORK
CITY OF NEW ROCHELLE
------------------------------------------------------------x
In the Matter of Disciplinary Charges Preferred by

CAPTAIN KEVIN KEALY,                            HEARING OFFICER'S
                                                REPORT AND
                                                RECOMMENDATIONS
                              Charging Party,

              -against-

POLICE OFFICER JOSEPH POGGIOLI

                              Charged Party,
------------------------------------------------------------x

To:    Captain Kevin Kealy
       Police Department
       City of New Rochelle

  ROBERT J. PONZINI, as Hearing Officer herein, presents his report and recommendations:

  1. Notice of Charges, pursuant to Section 75 of the Civil Service Law of the State of New York, against the respondent, were duly served upon him by personal service on May 19, 2005

  2. Said charges, dated May 19, 2005, consist of six (6) charges of misconduct alleging that the respondent while employed by the City New Rochelle Police Department("Department") in his capacity as a police officer submitted a request for overtime pay for working a special duty assignment at Coligni Avenue and Webster Avenue in New Rochelle from 12:00 p.m. to 3:30 p.m. on April 20, 2005 although he did not actually work the entire three and one-half hours (Charges I-IV), that he failed to make a proper entry in his log book of his activity at that special duty assignment (Charge V), and that he failed to cooperate in a truthful manner with a departmental investigation (Charge VI) available.

  3. Hon. Patrick J. Carroll, Commissioner, City of New Rochelle Police Department, by letter dated December 18, 2005, designated me to be the hearing officer pursuant to Section 75 of the Civil Service Law. I was directed to submit my findings and recommendations to him together with the records and exhibits, for his review and determination. This designation was confirmed by a subsequent letter of designation dated September 9, 2005

4. Hearings were held before me at the public offices of the City of New Rochelle on December 15, 2005, January 20, 2006, February 4, 2006, March 9, 2006, March 10, 2006, May 16, 2006, June 19, 2006 and July 7, 2006. Present were the Respondent, Police Officer Joseph Poggioli, his attorney, Jonathan Lovett, Esq. and New Rochelle Police Association President Police Officer Edward Hayes. Appearing on behalf of the City of New Rochelle Police Department and Captain Kealy was the Office of Vincent Toomey, Esq. by Kevin T. Keron, Esq. and Thomas J. Marcoline, Esq.

5. Among the witnesses called by the Department were: a) Lieutentant James Fortunato ("Fortunato"); b) Sergeant Myron Joseph ("Joseph"); c) Detective Robert D'Andrea ("D'Andrea"); d) Lieutenant Donal Feery; e) Sergeant George Rosenbergen ("Rosenbergen"); f) Lieutenant William Childs ("Childs"); Police Officer Dina Moretti ("Moretti"); Detective Judy Donald ("Donald"); Captain Kevin Kealy ("Kealy") and Police Officer Joseph Poggioli ("Poggioli") The charged party called as witnesses: a) Sergeant Myron Joseph ("Joseph"; b) Lieutenant James Fortunato ("Fortunato"); c) Lieutenant George Masseo ("Masseo"); d) Police Officer/Union President Edward Hayes ("Hayes"); e) Lieutenant William Childs ("Childs"); f) Detective Judy Donald ("Donald"); g) Captain Robert Gazzola ("Gassola"); Police Commissioner Patrick Carroll ("Carroll"); Deputy Police Commissioner Anthony Murphy ("Murphy") and Police Officer John Young ("Young"). The charged party elected not to testify in defense of the charges.

6. Annexed hereto and made a part of hereof are the stenographic transcript of the minutes and the exhibits admitted into evidence. The exhibits consist of three (3) Hearing Officer Exhibits, twenty one (21) Charging Party Exhibits, (C-3 through C-5, C-7 through C-17 and C-19 through C-22)The Charged Party submitted Exhibit "R-C". Rather than list each exhibit individually they are specified in the appendix of the transcript and are incorporated herein by reference. Counsel for the Petitioner and the Respondent submitted closing briefs which have been reviewed and considered for the purposes of this report.

Both Counsel stipulated that they would not seek the disqualification of Commissoner Carroll as the appointing authority or challenge his capacity as the appointing authority to render a final determination and made the same stipulation with respect to Deputy Commissioner Murphy in the event that Commissioner Carroll's authority was delegated to the Deputy Commissioneer (Tr 5/16/06, 557-560).

**PRELIMINARY RULINGS:**

7. As Hearing Officer herein, I charge myself with the following principles of law to be utilized with others in the report and recommendations for these specifications.

2

It is well established that the courts will not interfere with an administrative determination after a disciplinary hearing if the determination is supported by substantial evidence. Pell v. Board of Education of Union Free School District No. 1 of the Towns of Scarsdale and Mamaroneck, 34 N.Y.2d 222, 230-31; 356 N.Y.S.2d 833 (1974). The hearing officer should consider the totality of the evidence and all reasonable inferences to be drawn therefrom. Moorehead v. Langloh, 145 A.D. 2d 777, 778, 537 N.Y.S.2d 258 (2d Dep't 1989). "The New York State rule has long been that whether evidence is substantial is to be determined 'in light of the record as a whole' (citations omitted)" Kelly v. Murphy, 20 N.Y.2d 205, 209; 282 N.Y.S.2d 254 (1967). Substantial evidence is "when the proof is 'so substantial that from it an inference of the existence of the fact found may be drawn reasonably' (citations omitted)." 300 Gramatan Avenue Associates v. State Division of Human Rights, 45 N.Y.2d 176, 408 N.Y.S.2d 54 (1978)

A hearing officer is further charged with the responsibility of making judgments with regard to a witness's credibility. The Court of Appeals has stated that "a hearing officer's report is entitled to weight, at times variously stated to be 'much, 'considerable', or the 'greatest', in determining the existence of substantial evidence, particularly to the extent that material facts in a given case may depend on resolving the credibility of witnesses as shown by their demeanor or conduct at the hearing." Simpson v. Wolansky, 38 N.Y.2d 391, 394; 380 N.Y.S.2d 630 (1975). The Court of Appeals in Kelly, supra at 210, quoting, Universal Camera Corp. v. Labor Board, 340 U.S. 474, 493: 71 S.Ct. 456 (1951), stated " the trial examiner's report is entitled to weight in determining the existence of substantial evidence particularly 'to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing.'"

## STATEMENT OF FACTS

The New Rochell Police Department has approximately 180 members. (Tr 12/15/05, 32). In addition to police officers' regular assignments, police officers may elect to perform special detail assignments or "off-duty jobs". This work is sanctioned by and compensated throught the Department in which a uniformed police officer performs work involving the use of his or her police powers, such as directing traffic or performing security or crowd control (Tr 12/15/05, 38). The charges propounded herein relate to a special detail assignment at Coligni Avenue and Webster Avenue in New Rochelle on April 20, 2005.

Captain Kealy is the commanding officer of the Staff Services Division (Tr 2/04/06, 99). His responsibilities include oversight of the Department's records, payroll, training, information and technology systems and staffing. (Tr 2/4/06, 100-101). On April 20, 2005, on or about 11:00 a.m., he overheard the Department's Assignment Officer, Sergeant Mugenthaler, attempting to fill a special duty job. Later that day, Murgenthaler told Kealy that he had filled the detail. Kealy continued his normal duties. (Tr 3/9/06, 204-205).

3

Sergeant Joseph is in charge of the Department's Traffic Unit. Two days earlier, on April 18, 2005, Joseph worked from 4:00 p.m. until 12:00 a.m.. When he arrived at work on the 18th he had voice messages from parents complaining about traffic on Webster Avenue in the area of Coligni Avenue. (Tr 1/20/06, 6, 25). Joseph checked to see if there was a police officer scheduled to work at the site on April 19, 2005. He also dispatched a traffic officer to the site on April 19th to see if there was a problem. He instructed the officer to go to the site at 8:00 a.m. on April 19th because that is when construction jobs in New Rochelle generally start (Tr 1/20/06, 29-33). The officer reported to Joseph that there was no traffic problem at the intersection and that there was a police officer at the site. (Tr 1/20/06, 35). Later on April 19, 2005, however, Joseph received three (3) more complaints about traffic at the site. (Tr 1/20/02, 41). One was from a mother whose daughter had difficulty crossing the street and the other two calls were from motorists complaining about the traffic. (Tr 1/20/06, 43-44).

On April 20, 2005 Joseph drove past the site to observe the traffic conditions. (Tr 1/20/06, 50). He arrived at 2:15 a.m. and remained for five to ten minutes. (Tr 1/20/06, 55-56, 59). There was no active construction taking place at that time, and except for himself, there was no other New Rochelle Police Officer at the site. (Tr 1/20/06, 56). Later in the afternoon of April 20, 2005, at approximately 4:15 p.m., Joseph approached Kealy and asked whether the construction site was covered by a police officer. (Tr 3/9/06, 206; Tr 2/4/06, 101). During the week of April 20 and 21, 2005 Robert Gazzola, the Captain to whom Joseph normally reports, was on vacation. Captain Kealy became the Captain to whom Joseph would report for that period. (Tr 1/20/06, 17-18). Additionally, Kealy was in charge of reviewing the overtime slips since one of his job responsibilities was payroll. (Tr 1/20/06, 23). Joseph reported the incident to Gazzola when he returned from vacation the following week. (Tr 1/20/06, 20).

Kealy testified that this issue was his responsibility because it is a staffing issue. (Tr 2/04/06), 101). He reviews the overtime slips on a daily basis as part of his job responsibilities (Tr 2/4/06, 109). On the morning of April 21, 2005, Kealy looked into the matter. He collected all of the overtime slips for the day before to see whether the job at Webster and Coligni Avenues had been covered. (Tr 3/09/06, 191). This included Police Officer Poggioli's overtime slip, on which Poggioli claimed that he had worked from 12:00 p.m. until 3:30 p.m. at the Webster Avenue site. (Tr 2/4/06, 101-102). Kealy testified that this seemed unusual to him because he rememberd that Murgenthaler was trying to fill the job late on the morning of the 20th, and that he was surprised that anyone could get to Police Headquarters, change into uniform, pick up a radio, and get to the job by noon. (Tr 2/4/06, 102)

Kealy checked the special duty sign-out/sign-in lob and noticed that there was no initial next to the entry where Poggioli signed out to the special detail. (Tr 2/4/06, 102). He spoke with Lieutenatn Feery and asked him whether he saw Poggioli and why he was not signed out. (Tr 2/4/06), 103). Feery said that he did not see Poggioli sign out (Tr 2/4/06, 103).

4

Kealy also asked Detective Donald for a copy of Poggioli's card key access report for April 20, 2005. The report indicated that Poggioli used his swipe card to gain access to the door located at the rear prison corridor at 13:03 p.m. on April 20, 2005. (Tr 2/4/06, 104, C-14). Since Poggioli's card key report indicated 1:03 p.m., Kealy became suspicious because Poggioli's overtime request said that he began the job at 12:00 p.m. (Tr 2/4/06, 111).

Kealy then decided to consult the Department's video system, which records activity at certain locations in Headquarters, to verify when Poggioli was in the building that day. (Tr 2/4/06, 112). He asked Detective D'Andrea to check the video recordings from 1:00 p.m. on April 20, 2006 and report to him if he saw Poggioli on the video. (Tr 2/4/06, 113). D'Andrea reported that he had performed the task assigned and that he saw Poggioli walk through the cell block area on the video (Tr 2/4/06, 113). Kealy directed D'Andrea to make a copy of the video on a disc, which D'Andrea did. (Tr 2/4/06, 113, C-10).

Kealy watched the video and observed Feey walk through the booking area and then later he saw Poggioli walk through the booking area and walk towards the prisoner corridor. He also saw Police Officer Dina Moretti walk through the corridor. (Tr 2/4/06, 114). Poggioli was wearing civilian clothes at the time while on the video. (Tr 2/4/06). Kealy testified that the video recording displays the time of the activity being recorded. (Tr 2/4/06, 115).

Kealy testified that Lt. Fortunato obtained a PD 23-A which is an activity report for prisoners for that day, and it confirmed that Moretti brought a femal prisoner her lunch around 1:00 p.m. that day. (tr 2/4/06, 226)

Kealy spoke with Poggioli on May 6, 2005. (Tr 2/4/06, 117). During that meeting, Kealy, Poggioli and Joseph were present. (Tr 2/4/06, 124). Poggioli signed a statement waiving his right to a union representative at the interview in Kealy's presence and Joseph witnessed his signature. (Tr 2/4/06, 125, C-17). During the meeting, Kealy asked Poggioli twice whether he returned to Police Headquarters during the detail in question. Poggioli said no. (C-15A). Poggioli stated that he was at the job from 1200 hours until 1530 hours. (C-15A). The May 6, 2005 meeting was recorded (C-15A).

Poggioli went to Kealy's office on May 13th and dropped off a letter, asked Kealy to look at it, and had no other conversation. (Tr 2/4/06, 117). The letter was a statement from Al Carneiro, who was the job site foreman at the Webster Avenue excavation of April 20th. After receiving the letter from Poggioli, Kealy set up a meeting with Poggioli for on or about May 19, 2005. Kealy served the charges on Poggioli at the meeting, which was tape recorded. (Tr 2/4/06, 118; C-16A).

**CHARGING PARTY'S CONTENTIONS & PROOF**

Poggioli is charged with misconduct based upon his submission of an overtime request in which he claimed to have worked from 12:00 p.m. until 3:30 p.m. on April 20, 2005 on a

5

special police detail although the proof is to the contrary, that he did not actually work the full 3.5 hours for which he sought and received compensation. There is no dispute between the parties that Poggioli submitted an overtime request seeking 3.5 hour of over time pay for allegedly working a special detail at the intersection of Webster and Coligni Avenues in New Rochelle from 12:00 p.m. until 3:30 p.m. on April 20, 2005. The evidence also supports the contention that Poggioli did not start working at the paid detail until sometime after 1:00 p.m.

Captain Kealy testified that he deemed it suspicious that Poggioli could have gotten ready for work, reported to Headquarters, changed into his uniform, signed out for the special detail and driven to the site by 12:00 noon, as Poggioli claimed in his overtime request, since the job was still unstaffed as of approximately 11:00 a.m. on April 20, 2005.

Feery was the desk officer during the day tour on April 20, 2005. He signed out every officer reporting for special detail during his tour on that day except Poggioli and Navarette. (C-12). Feery testified that Navarette called from one detail and received permission from Feery to go from one detail to the next without reporting to Headquarters. Feery also testified that he did not see Poggioli on April 20th (Tr 2/4/06, 103). Feery reported these facts to Kealy. (C-11).

When called by the charging party, Poggioli testified that he did not recall whether he reported to a desk officer before going to his special detail on April 20th. (Tr 3/9/06, 333-334). He stated that he did not present himself to the desk officer because "no one does it" (Tr 3/9/06, 334). On April 20th, every other officer performing a special detail signed out with the desk officer, either in person or by phone (P.O. Navarette). (C-11).

Fortunato testified that for special duty jobs an officer must actually report to the desk officer, or another supervisor if the desk officer is absent. (Tr 12/15/05, 100). If there is no desk officer or supervisor present, the officer must wait for a supervisor to sign him out. (Tr 12/15/05, 124). The charged party contends that the special duty sign-in/sign-out sheet entries are not always countersigned by a supervisor. On April 20th, however, every officer on the special duty sign-out sheet other than Poggioli was accounted for on the sheet by the desk officer. (C-11). Exceptions, such as the Navarette instance, were also accounted for. ((Tr 3/9/06, 317). Poggioli presented no evidence of any other instances where a sign out sheet was not countersigned by the desk officer, in particular, as a result of any misconduct by a desk officer. The evidence clearly supports the contention that Feery was the desk officer on April 20th, that he did not countersign Poggioli's sign-out entry because Poggioli did not report to him. Feery was at his post on April 20th until his lunch hour at 1:00 p.m.

The video was played as part of the direct case. (C-10). Poggioli is seen on that video leaving the communications room moments after Feery, which provided him with the opportunity to sign the special duty sign-out sheet and not be noticed by Feery who was being relieved for lunch. By avoiding the desk officer, Poggioli would avoid the creation of the written record by the desk officer that he actually left for the detail at 1:00 p.m. on April 20th.

6

Access to Police Headquarters is regulated for security purposes by a swipe card or "proximity reader", on which officers swipe their own identification card near a reader on the door that unlocks the door (Tr 2/4/06, 75-76). The system records the time that the door is acessed and whose card was swiped onto a computer server. (Tr 2/4/06, 77). Detective Donald was the coordinator of the Department's MIS Department in April 2005. (Tr 2/4/06, 74) He was responsible for the hardware and software pertaining to the security system in Police Headquarters. (Tr 2/4/06, 75). He would periodically check the system, such as when he signed up a new user and to issue reports at the request of his supervisors. (Tr 2/4/06, 79).

Poggioli's swipe card was reviewed and it showed that Poggioli was in Headquarters at 13:03 hours on April 20, 2005. (C-14). This would indicate that he would have arrived at the special detail substantially after 1:00 p.m. There was not evidence entered into the record that the recordings of the time swipe card were inaccurate. There was no evidence that the time stamp on the swipe card access report was ever incorrect or that it even could be manipulated to show that Poggioli was in Headquarters when he was not actually present (Tr 2/4/06, 94). The record is also devoid of any proof that anyone other than Poggioli was in possession of his swipe card on April 20th.

The Department has motion activated cameras throughout headquarters to keep a record of activity in certain areas of the Department, such as the DWI room, holding cells and the booking desk. (Tr 1/20/06, 98). D'Andrea is trained in how to operate the video system. (Tr 1/20/06, 29). The images recorded by the cameras are stored among five or six hard drives located in D'Andrea's office. There is a video screen where the images captured by the camera can be viewed. (Tr 1/20/06, 100). The video recordings are all time stamped, displaying the time they were captured. (Tr 1/20/06, 102). D'Andrea testified that he checks the clock each day to make sure that it is accurate. (Tr 1/20/06, 102-104. In addition, D'Andrea testified that he adjusted the system for daylight savings time.

The video is motion activated. The motion detection video recording shows that Poggioli passed from the communications room through the booking area and down the corridor of the prisoners area at 1:04 p.m. (C-10). Three (3) police officers, D'Andrea, Moretti and Kealy testified that they recognized Pogiolli on the video recording. Kealy recalled that the video captured Poggiols's face. (Tr 3/9/06), 263-265).

Poggioli testified at the hearing that he could not identifiy the person depicted on the video as himself. He was provided the opportunity to view the video and still photos at the hearing. (tr 3/9/06, 335-336). On the other hand, he never denied that it was him on the video.

Poggioi's card swipe report shows that his card was used to access the rear prison corridor door at 1:03 p.m., near the same time that the video shows Poggoli walking toward the rear of the prisoner corridor. Kealy testified that someone going through the rear prisoner corridor would have to walk through the cell block which is covered by the video camera, and which led him to check the video. (Tr 2/4/06, 112).

7

Poggioli is wearing street clothes in the video. (C-10). In his testimony, he never testified that he had come back to Headquarters to change his uniform or offered any other explanation as to why he would be seen in his street clothes at 1:00 p.m. on April 20th when he claims that he started working at noon. During the May 6, 2005 interview with Kealy, Poggioli twice denied having returned to Headquarters during the detail. (C-15A). In the second interview, he did not recall returning to headquarters and stated only that if he did return he did so to pick up his traffic vest. (C-16A). He said nothing about changing his uniform or how he could have been in street clothes at 1:00 p.m. if he started working at noon.

Poggioli attacked the credibility of D'Andrea by questioning him about a prior disciplinary action against him. D'Andrea appeared appropriately embarassed by the incident and answered questions about it in a forthright manner. Irrespective of that one incident, there was no evidence presented that the video equipment was anything but accurate. Fortunato testified that he views the videos on a regular basis and he has never known them to be inaccurate. (Tr 12/15/05).

The video recording (C-10) was clear, unimpeachable and unambiguous. It established beyond peradventure that Poggioli was in Headquarters at 1:00 p.m. on April 20, 2005. This is further supported by the time stamp on the video, the swipe card records and other time devices at Headquarters.

In addition to the time stamp on the video recording, there is a large clock on the wall in the booking area which is also visible in the video. The time on the clock was 1:00 when Poggioli is seen on the video.

Moretti testified that she worked the day tour on April 20, 2005. (Tr 2/4/06, 66). Moretti testified that she fed a female prisoner at approximately 1:00 p.m. on that day. (Tr 2/4/06, 70). She made an entry on the prisoner's daily log at 1258 hours on April 20, 2005 that day that she "fed lunch" to a female prisoner. (C-13). Moretti is seen on the video at 13:02:04 hours taking something from a box and then carrying a bag from the booking desk to the rear of the prisoner corridor. (C-10, clip 12_25_49). She is next seen returning from the back of the prisoner corridor and replacing the item in a box behind the booking desk at 13:03:58 hours. (C-10 clip: 13:03:51). At 13:04:11 hours, Poggioli walked by Moretti in the video. Moretti in her testimony identified herself and Poggioli on the video. (Tr 2/4/06, 67)

Feery testified that he went to lunch at 1:00 p.m. on April 20, 2005 (Tr. 2/4/06, 23). Rosenbergen testified that he came to headquarters from 1:00 p.m. to 2:15 p.m. on April 20, 2005 to relieve Feery as the desk officer. (Tr 2/4/06, 35). Rosenbergen testified that he has a notation in his memo book for that day confirming this fact. (Tr 2/4/06, 38). Feery is seen on the video going from the communications room where he was stationed through the booking area and down the corridor past the prisoners area on his way to lunch. (C-10). The time stamp on the video and the electric clock on the wall verifies Feery's testimony that his lunch hour starts at 1:00 p.m. together with Rosenbergen's testimony that he came to headquarters at 1:00 p.m. to cover for Feery during lunch.

8

Sgt. Joseph called Carneiro on April 21, 2005, the day after the special detail assignment in question. Carneiro told Joseph that no police officer arrived at the construction site at Webster and Coligni Avenues until after he and his men returned from lunch at about 1:00 p.m. on April 20, 2005 (Tr 1/20/06, 11). He told Joseph that the site closed down at about 2:00 p.m. (Tr 1/20/06), 12). Joseph testified under oath that Carneir previously told him that there was no police officer at the site until after 1:00 p.m. and that he meorialized that information in a memorandum to Kealy dated May 4, 2005.

Two weeks later, Carneiro signed a letter stating that Poggioli arrived at approximately 12:00 p.m. and the he released Poggioli at approximately 2:30 p.m. (C-7). Poggioli admitted during his taped interview with Kealy on May 6, 2005 that he typed this statement and presented it to Carneiro (C-15A). Poggioli did not produce Carneiro to testify in his behalf during the course of the hearing..

Fortunato, spoke with Carneiro on May 17, 2005, one month after the special duty job in question. Carneiro told Fortunato in a tape recorded interview that he did not write the letter, saying "I told Pggioli to put whatever he wants. I just sign [sic] it, I read it, and it was fine with me no lies in there or nothing. Times in the letter are accurate." Carneiro said that he was not sure that he told Poggioli to stay until 3:30, as the letter he signed say, but he recalled that the job broke down at about 2:10 and that Poggioli was there when he returned to that site at approximate 2:30 p.m. At points during the interview, Carneiro told Fortunato that the officer was there at approximately 12:00 noon, before Carneiro and his crew went to lunch. At another point during the interview, when Fortunator asked Carneiro whether he was positive that Poggioli was at the job site at 1:00, Carneiro expressed uncertainty (C-8). The totality and circumstances of Carneiro's statements, recantations, and further amended statements make them questionable and unreliable at best and totatlly unbelievable at worst.

Poggioli was on notice of the prohibition of submitting inflated overtime requests. Police Officer Young testified he and Poggioli were caught previously submitting inflated overtime requestes and they were directed to correct them. Off duty jobs are regulated by Chapter 6 of the Department's Manual of Procedure. (Tr 12/15/05, 38-39; C-3). City Exhibit 3, Rule 4.2 was in effect in April 2005 (Tr 12/15/05, 57:9-12) and provides "All officers must report daily to the desk officer for inspection prior to and after completing their special duty employment. Upon reporting to the desk officer, all officers will make appropriate entries on the Special Duty Roster PD 59d.". Rule 4.2 of the Department's Manual of Procedure requires the officer to wait until the desk sergeant signs the officer out for the special detail. Poggioli, to the contrary, waited until Feery left his post for lunch to sign out for the special detail, and then, hoepfully without a witness to the contrary, allege that he signed out at noon.

Poggioli did not make an entry into his memo book for this detail, but did make entries for his regular tours on April 19th and 20th.

The evidence with respect to Charges I, II, and III is not just substantial but overwhelming. I have observed the testimony of witnesses presented by the Department

9

and find them credible. The real evidence, in the form of video tape and time records is unrebutted. And the testimony of the charged party, in the most kindest of terms, can only be characterized as implausible.

Poggioli was in Headquarters at 1:00 p.m. on April 20, 2005. He denied returning to headquarters during his pecial duty assignement on April 20, 2005 when interviewed by Kealy on May 6, 2005 (C-15A), and at the hearing. (Tr 3/9/06, 331-332). Based upon the physical evidence, he could not have worked from 12:00 p.m. until 3:30 p.m., as he claimed on his special duty sign out sheet (C-12) and his overtime request. (C-22).

The Department's overtime request is the document used to compute the amount billed to the entity requesting the special duty assignment. It is an official business record of the department. In addition, the special duty sign out sheet is a record of the special detail activity of the day. The generation of an intentionally inaccurate overtime request results is a false and deliberate overcharge to a member of the public, and false and inaccurate time out sheet generates a fraudulent special duty record, all of which are detrimentaal to the good order, efficiency and discipline of the Department and violate Section 2.8 of the Department's Rules and Regulations.

For all of the above reasons, and based upon the evidence which I find to be both credible and substantial, Charge IV has been sustained.

Poggioli admitted during the May 6, 2005 interview that he did not make an entry in his memo book. (C-15A). His entry for April 20, 2005, on page 40 of his memo book, starts with the entry "4.20.05 – Wednesday 3rd tour – 1600 to 2400h". The entry on the preceding page , page 39, is limited to his 8 to midnight tour on April 19, 2005 (C-19).

Rule 1.29 of the Department's Rules and regulation requires that the memo book entries be complete and accurate. It is reasonable to assume that Poggioli did not make an entry of his special duty assignment of April 20th so as not to further incriminate himself. But irrespective of the reason, he failed to make the entry.

Based upon all of the foregoing, and the evidence and testimony which I find to be both credible and substantial, Charge V has been sustained in all respects.

Kealy interviewed Poggioli on May 6, 2005. Poggioli was offered the opportunity to have his union representative present and Poggioli declined in writing. (C-17). Poggioli stated during the interview that he could not recall who the desk officer was that afternoon, whether he even reported to the desk officer, when the job site broke down. (C-15A). He told Kealy that he did recall when he left the job site, saying "that was April 20. I don't remember yesterday." Id. Oddly enough he remembered enough detail to prepare a letter of the days events for Carneiro to sign three days later (C-7). He told Kealy he was at the job site from 1200 hours until 1530 hours on April 20, 2005. He was unequivocal in his statement and did not waiver.

10

Poggoli's statements to Kealy were both evasive and knowingly false during the course of his interview on May 6th and constitute a violation of Section 2.23 of the Department's Rule and Regulations.

Based upon all of the foregoing, by both substantial and credible evidence, the allegations in Charge VI have been sustained in all respects.

## CHARGED PARTIES CONTENTIONS

Poggiole did not present any evidence which would rebut the essential elements of the charges. Poggioli did not testify on his own behalf, and while the Department has made a strong showing for drawing a negative inference, I will not do so. It may have been upon advice of counsel, and he should not be penalized for what may have been perceived as a legitimate legal strategy.

The issue of jurisdiction is rejected as without merit. The Hearing Officer was appointed by Commisioner Carroll, the appointing authority, by letter dated July 18, 2006 and confirmed by letter date September 9, 2005. The appointment was made in writing before the commencement of the hearing and complies with Section 75 of the Civil Service Law.

There is no bias by the Hearing Officer. None has been shown because none exists.

A substantial and thorough effort was made by Poggioli and his attorney to discredit the various witnesses. What ever efforts were made do not distract from the overwhelming dispassionate evidence presented at the hearing – video tapes, swipe records, overtime sheets, memo books, sign out sheets, etc. These forms of evidence have no bias, and cannot be discredited.

Lastly, the charged party alleges a combination of selective prosecution and/or retaliation. The record is such, that even if these were proper defenses to an Article 75 prosecution, that they could not be sustained.

## DECISION:

I have listened to the testimony, observed the witnesses and weighed their credibility. I have reviewed the exhibits and the record as a whole. I find the testimony of the witnesses for the Department to be both compelling and professional. I have considered all of the arguments of the Respondent, both legal and factual, including any claims for selective prosecution. I find the record devoid of facts that would sustain such a defense to any degree.

Therefore, based upon all of the foregoing, I find that the allegations contained in Charges I, II, III, IV, V, and VI and the Specifications therein have been sustained in all respects by substantial evidence.

11

**RECOMMENDATION AS TO PENALTY:**

In accordance with the agreement between the parties at the close of testimony on July 7, 2006, the parties are directed to simultaneously exchange briefs on any recommendaton as to penalty with in thirty (30) days of this decision and forward same to the Hearing Officer herein.

Dated: April 24, 2007
White Plains, New York

Robert J. Ponzini, Hearing Officer

12