UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOSEPH A. POGGIOLI,

                                    Plaintiff,                           07 Civ 6674 (CLB)

                                                                        **AFFIRMATION IN**
            -against-                                                    **OPPOSITION TO**
                                                                        **DEFENDANTS' MOTION**
PATRICK J. CARROLL, individually,                                       **FOR SUMMARY JUDGMENT**
And the CITY OF NEW ROCHELL, New York,

                                    Defendants.
-----------------------------------------------------------------x

        DRITA NICAJ, an attorney duly admitted to this Court and the Courts of the State of

New York, hereby affirms under penalty of perjury that the following statement is true:

        1.      I am counsel to Plaintiff and submit this affirmation in opposition to Defendants'

Motion for Summary Judgment.

        2.      Annexed hereto as Exhibit 1 is a copy of Plaintiff's Proposed First Amended

Complaint in Poggioli v. Carroll, 07 Civ 6674.

        3.      Annexed hereto as Exhibit 2 is a copy of Plaintiff's First Amended Complaint in

Poggioli v. Murphy, et al., 06 Civ 12893.

        4.      Annexed hereto as Exhibit 3 is a copy of the deposition transcript of Joseph A.

Poggioli dated February 1, 2007 in the case Poggioli v Murphy, et al.

        5.      Annexed hereto as Exhibit 4 is a copy of the deposition transcript of Joseph A.

Poggioli dated October 30, 2007 in the case Poggioli v Carroll.

        6.      Annexed hereto as Exhibit 5 are copies of the relevant portions of the May 16,

2006 Poggioli disciplinary hearing.

7.      Annexed hereto as Exhibit 6 are copies of the relevant portions of the June 19, 2006 Poggioli disciplinary hearing.

8.      Annexed hereto as Exhibit 7 are copies of the relevant portions of the July 7, 2006 Poggioli disciplinary hearing.

9.      For the reasons set forth in Plaintiff's accompanying memorandum of law, it is submitted that Defendants' motion should in all respects, be denied.

Dated: White Plains, New York
       December 21, 2007

_____
                Drita Nicaj

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JOSEPH A. POGGIOLI,

                          Plaintiff,

        -against-

PATRICK J. CARROLL, individually, and
the CITY OF NEW ROCHELLE, New York,


                          Defendants.
-------------------------------------------------------------------x

07 Civ. 6674 (CLB)

**PROPOSED FIRST AMENDED
COMPLAINT**

**Jury Trial Demanded**

       Plaintiff JOSEPH A. POGGIOLI, by his attorneys Lovett & Gould, LLP, for his First

Amended Complaint respectfully alleges:


### NATURE OF THE ACTION

       1. This is an action for compensatory and punitive damages, proximately resulting from

Defendants' conduct as engaged in under color of the laws of the State of New York, for violations of

Plaintiff's rights as guaranteed him by reason of the First and Fourteenth Amendments to the United.

States Constitution, 42 U.S.C. §1983.


### JURISDICTION

       2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343.

## THE PARTIES

3. Plaintiff JOSEPH POGGIOLI, Jr. is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint, prior to July 20, 2007, he had been continuously employed for in excess of twenty years as a Police Officer by the City of New Rochelle.

4. Defendant PATRICK J. CARROLL (hereinafter "Carroll"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly appointed Police Commissioner of the Defendant City.  In 1994 Plaintiff filed in this Court a civil rights action alleging *inter alia* a violation of his Fourth Amendment rights by Carroll, the City of New Rochelle, and other high ranking members of the City's Police Department. Poggioli v. Carroll, 94 Civ. 8313 (BDP)(hereinafter "Poggioli I"). Evidence adduced at trial in that action demonstrated that the Defendants in Poggioli I intentionally destroyed Plaintiff's personal property, broke into his departmental locker, and unlawfully reviewed/copied Plaintiff's privileged notes of a meeting he had with his then PBA attorney. None of the Defendants in Poggioli I was arrested, prosecuted and/or subjected to disciplinary action for their unlawful conduct. On November 26, 1996, a jury verdict was entered in Plaintiff's favor in the amount of $155,000 in compensatory and punitive damages as a result of which Carroll was infuriated and harbored malice and bad faith towards Plaintiff and determined to take action against Plaintiff in the event an opportunity arose to do so.

5. Defendant CITY OF NEW ROCHELLE, New York (hereinafter "City")is a municipal corporate subdivision of the State of New York duly existing by reason of and. pursuant to the laws of the said State.

## THE FACTS

6.      On or about October 14, 2006, Plaintiff filed <u>Poggioli v. Murphy,</u> 06 Civ. 12893

(CLB) alleging (against amongst others Defendants Carroll and the City) violations of his rights as

guaranteed by the First and Fourteenth Amendments, 42 U.S.C. § 1983. In that connection Plaintiff

detailed in his complaint a series of matters of public concern including extensive corruption and

criminal wrongdoing as engaged in by members of the New Rochelle Police Department and the New

Rochelle City Court.

7.      Plaintiff also engaged in protected activities while he was the President of the

Police Benevolent Association (PBA) during the period from January 1, 2001 through December

31, 2003, which was known by Defendants, including expressing concern that:

a. Antiquated police equipment posed a substantial risk to the safety of members of

Police Department and to the public; and

b. The shortage of manpower in the Police Department presented a substantial danger to

the members of the Police Department and to the public.

8.      Plaintiff continued to raise concern regarding the issues referenced in the

preceding paragraph "7" after his tenure as PBA President had ended, which was known to

Defendants until July 20, 2007 as referenced *infra*.

9.      On or about April 24, 2007, in connection with the rigged disciplinary proceeding

referenced in the 2006 filing, Hearing Officer Robert J. Ponzini generated a substantially falsified

and/or materially inaccurate report and recommendation finding Plaintiff guilty of disciplinary

charges. Ponzini did so in accordance with his well established and publicly known reputation for

always and/or virtually always finding governmental employees guilty of whatever disciplinary

charges have been leveled against them by, *inter alia,* the City of White Plains, the County of

Westchester, and the City of New Rochelle. In fact by reason of his established record of convicting such employees, he was appointed to preside over the Poggioli disciplinary since the appointing authority knew that in exchange for pecuniary gain Ponzini would convict Plaintiff regardless of the evidence.

10. On or about June 25, 2007, Ponzini earned the balance of his fees from the City of New Rochelle by recommending that Plaintiff be terminated.

11. On July 20, 2007, Defendants in writing terminated Plaintiff's employment, a termination that was motivated in whole and/or substantial respect by:

a. Plaintiff's 2006 filing and/or the substantive allegations contained in that complaint;

b. Evidence of corruption rampant in the City's government, including its Court and Police Department, as adduced by Plaintiff during the disciplinary proceeding as presided over by Ponzini; and/or

c. Plaintiff's expressions of concern referenced in paragraph "7" and "8" *supra*.

12. Members of the Police Department who have engaged in criminal wrong doing on the job (as known by Defendants and identified during Plaintiff's disciplinary hearing) as well as other members of the Department who wholesale violated and continue to violate the federal civil rights of the only Police Officer of Middle Eastern descent employed by the City have neither been subjected to formal disciplinary charges nor terminated from the City's employ. Instead that criminal misconduct and those civil rights violations have been encouraged, condoned and ratified by Defendants while subjecting Plaintiff's to disciplinary action, including termination without having a rational basis for doing so.

13.    As a proximate result of Defendants' retaliatory, malicious and bad faith selective conduct which had no rational basis, Plaintiff has been caused to suffer: substantial pecuniary losses

and lost benefits; public humiliation; public embarrassment; shame; anxiety; destruction of his

professional career; emotional upset; and he has otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

14. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1"

to "13", inclusive.

15. Under the premises Defendants violated Plaintiff's rights as guaranteed by the First

Amendment to the United States Constitution, 42 U.S. C. § 1983.

## AS AND FOR A SECOND CLAIM

16. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1"

to "13", inclusive.

17. Under the premises Defendants violated Plaintiff's rights as guaranteed by the Fourteenth

Amendment to the United States Constitution, 42 U.S.C. §1883 because: (1) they intended to retaliate

against Plaintiff because he exercised his constitutional rights; (2) they were motivated by a

malicious or bad faith intent to injure Plaintiff; and/or (3) that the Defendants do not have a rational

basis for the difference in the treatment of Plaintiff.

WHEREFORE a judgment is respectfully demanded:

a. Awarding against Defendant Carroll such punitive damages as the jury

may impose,

b. Awarding against both Defendants such compensatory damages as the jury may

determine,

c. Awarding reasonable attorney's fees and costs, and,

d. Granting such other and further relief as to the court seems just and proper.

Dated: White Plains, N.Y.
        December 20, 2007

                                        LOVETT & GOULD, LLP
                                        Attorneys for Plaintiff
                                        By:_____
                                             Drita Nicaj (DN 0966)
                                        222 Bloomingdale Road
                                        White Plains, New York 10605
                                        914-428-8401

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JOSEPH A. POGGIOLI,

                    Plaintiff,

          -against-

ANTHONY MURPHY, individually, KEVIN
KEALY, individually, PATRICK J. CARROLL,
individually, MYRON JOSEPH, individually,
and the CITY OF NEW ROCHELLE, New York,

                    Defendants.

------------------------------------------------------------x



06 Civ. ~~4549 (CLB)~~

**FIRST AMENDED
COMPLAINT**

**Jury Trial Demanded**

Plaintiff JOSEPH A. POGGIOLI, by his attorneys Lovett & Gould, LLP, for his complaint respectfully alleges:

## NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages proximately resulting from Defendants' conduct, engaged in under color of New York State law pursuant to a common retaliatory plan, that violated Plaintiff's rights as guaranteed by reason of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

1

## THE PARTIES

3. Plaintiff is a citizen of the United States, a domiciliary of the State of New York and a resident of the Northern Counties. At all times relevant to this complaint he was employed as a Police Officer by the Defendant City.

4. Defendant ANTHONY MURPHY (hereinafter "Murphy"), who is sued in his personal and individual capacities, at all times relevant to this complaint was employed by the Defendant City as Deputy Commissioner of Police except as otherwise referenced *infra*.

5. Defendant KEVIN KEALY (hereinafter "Kealy"), who is sued in his personal and individual capacities, at all times relevant to this complaint was employed by the Defendant City as a police Captain.

6. Defendant PATRICK J. CARROLL (hereinafter "Carroll"), who is sued in his personal and individual capacities, at all times relevant to this complaint was employed by the Defendant City as Commissioner of Police.

7. Defendant MYRON JOSEPH (hereinafter "Joseph"), who is sued in his personal and individual capacities, at all times relevant to this complaint was employed by the Defendant City as a police Sergeant assigned to the Traffic Division.

8. Defendant CITY OF NEW ROCHELLE, New York (hereinafter "City") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State.

2

## THE FACTS

9. In 1994 Plaintiff filed in this Court a civil rights action alleging *inter alia* a violation of his Fourth Amendment rights by Carroll, Murphy (then a police Captain), the City of New Rochelle, and other high ranking members of the City's Police Department. Poggioli v. Carroll, 94 Civ. 8313 (BDP)(hereinafter "Poggioli I"). Evidence adduced at trial in that action demonstrated that the Defendants in Poggioli I intentionally destroyed Plaintiff's personal property, broke into his departmental locker, and unlawfully reviewed/copied Plaintiff's privileged notes of a meeting he had with his then PBA attorney. None of the Defendants in Poggioli I was arrested, prosecuted and/or subjected to disciplinary action for their unlawful conduct.

10. On November 26, 1996, a jury verdict was entered in Plaintiff's favor in the amount of $155,000 in compensatory and punitive damages as a result of which Murphy and Carroll were both infuriated and determined to retaliate against Plaintiff in the event an opportunity arose to do so.

11. In April of 2005 that opportunity arose on the basis of a complaint made by Joseph to Kealy regarding an incident where Poggioli was accused of having submitted an overtime slip for an off-duty police assignment for approximately one hour of time that he claimed to have worked but which Joseph, Kealy, Murphy and Carroll collectively agreed to accuse him of not working.

12. In that connection the amount of money in controversy was approximately $67, a portion of which Defendants knowingly retained (despite their allegation that the private sector contractor [Persico Construction] who paid for the services Poggioli

3

claimed to have worked should not have paid that money to the City at all) for expenses incurred in the Police Department. The balance of that sum was paid by Defendants to Plaintiff - - notwithstanding their allegation that he was not entitled to be paid.

13.    Plaintiff also engaged in protected activities while he was the President of the Police Benevolent Association (PBA) during the period from January 1, 2001 through December 31, 2003, which was known by Defendants, including expressing concern that:

a. Antiquated police equipment posed a substantial risk to the safety of members of Police Department and to the public; and

b. The shortage of manpower in the Police Department presented a substantial danger to the members of the Police Department and to the public.

14.    Plaintiff continued to raise concern regarding the issues referenced in the preceding paragraph "13" after his tenure as PBA President had ended, which was known to Defendants until the termination of his employment in or about July 20, 2007 – the subject of a related Court filing [Poggioli v. Carroll, 07 Civ. 6674(CLB)].

15. Based upon the events referenced in the preceding paragraphs "11" through "14", Defendants in or about May of 2005 entered into an agreement to retaliate against Poggioli for having previously successfully sued Carroll, Murphy and inter alia the City and for expressing his concern.

16. In furtherance of that plan and on May 19, 2005, Kealy preferred against Plaintiff civil service disciplinary charges accusing him of having submitted the referenced overtime request for time that he allegedly did not perform services.

17. In that connection: a) Defendants agreed to retain the services of a "hearing officer" well known in the legal community to not only always rule in favor of the

4

municipal corporation paying his fees but to actually fabricate evidence to bolster his findings of "fact"; and b) both Joseph and Kealy agreed with their co-defendants to testify against Plaintiff with a view towards terminating his employment.

18. Over a period of months Defendants then prosecuted, at a cost of substantially in excess of $50,000, the retaliatory disciplinary proceeding having pre-determined that Plaintiff will be found guilty and terminated from the City's employ. During the course of that prosecution Kealy was overheard by the President of the City's PBA discussing in a hallway a self-evident dilemma they faced -- how to explain prosecuting Plaintiff for requesting overtime money for time allegedly not worked when numerous Police Officers routinely engaged in the same conduct with respect to which Plaintiff stands accused.

19. In engaging in that retaliatory plan Defendants knowingly and deliberately failed to take law enforcement action, with respect to on-going criminal wrongdoing that permeated both the Police Department and the New Rochelle City Court (claimed by the City to be one of its "Departments"). As a result:

a. Police Detective Robert D'Andrea was not arrested, criminally prosecuted, and/or terminated for stealing evidence (a computer) from the Department's Property Clerk's Office and when caught discarding the evidence in the garbage. Subsequently D'Andrea, who was recruited by Defendants to testify against Plaintiff in the disciplinary proceeding, was reassigned as the Department's Communications Supervisor in charge of intra-departmental security systems.

b. The City Marshall, an attorney, openly operates a private law practice out of the Courthouse using, at taxpayers' expense, on-duty City and State employees' services to draft his private clients[ wills and contracts for the sale of real property -- -

stealing in that process government-owned paper, copiers, computer equipment, and other office supplies.

c. One female employed in the Court Clerk's Office openly and admittedly has repeated engaged with impunity in the felonious sale of controlled substances (Vicodin and Valium) in that Office to other employees.

d. That same female while working in the Clerk's Office has also openly and admittedly engaged with impunity in felony possession of controlled substances (Vicodin and Valium) that had been feloniously sold to her by certain of her co-workers.

e. That female employee's multiple co-workers, who have under oath been identified by name as having engaged in the felony sale of controlled substances to that female, have neither been arrested, prosecuted nor subjected to disciplinary charges with a view towards termination.

f. Another female employee working in the City Court Clerk's Office has openly and admittedly engaged in grand larceny, stealing in excess of $3,000 from funds received by and belonging to the Court - - later bragging in testimony that she was "never charged" with that theft.

g. A police Detective repeatedly tampered with Plaintiff's security door access card for the Police Department, disabling the card and preventing Plaintiff from entering Headquarters. Although that conduct constituted a crime, no arrest, criminal and/or disciplinary prosecution resulted.

h. A male Court Officer employed in the City Court has also openly and admittedly engaged in the same grand larceny - - committed with his now-fiancé - - as a

6

result of which he was never arrested, charged and/or brought up on disciplinary charges with a view towards determination, and *inter alia,*

    i. Three members of the Police Department were paid for off-duty work, which they did not perform and no disciplinary action was taken against them.

20. As a proximate result of Defendants' conduct Plaintiff has been: subjected to retaliation for having engaged in constitutionally protected speech; selectively prosecuted; caused to suffer pecuniary losses; publicly humiliated; publicly embarrassed; suffered irreparable damage to his professional career and reputation; rendered anxious; emotionally upset; and otherwise rendered sick and sore.

## AS AND FOR A FIRST CLAIM

21. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "20", inclusive.

22. Under the premises Defendants' intentional conduct violated Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

23. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "20", inclusive.



24. Under the premises Defendants' intentional conduct violated Plaintiff's right to Equal Protection as guaranteed by reason of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE judgment is respectfully demanded:

a.  Awarding on the First and Second Claims as against the individually named Defendants such punitive damages as the jury may impose,

b.  Awarding on the First and Second Claims as against all Defendants such compensatory damages as the jury may determine,

c.  Awarding reasonable costs and attorney's fees, and,

d.  Granting such other and further relief as to the Court seems just and proper.

Dated: White Plains, N.Y.
      August 23, 2007

LOVETT & GOULD, LLP
Attorneys for Plaintiff
By: _____
    Drita Nicaj (DN 0966)
222 Bloomingdale Road
White Plains, New York 10605
914-428-8401

8

**EXHIBIT 3**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

JOSEPH A. POGGIOLI,

                     Plaintiff,

                              Case No.:

      -against-            106 CIV 12893

ANTHONY MURPHY, Individually, KEVIN KEALY,

Individually, PATRICK J. CARROLL, Individually,

MYRON JOSEPH, Individually, and the CITY of

NEW ROCHELLE,

                    Defendants.

------------------------------------------X

                3 Gannett Drive

                White Plains, New York

                February 1, 2007

                10:15 AM

    Examination before Trial of PLAINTIFF,

JOSEPH A. POGGIOLI, held pursuant to Notice, at

the above time and place, before a Notary

Public of the State of New York.

J. POGGIOLI

```
1   A P P E A R A N C E S :

2              LOVETT & GOULD, LLP
               Attorney for Plaintiff
3              222 Bloomingdale Road
               White Plains, NY 10605
4              BY: JONATHON LOVETT, ESQ.
               jlovett@lovett-gould.com
5
6              WILSON, ELSER, MOSKOWITZ, EDELMAN &
               DICKER, LLP
7              Attorney for Defendants
               3 Gannett Drive
8              White Plains, NY 10604
               BY: PETER A. MEISELS, ESQ.
9              peter.meisels@wilsonelser.com
10
11

    ALSO PRESENT:
12  Latlit K. Loomba - Wilson Elser
    Sargent Anthony Murphy
13  Captain Kevin Kealy
    Myron Joseph

14
15
16
17
18
19
20
21
22
23
24
```

J. POGGIOLI

1    IT IS HEREBY STIPULATED, by and between the

2    attorneys for the respective parties hereto, that:

3

4    All rights provided by the C.P.L.R., and Part 221 of

5    the Uniform Rules for the Conduct of Depositions,

6    including the right to object to any question,

7    except as to form, or to move to strike any

8    testimony on this examination is reserved; and in

9    addition, the failure to object to any question or

10   to move to strike any testimony at this examination

11   shall not be a bar or waiver to make such motion at,

12   and is reserved to, the trial of this action.

13

14   This deposition may be sworn to by the witness being

15   examined before a Notary Public other than the

16   Notary Public before whom this examination was

17   begun, but the failure to do so or to return the

18   original of this deposition to counsel, shall not be

19   deemed a waiver of the rights provided by Rule 3116

20   of the C.P.L.R. and shall be controlled thereby.

21

22   The filing of the original of this deposition is

23   waived.

24

4

1              J O S E P H   P O G G I O L I,

2    a Plaintiff, having been first duly sworn by

3    Ruthayn Sgaglio, a Notary Public of the State of

4    New York, and stating his address as 475 North

5    Avenue, New Rochelle, New York, 10801, was examined

6    and testified as follows:

7    EXAMINATION BY

8    MR. MEISELS:

9         Q    Mr. Poggioli, my name is Peter Meisels.

10   I'm going to ask you some questions about your

11   complaint.  If they're not clear, please tell me and

12   I will rephrase them.

13              I'm going to show you what's been

14   premarked as Defendant's A for identification.  Can

15   you identify that document?

16        A    This is the --

17             MR. LOVETT:  Look at the whole document.

18             (Witness perusing documents.)

19             (Discussion held off the record.)

20        A    I'm going to read it.

21        Q    Yes, please do.

22        A    Okay.

23        Q    Mr. Poggioli, have you had a chance to

24   review the first eight pages of Defendants' A?

J. POGGIOLI

5

1     A    Yes.

2     Q    Can you identify the document that's

3  contained in the first eight pages?

4     A    Yes.

5     Q    What is it?

6     A    This is -- my attorney set these papers up

7  for my lawsuit against the City of New Rochelle.

8     Q    Did you have a chance to review that

9  before today?

10     A    Yes.

11     Q    You reviewed it again this morning?

12     A    Yes.

13     Q    Is the information contained in the first

14  eight pages accurate?

15     MR. LOVETT:  Objection as to form.

16     Q    To the best of your knowledge --

17  withdrawn.

18         In reviewing the first eight pages of

19  the document, did you notice anything that you

20  believe to be inaccurate?

21     A    I don't think so, no.

22     Q    As far as you know, the allegations made

23  in those first eight pages are accurate?

24     A    Yes.

J. POGGIOLI

6

1       Q     If you could please turn to page three of

2    the document.

3             MR. LOVETT:   The numbered page three?

4             MR. MEISELS:   Yes.

5       Q     In particular to paragraph nine at the top

6    of the page.  Do you see that?

7       A     Yes.

8       Q     I'm going to ask you a question about it.

9             Paragraph nine references a lawsuit,

10   Poggioli versus Carroll, with an index number of

11   94 Civ 8313; is that correct?

12      A     Yes.

13      Q     As far as you know, is that your prior

14   lawsuit that you brought?

15      A     I believe so, yes.

16      Q     Do you recall who the defendants were in

17   that lawsuit?

18      A     Yes.

19      Q     Can you tell us who they were?

20      A     Police Commissioner Carroll, Captain

21   Anthony Murphy at that time.

22      Q     Were there any other defendants that you

23   can recall?

24      A     Yes.

J. POGGIOLI

7

Q    Who were they?

A    Lieutenant Cappio.

Q    Were there any others?

A    Yes.

Q    Who were they?

A    That was the City of New Rochelle.

Q    Were there any other defendants?

A    Yes, I believe there is one more.

Q    As you sit here today, do you recall who it was?

A    I can't think offhand who it was.

Q    Now, referring to the second sentence of paragraph nine, it says, "Evidence produced at trial in that action demonstrated that the defendants in Poggioli 1 intentionally destroyed plaintiff's personal property, broke into his departmental locker and unlawfully reviewed/copied plaintiff's priveledged notes of a meeting he had with his then PBA attorney."  Do you see?

A    Yes.

Q    Now, when the sentence indicates "destroyed plaintiff's personal property," what personal property did that relate to?

A    That was my lock.

J. POGGIOLI

8

1      Q      The next phrase, "broke into his

2   departmental locker," that would be the same

3   property?

4      A      No, the lock is different from the locker.

5      Q      So the personal property that they

6   destroyed was the lock; is that right?

7      A      Yes.

8      Q      It was your locker that was broken into?

9      A      Yes.

10      Q      Now, in reference to the next phrase that

11   says, "unlawfully reviewed/copied plaintiff's

12   privileged notes of a meeting he had with his then

13   PBA attorney," do you see that?

14      A      Yes.

15      Q      Did that relate to a pending disciplinary

16   action that you had?

17      A      Yes.

18      Q      Was that disciplinary action based upon

19   claims relating to off-duty employment?

20      A      No.

21      Q      What did that discipline action relate to?

22      A      It was alleging misconduct, I believe.

23      Q      Do you recall what the alleged misconduct

24   was?

9

1     A     I don't remember.

2     Q     Do you recall whether that disciplinary

3 proceeding had anything to do with working at the

4 Classic golf event?

5     A     It might have.

6     Q     If you can go to paragraph ten, the next

7 paragraph.

8     A     Yes.

9     Q     It says, "On November 26, 1996, a jury

10 verdict was entered in plaintiff's favor in the

11 amount of $155,000 in compensatory and punitive

12 damages, as a result of which Murphy and Carroll

13 were both infuriated and determined to retaliate

14 against plaintiff in the event an opportunity arose

15 to do so."  Do you see that?

16     A     Yes.

17     Q     What is the basis for your belief that

18 Mr. Murphy was infuriated as a result of that jury

19 verdict?

20     A     It's obvious they were not happy that they

21 lost the case.

22     Q     How did that become obvious to you?

23     A     It was mentioned when they failed to

24 adhere to the court order during testimony that they

J. POGGIOLI

10

1    felt that the results were unfair.

2        Q    Was that the basis of your belief that

3    Mr. Murphy was infuriated?

4        A    Yes.

5        Q    Can you tell me what the basis is for your

6    belief that Mr. Carroll was infuriated?

7        A    I believe he said the same thing.

8        Q    Now, in the same sentence, it says,

9    "determined to retaliate against plaintiff."  What

10   is the basis for your belief that Mr. Murphy was

11   determined to retaliate against you?

12       A    I felt the decision was unfair.

13       Q    What was the basis for your belief that

14   Mr. Carroll was determined to retaliate against you?

15       A    Same answer.

16       Q    He thought it was unfair?

17       A    Unfair, yes.

18       Q    At that time Mr. Murphy was a captain?

19       A    Yes.

20       Q    At that point Mr. Carroll was the

21   commissioner?

22       A    Yes.

23       Q    After that verdict was entered, do you

24   recall whether or not the case was ultimately

J. POGGIOLI

11

1      settled between you and the defendants?

2          A      Yes, it was.

3          Q      In the last -- withdrawn.

4                 Do you recall what year that case was

5      settled in?

6          A      I believe it was 1996.

7          Q      The same year the verdict was entered?

8          A      Yes.

9          Q      In the last seven years, in other words

10     from 1999 to 2007, have you ever had occasion to

11     have been disciplined in the course of your duties?

12         A      In what way?

13         Q      In any way.

14             (Discussion held off the record.)

15                Mr. Poggioli, I'm going to go back to

16     my question I'd asked you about whether you had been

17     disciplined in the last seven years, and you asked

18     in what way, I believe, and I said in any way.

19     Let's go back to that.

20         A      So you mean reprimanded by a superior

21     officer verbally?

22         Q      In any way, whether any penalty was

23     imposed for any alleged violation in the last seven

24     years.

J. POGGIOLI

12

1        A       I would need department records to look at

2    that.

3        Q       So you don't recall?

4        A       It could have been but I don't have that

5    information in front of me.

6        Q       So as you sit here today, do you recall

7    whether or not any discipline had been imposed on

8    you in the last seven years?

9        A       Possibly verbally.

10        Q       Do you recall the incidences when that

11    occurred?

12        A       No.

13        Q       Have you ever, in the last seven years,

14    been penalized in any other way, other than

15    verbally?

16        A       Again, I would need the department records

17    to refresh my memory.

18        Q       I'm going to ask you the same question but

19    over a wider period of time.  After the settlement

20    in your 1994 case up until today, have you ever been

21    disciplined by the New Rochelle Police Department?

22        A       I may have been.

23        Q       At any time did anyone inform you they

24    were seeking your termination?

13

1      A     If they were seeking my termination?

2      Q     Correct.

3      A     You mean personally tell me they were

4  looking to fire me?

5      Q     Correct.

6      A     No.

7      Q     From the time that your 1994 case was

8  settled up until today, have you ever been fined or

9  required to give up pay days as a result of any

10  disciplinary action brought by the New Rochelle

11  Police Department?

12          MR. LOVETT:  Object to form.  You can

13      answer.

14      A     Since what time is that again?

15      Q     From the time the 1994 case was settled to

16  today.

17      A     Again, I don't have that information in

18  front of me.

19      Q     I'd ask you to take a look at paragraph 11

20  of the complaint.  It says, "In April of 2005, that

21  opportunity arose on the basis of a complaint made

22  by Joseph Kealy regarding an incident where Poggioli

23  was accused of having submitted an overtime slip for

24  an off-duty police assignment for approximately one

J. POGGIOLI

14

1    hour of time that he claimed to have worked but

2    which Joseph Kealy, Murphy and Carroll collectively

3    agree to accuse him of not working."  Do you see

4    that?

5          A    Yes.

6          Q    Do you know which off-duty police

7    assignment this paragraph refers to?

8          A    Yes.

9          Q    Could you tell us what it was.

10         A    It was a traffic detail in New Rochelle.

11         Q    Do you know which company needed the

12    assistance of the police department?

13         A    Yes.

14         Q    What was that?

15         A    Persico.

16         Q    The Persico Contracting Company?

17         A    Yes.

18         Q    Where was it that they needed the

19    assistance?

20         A    The intersection of Caligni and Webster.

21         Q    Do you know what the particular assignment

22    was on that particular day?

23         A    Could you clarify the question.

24         Q    Do you recall the particular date on which

J. POGGIOLI

15

1    Persico Contracting needed the assistance of a

2    police officer?

3            MR. LOVETT:  Object as to form.  You can

4        answer.

5        A    Which particular day they requested?

6        Q    Right.

7        A    I believe they requested for many days.

8        Q    Was there a particular date in April on

9    which you were supposed to work there?

10       A    A day I did work there, yes.

11       Q    Was that April 20, 2005?

12       A    Yes.

13       Q    Did you submit an overtime slip for that

14   work?

15       A    Yes, I did.

16       Q    How many hours of work did you perform

17   that day for Persico Contracting?

18       A    I don't recall.

19       Q    Did you sign in and sign out for that

20   work?

21       A    Yes.

22       Q    From the time that you arrived at that job

23   site -- withdrawn.

24            After you arrived -- withdrawn.

J. POGGIOLI

16

1           After you arrived at the job site,

2   did you remain there until your work was completed?

3       A    I don't recall.

4       Q    During the course of your assignment, did

5   you return to police headquarters?

6       A    During the assignment?

7       Q    Correct.

8       A    I believe not.

9       Q    Now, looking at the next-to-last sentence

10  of paragraph 11 where it says that "Joseph, Kealy,

11  Murphy and Carroll collectively agreed to accuse him

12  of not working," my question, what is the basis for

13  your belief that Joseph, Kealy, Murphy and Carroll

14  entered into such a agreement?

15      A    There was an investigation and those

16  parties were all involved.

17      Q    Am I correct that that investigation is

18  the basis for your belief that they agreed to accuse

19  you of not working?

20           MR. LOVETT:   Objection to form.  You can

21      answer.

22      A    Yes.

23      Q    I'd ask that you take a look at

24  paragraph 12.  It says, "In that connection, the

J. POGGIOLI

17

1    amount of money in controversy was approximately

2    $67."  Do you see?

3        A    Yes.

4        Q    What is the basis for your belief that the

5    amount of money involved was $67?

6        A    That's approximately time and a half of my

7    hourly wage.

8        Q    Do you recall what your hourly rate was?

9        A    2005, I think it was about $39, $40 an

10   hour, I believe.  Approximately.

11       Q    That 67 would be equivalent to one and a

12   half times whatever your hourly rate was for 2005;

13   is that right?

14       A    Approximately.

15       Q    Based upon your contention that the amount

16   of money in controversy was approximately $67, does

17   that indicate that you actually worked for one hour?

18           MR. LOVETT:  Objection to form.  You can

19       answer.

20       A    Yes.

21       Q    Turn the page, please.  Did you ever --

22   withdrawn.

23           Were you actually compensated by the

24   police department for that hour of work?

18

1  A  Yes.

2  Q  Did you ever return the money?

3  A  No.

4  Q  You kept the money?

5  A  It was my money.

6  Q  So the answer is yes, you did keep it?

7  A  Yes.

8  Q  I ask you to take a look at paragraph 13,

9 which says, "Based upon the event referenced in the

10 preceding paragraphs 11 and 12, defendants in or

11 about May of 2005 entered into an agreement to

12 retaliate against Poggioli for having previously

13 successfully sued Carroll, Murphy and The City."  Do

14 you see that?

15  A  Yes.

16  Q  What is the basis for your belief that the

17 defendants in this case entered into an agreement to

18 retaliate against you?

19  A  There's obviously there are hard feelings

20 from the federal lawsuit that have prevailed to this

21 date.

22    (Short recess taken.)

23  Q  Mr. Poggioli, was Sergeant Joseph a

24 defendant in that 1994 lawsuit?

J. POGGIOLI

19

```
1       A    No.

2       Q    Was Captain Kealy a defendant in that

3  lawsuit?

4       A    No.

5            Can I clarify on something?

6       Q    Absolutely.

7       A    The $67 that we talked about previously

8  about getting it for the hourly pay, I don't get

9  that full amount, the police department gets some of

10 that.

11      Q    So you didn't get the whole $67?

12      A    Yes, that's correct.

13      Q    You got less than that?

14      A    That's correct.  I think the correct

15 amount was $57 at that time.  Thank you.

16      Q    Going on to paragraph 14 of the complaint,

17 it says, "In furtherance of that plan and on May 19,

18 2005, Kealy preferred against plaintiff civil

19 service disciplinary charges accusing him of having

20 submitted the referenced overtime requests for time

21 that he allegedly did not perform services"; is that

22 correct?

23      A    Yes.

24      Q    When you allege Kealy preferred discipline
```

J. POGGIOLI

20

1    charges, does that mean that he signed them?

2         A    I believe that he had them written up.

3         Q    Do you know who actually signed the

4    charges?

5         A    I'm sure that -- I don't have them in

6    front of me, but I'm sure that he signed them also,

7    Captain Kealy.

8         Q    Going on to paragraph 15, it says, "In

9    that connection, defendants agreed to retain the

10   services of a hearing officer well known in the

11   legal community to not only always rule in favor of

12   the municipal corporation paid his fees, but to

13   actually fabricate evidence to bolster his findings

14   of facts."  Do you see that?

15        A    Yes.

16        Q    Going to the first portion of paragraph 15

17   where it says the defendants agreed to retain the

18   services of a hearing officer.

19        A    Yes.

20        Q    What is the basis for your belief that the

21   defendant in this case entered into such an

22   agreement?

23        A    Well, the hearing officer is picked by the

24   department.  It's not me.

J. POGGIOLI

21

1    Q    Other than that, did you have any other

2    basis for your belief that they agreed to retain

3    that particular hearing officer?

4    A    The hearing officer, to my knowledge, to

5    my belief, has always favored the municipality that

6    has hired him.

7    Q    What is the basis for your belief in that

8    regard?

9         MR. LOVETT:  If answering that question

10        would require him to disclose otherwise

11        priveledged communication between you and your

12        lawyer, I'm instructing him not to answer.

13    Q    What is the basis for -- withdrawn.

14         Is it your belief that the

15    commissioner had any information about the hearing

16    officer's reputation before he was appointed?

17    A    I believe so, yes.

18    Q    What is the basis for your belief that the

19    commissioner had that information?

20         MR. LOVETT:  Same instructions as given.

21    Q    Is it your belief that Deputy Commissioner

22    Murphy had any information about this hearing

23    officer's reputation before the hearing officer was

24    appointed?

J. POGGIOLI

22

1      A      This was information that I spoke with my

2  attorney.

3      Q      I'm not asking you about anything you

4  learned from your attorney, I am asking you about

5  what you understood these defendants to know about

6  the hearing officer.

7      A      Again, that's information I have with my

8  attorney.

9      Q      So am I correct that other than

10  information you learned from your attorney, which

11  I'm not asking you about, you had no other

12  information about what these defendants knew about

13  the hearing officer?

14      A      I don't understand the question.  I'm

15  sorry.

16      Q      Aside from anything you learned from your

17  attorney, did you have any information about what

18  these defendants knew about the hearing officer?

19      A      I believe not.

20      Q      Other than any information you may have

21  learned from your attorney, did you personally have

22  any information about the hearing officer?

23      A      Now?

24      Q      Yes, now.

J. POGGIOLI

23

1      A      Yes.

2      Q      Can you tell us what that is?

3      A      It's my understanding that the hearing

4  officer has been employed by municipalities that

5  favors -- his decisions favors the municipalities.

6      Q      What is the basis for your belief that

7  that is the case?

8          MR. LOVETT:  It may be a little late, but

9          if answering that question would require you to

10         disclose a communication between you and your

11         attorney, I'm instructing you not to answer.

12             Before we go on and on the record, if you

13         are asked a question, the answer of which would

14         embody communication between you and me or

15         anyone in my office, don't waive the privilege.

16         Do not answer.

17         MR. MEISELS:  Mr. Lovett, for the record,

18         would you invoke the privilege so it's clear

19         why he's not answering.

20         MR. LOVETT:  Yeah.

21         MR. MEISELS:  Fair enough.

22     Q      Mr. Poggioli, other than information that

23  you may have learned from your attorney, do you have

24  any independent information about this hearing

J. POGGIOLI

24

1    officer?

2        A    Independent?

3        Q    Yes, aside from anything you learned from

4    your attorney.

5        A    So any information I have on him

6    previously?

7        Q    Or as you sit here today.

8        A    Yes.

9        Q    Can you tell us what that is?

10       A    These were conversations I had with my

11   attorney.

12       Q    I'm asking you other than anything you

13   learned from your lawyer.  Let me rephrase the

14   question.

15           Other than information that you

16   learned from your lawyer, do you have any

17   information about this hearing officer?

18       A    No.

19       Q    Now, going to the sub sentence B of

20   paragraph 15 where it says, "Both Joseph and Kealy

21   agreed with their codefendants to testify against

22   plaintiff with a view towards terminating his

23   employment."  Do you see that?

24       A    Yes.

25

1    Q    What is the basis for your belief that

2    Sergeant Joseph and Captain Kealy agreed with their

3    codefendants to testify against you with a view

4    towards terminating your employment?

5    A    It's well known that the defendants have a

6    strong dislike towards me.

7    Q    Other than what you've just indicated, is

8    there any other information that you have that would

9    support the claim that they agreed to testify

10   against you?

11   A    Well, I ran against Officer Joseph several

12   years ago for PBA president and I beat him in the

13   election and to that day there has not been any good

14   feeling from him towards me.

15   Q    What is the basis for your belief that any

16   person is seeking termination of your employment?

17   A    I think there is an animosity towards me,

18   my working at the police department, from a lot of

19   superiors.

20   Q    Am I correct that you -- there was a

21   disciplinary hearing in this case?

22       MR. LOVETT:   Object as to form.  You can

23       answer.

24   A    Yes.

J. POGGIOLI

26

1  Q At the close of that hearing, did anyone

2 ask for your termination?

3   MR. LOVETT:  Objection as to form.

4  A No.

5  Q Has the city sought your termination in

6 reference to the pending disciplinary charges?

7   MR. LOVETT:  Objection as to form.  You

8  can answer.

9  A The disciplinary charges are not finished

10 yet.  They are still in limbo.

11  Q Has the hearing been closed?

12  A Yes.

13  Q When you indicate that it's in limbo, do

14 you mean that there is -- no decision has been

15 rendered yet?

16  A That I have been aware of, yes.

17  Q As far as you know, there has been no

18 decision?

19  A That I have been aware of, yes.

20  Q As far as you know, so far in the

21 proceeding has anyone asked for your termination?

22  A Well, it's not finished yet.

23  Q I understand.  So far, has anyone asked

24 for your termination?

VERITEXT/NEW YORK REPORTING COMPANY

J. POGGIOLI

27

1    A    As of now, no.

2    Q    Take a look at paragraph 16.  It says,

3  "Over a period of months, defendants then

4  prosecuted, at a cost of substantially in excess of

5  $50,000, the retaliatory disciplinary proceeding,

6  having predetermined that plaintiff will be found

7  guilty and terminated from the city's employ."  Do

8  you see that?

9    A    Yes.

10    Q    In reference to the contention that the

11  cost was substantially in excess of $50,000, what

12  was the basis for your belief that that's correct?

13        MR. LOVETT:  If answering that question

14        would require you to disclose otherwise

15        privileged communication between you and me, I

16        instruct you not to do it.

17    Q    Other than any information that you may

18  have learned from your attorney, do you have an

19  independent basis to believe that this hearing cost

20  in excess of $50,000?

21    A    I know what my attorney fees are with

22  Mr. Lovett, and to think that the city had two

23  attorneys at the hearing at the same time and all

24  the overtime that they incurred by bringing in

28

1  officers that were off for prepping them and for

2  paying the hearing officer, I would say that fee is

3  correct.

4      Q    It's an estimate on your part?

5      A    Yes.

6      Q    Did you incur counselor fees in defending

7  the disciplinary hearing?

8      A    Yes, I did.

9      Q    How much did you incur?

10     A    That's something between the attorney and

11  myself.

12          MR. LOVETT:  No, no.  You can answer.

13     A    I would have to check on that but I think

14  it was $21,000.  I'm not sure.  It's around there.

15     Q    Referring back to paragraph 16 where it

16  indicates, "the retaliatory disciplinary proceeding

17  having predetermined that plaintiff will be found

18  guilty and terminated," what was the basis for your

19  belief that it was predetermined that you would be

20  found guilty?

21     A    The police department picks the hearing

22  officer.  Myself as being on trial as the defendant,

23  we would have liked someone that was unbiased, that

24  someone we would have a choice to pick from a list.

29

1    That wasn't the case.

2         Q    Again, in reference to that phrase,

3    "predetermined the plaintiff would be found guilty,"

4    who made that predetermination?

5         A    I would say the police department.

6         Q    Anyone in particular?

7         A    Administration.

8         Q    Any person in particular?

9         A    I would say the police commissioner and

10   deputy police commissioner.

11        Q    What is the basis for your belief that the

12   commissioner and the deputy commissioner made that

13   predetermination?

14        A    It's well known through the department

15   that they do not like me.

16        Q    Now, in reference to the contention that

17   it was predetermined that you would be terminated,

18   what is the basis for your belief that it was

19   predetermined that you would be terminated?

20        A    You don't know the history of myself in

21   the police department, sir, so it would be very

22   difficult to tell you all the things that have

23   happened as being PBA president for four years and

24   the clashes that I had with the administration.  It

J. POGGIOLI

30

1  would be numerous.

2      Q    Is it your contention that as a result of

3  being PBA president that they predetermined to

4  terminate you?

5      A    One of the reasons, yes.

6      Q    Any other reasons that you are aware of?

7      A    A lot of envy, fact that I work a lot of

8  overtime and make substantial money, which is also

9  involved.

10     Q    Again, in reference to paragraph 16, it

11 says, "During the course of that prosecution, Kealy

12 was overheard by the president of the city's PBA

13 discussing in a hallway a self-evident dilemma they

14 faced, how to explain prosecuting plaintiff for

15 requesting overtime money for time allegedly not

16 worked when numerous police officers routinely

17 engage in the same conduct with respect to which

18 plaintiff stands accused."  Do you see that?

19              Did you overhear that conversation

20 that Captain Kealy allegedly had?

21     A    No.

22     Q    Can you identify who did overhear?

23     A    PBA president.

24     Q    Who is that person?

J. POGGIOLI

31

1       A     Edward Hayes.

2       Q     How did you become aware that Mr. Hayes

3    had overheard that?

4       A     He told me.

5       Q     Do you recall when he told you that?

6       A     Yes, it was right after the incident.

7    Right after the occurrence.

8       Q     When was that occurrence?

9       A     It was in 2005.

10       Q     Can you be more specific as to the date?

11       A     After the disciplinary charges were --

12    that I was charged with disciplinary charges.

13       Q     Can you be more specific than that?

14       A     It was after April 2005.

15       Q     Do you recall when the disciplinary

16    charges were filed?

17            MR. LOVETT:  Objection as to form.  You

18        may answer.

19       A     I believe May of 2005.

20       Q     You were told about this after May of

21    2005?

22       A     Yes.

23       Q     Do you recall how soon after May of 2005?

24       A     No, I'm sorry.

J. POGGIOLI

32

1    Q    Was it before the hearing commenced?

2    A    Before the hearing started?

3    Q    Correct.

4    A    Yes.

5    Q    Who is the hearing officer in this case?

6    A    Mr. Ponzini.

7    Q    Aside from anything that your lawyer has

8 said to you, do you have any information about other

9 cases on which Mr. Ponzini has presided?

10    A    I might have heard something.

11    Q    What information do you have, aside from

12 anything that your lawyer told you?

13    A    I don't recall if I read something in a

14 case that he was involved in.

15    Q    Was that in his capacity as a town justice

16 or as a hearing officer?

17    A    A hearing officer.

18    Q    Now, in reference to the last portion of

19 paragraph 16, and particularly in reference to the

20 language that, "numerous police officers routinely

21 engage in the same conduct," as you sit here today,

22 are you aware of any particular officers who have

23 engaged in the same conduct?

24    MR. LOVETT:  Objection as to form.  You

J. POGGIOLI

33

1    can answer.

2        A    I don't understand by conduct.

3        Q    Let's go back to paragraph 16.  It says,

4    "During the course of that prosecution, Kealy was

5    overheard by the president of the city's PBA

6    discussing in a hallway a self-evident dilemma they

7    faced, how to explain prosecuting plaintiff for

8    requesting overtime money for time allegedly not

9    worked when numerous police officers routinely

10   engage in the same conduct with respect to which

11   plaintiff stands accused."

12              Regarding that paragraph, my question

13   is, as you sit here today, are you aware of any

14   police officers who have engaged in the same conduct

15   with which you were accused?

16       A    Of alleging not working?

17       Q    Correct.

18       A    Yes.

19       Q    Who are they?

20       A    Officer Colotti.

21       Q    How do you spell that?

22       A    C. O. L. O. T. T. I.

23            (Discussion held off the record.)

24       Q    Officer Colotti?

J. POGGIOLI

34

1      A    Yes.

2      Q    Do you know of any others?

3      A    Officer Pitzeo, P. I. T. Z. E. O.

4      Q    Any others?

5      A    Officer Vasquez.  Those are the only ones

6  I can think of now.

7      Q    Let's talk about the first one, Officer

8  Colotti.  Do you know when he was accused of

9  requesting overtime money for work that he didn't

10  do?

11            MR. LOVETT:  Objection as to form.

12      A    I don't think he was accused.

13      Q    What is the basis for your belief that he

14  did that?

15      A    Because he worked the job with me and the

16  job was terminated at a certain point.  Buddy stayed

17  there at the job and put in for more time than was

18  actually worked.

19      Q    At the time that he did that, you were

20  aware of it; is that right?

21      A    Yes, I went in.

22      Q    Did you report that to somebody?

23      A    I advised Captain Pizola.

24      Q    When did you advise Captain Pizola of

J. POGGIOLI

35

1    that?

2          A    I don't recall the date.

3          Q    Do you recall what year that happened at?

4          A    I don't recall at this time.

5          Q    What is Mr. Pizola's title now?

6          A    Captain.

7          Q    When did he become a captain, do you

8    recall?

9          A    I don't know when he was promoted to

10   captain.

11         Q    This particular job, what -- where was it?

12         A    Main Street, New Rochelle.

13         Q    Who was the employer?

14         A    Con Edison.

15         Q    How often did Officer Colotti do that?

16         A    I just know he did it that time.

17         Q    Do you know whether or not that -- your

18   allegation was investigated?

19         A    I don't know.

20         Q    Do you know how many hours of pay he

21   requested for time he didn't work?

22         A    I don't know.

23         Q    What is the basis for your belief that he

24   requested pay for time he didn't work?

J. POGGIOLI

36

1      A      The job was terminated at a certain point

2   and I went in and he stayed there.

3      Q      So is it your understanding that he then

4   requested compensation for the time that he stayed

5   there?

6      A      Yes.

7      Q      In reference to Officer Pitsel.

8      A      Yes.

9      Q      What was the basis for your belief that he

10   requested compensation for work that he didn't do?

11      A      He told me.

12      Q      When did he tell you that?

13      A      I believe it was the day after.

14      Q      The day after what?

15      A      The day after he allegedly worked the job.

16      Q      When was that that he allegedly worked the

17   job?

18      A      I don't know the day.

19      Q      Do you know the year?

20      A      It was in 2005 or 2006.

21      Q      Did you report that to anybody?

22      A      The Administration was aware of it.

23      Q      What is the basis for your belief that the

24   administration was aware of it?

J. POGGIOLI

37

1      A    I understand there was a discrepancy in

2   paying them.

3      Q    Can you explain the discrepancy?

4      A    Well, I understand that the vendor reneged

5   on paying them, but they eventually did get paid.

6      Q    Let me ask you again, who was the vendor?

7      A    I believe it was Con Ed.

8      Q    Could you tell me in words or substance

9   what Officer Pitsel said to you about his having

10  sought compensation for work he didn't do?

11     A    I believe that he told me that we worked a

12  job yesterday or a few days ago and no one showed

13  up, but we put in for the hours.

14     Q    When he used the word we, what was your

15  understanding as to who that referred to?

16     A    Himself and Officer Vasquez.

17     Q    Am I correct that you did not report that

18  conversation to anybody?

19          MR. LOVETT:  Objection as to form.  You

20     can answer.

21     A    Correct.

22     Q    Other than --

23     A    I might have told Captain Pizola.  I'm not

24  sure.

J. POGGIOLI

38

1      Q      Other than that particular instance, were

2   you aware of any other occasions that Officer Pitsel

3   requested compensation for work that he didn't do?

4      A      No.

5      Q      Now, regarding the third name you

6   mentioned, Officer Vasquez, what is the basis for

7   your belief that Officer Vasquez has requested

8   compensation for work that he didn't do?

9      A      They both put in for the overtime.

10     Q      Does that refer to the same incident that

11   you mentioned concerning Officer Pitsel?

12     A      Yes.

13     Q      The employer was Con Edison?

14     A      I believe so, yes.

15     Q      This relates to one particular day?

16     A      Yes.

17     Q      That was in either 2005 or 2006?

18     A      Yes.  I believe it was 2005.

19     Q      Did Officer Vasquez ever say anything to

20   you about it, that incident?

21     A      I believe he told me that also.

22     Q      When did he tell you that?

23     A      Right after the incident.

24     Q      Would you tell me in words or substance

J. POGGIOLI

39

1    what Officer Vasquez said to you?

2         A    He went to work an off duty job and no one

3    showed up and we stayed there and put in for the

4    eight hours.

5         Q    Based upon the conversation that you had

6    with Officer Vasquez, was it your understanding that

7    both he and Officer Pitsel went to an off duty job

8    and stayed there and then put in compensation for

9    it?

10        A    And the vendor didn't show up, yes.

11        Q    Did you report your conversation with

12   Officer Vasquez to anybody?

13        A    The department knew about it.

14        Q    What is the basis for your belief that the

15   department knew about it?

16        A    Because Officer Pitsel told me that --

17   something about the vendor refusing to pay but

18   somehow they got paid.

19        Q    As far as you know, they got paid for the

20   time that they stayed there?

21        A    Yes.

22        Q    I understand your explanation about the

23   department knowing, but my question is a little bit

24   different.  Did you ever report your conversation

40

1    with Officer Vasquez to anybody?

2            MR. LOVETT:   Objection as to form.   You

3        can answer.

4        A    I believe I told Captain Cozolla.

5        Q    Do you recall when you did that?

6        A    No.

7        Q    Could you tell us in words or substance

8    what your conversation with Captain Cozolla was?

9        A    We were on the subject of talking about

10   many things and somehow off duty became part of it.

11   Talking back and forth and -- about different

12   subjects.  We were kind of bouncing on different

13   things.

14       Q    How soon after --

15       A    See, I believe I told him.  I'm not sure.

16       Q    Can you estimate the amount of time that

17   elapsed from the time that Officer Vasquez told you

18   about it to the time you had the conversation,

19   possibly had the conversation with Captain Cozolla?

20       A    I don't recall.

21       Q    Take a look at paragraph 17.  "Engaging in

22   that retaliatory plan, defendants knowingly and

23   deliberately failed to take a law enforcement action

24   with respect to ongoing criminal wrongdoing that

J. POGGIOLI

41

1    permeated both the police department and the New

2    Rochelle City Court claimed by the city to be one of

3    its departments." Do you see that?

4         A    Yes.

5         Q    Could you tell us as you sit here today

6    what information you have about ongoing criminal

7    wrongdoing in the New Rochelle Police Department,

8    other than what your attorney may have told you?

9         A    In the police department?

10        Q    Correct.

11        A    It's on Page 5, paragraph A.

12        Q    Does that accurately include your

13   knowledge on the subject?

14        A    Yes.  I was PBA president at the time.

15   I'm very aware of it.

16        Q    We are going to get to that and I know

17   you've read the document.  Other than what is

18   enumerated here on page five, do you have any other

19   information about wrongdoing in the police

20   department?

21        A    On previous incidents of wrongdoing, yes.

22        Q    Other than what's here.  Tell me what

23   information you have about wrongdoing in the police

24   department, other than what's mentioned on Page 5 of

J. POGGIOLI

42

1    your complaint.

2        A    Another incident was a detective that was

3    accused of stealing a cable box.

4        Q    Which detective was that?

5        A    Grosso.

6        Q    When was he accused of stealing the cable

7    box?

8        A    I don't recall the year.

9        Q    As far as you know, what was the outcome

10   of that accusation?

11       A    They took his gold shield away from him

12   and I believe they suspended him.

13       Q    Was he brought up on charges?

14       A    Yes.

15       Q    In addition to losing his gold shield and

16   being suspended, was there any other penalty

17   imposed?

18       A    He was taken out of his unit.  He was put

19   into the patrol unit.

20       Q    Other than the various penalties you've

21   already mentioned, were there any other penalties

22   imposed for that?

23       A    On that particular case, I don't think so.

24       Q    Now, in addition to this incident related

J. POGGIOLI

43

1    to Detective Grosso, are you aware of any other

2    instance of wrongdoing in the police department,

3    other than the ones you enumerated on Page 5 of your

4    complaint?

5         A    Yes.

6         Q    Please tell me.

7         A    Detective Landau.

8         Q    What did he do?

9         A    He tampered with my access card.

10        Q    What was the basis for your belief that he

11   did that?

12        A    I couldn't get -- first of all, there is a

13   dislike.  He doesn't like me.  And he has -- he's in

14   charge of making these access cards.  He has the

15   capability of making -- he has access and does it.

16   On numerous occasions, I couldn't get -- he tampered

17   with my card, and the fact I couldn't get into the

18   building on numerous occasions.  There's a door

19   lock.

20        Q    Did you conclude that he tampered with

21   your card because you had trouble getting into

22   building?

23        A    Well, because he was one of two people

24   that could do that.

J. POGGIOLI

44

1    Q    Who was the other person?

2    A    Detective Donald.  Detective Donald's a

3    friend of mine.

4    Q    What was the basis for your belief that

5    Detective Landau did that and Detective Donald

6    didn't do it?

7    A    First of all, Detective Donald is a good

8    friend of mine, and second of all, that when I went

9    to him, not knowing that he did it first, and asked

10   him to fix the problem, he did, and then it happened

11   again.  And there was an internal investigation done

12   on that.

13   Q    Do you know what the outcome of the

14   internal investigation was?

15   A    Yes.

16   Q    What was it?

17   A    Nothing was done.

18   Q    Do you know whether or not he was ever

19   accused of doing it?

20   A    I know that I went to internal affairs

21   Lieutenant Fortunado to make a complaint, and he

22   said that Captain Kealy was handling it.

23   Q    Do you know whether or not he was ever

24   brought up on charges for having done that?

J. POGGIOLI

45

1        A       He was not.

2        Q       Do you know whether or not the

3   investigation ever concluded that he did do it?

4        A       I don't know.

5        Q       If you could enlighten me about the access

6   card that you refer to, what is the purpose of the

7   access card?

8        A       Gains you entrance into the building.

9        Q       Isn't the police department open 24 hours

10  a day, seven days a week?

11       A       Just the front entrance to the lobby.

12       Q       Is it correct that anyone could always

13  walk in the front entrance to the building 24 hours

14  a day, seven days a week?

15       A       Just in the lobby.

16       Q       Other than the incidents you mentioned

17  with Detective Grosso and Detective Landau, are you

18  aware of any other wrongdoing in the police

19  department that has gone unpunished, other than what

20  you mentioned on page five of your complaint?

21       A       There are a few others.  I just don't

22  have -- I don't remember right now.

23       Q       Again, going back to paragraph 17 of your

24  complaint, you talk about ongoing criminal

1    wrongdoing that permeated the New Rochelle city

2    court.  Other than the incidents that are alleged on

3    page five of your complaint, are you aware of any

4    incidents of criminal wrongdoing in the New Rochelle

5    city court?

6        A    Besides what's on page five?

7        Q    Correct.

8        A    And Page 6?

9        Q    Correct.

10       A    No, I believe not.

11       Q    Now, if we can take a look on the top of

12   page five, sub paragraph A, it says, "Police

13   Detective D'andrea was not arrested, criminally

14   prosecuted or terminated by reason of disciplinary

15   action for stealing evidence, a computer, from the

16   department's property clerk's office and when

17   caught, discarding the evidence in the garbage."

18             What is the basis for your belief

19   that detective D'andrea ever stole a computer?

20       A    I was involved in the negotiations as PBA

21   president so he wouldn't get terminated.

22       Q    Am I correct that you negotiated on his

23   behalf?

24             MR. LOVETT:  Objection.

J. POGGIOLI

47

1      A      Yes.

2      Q      In your capacity as PBA president?

3      A      Yes.

4      Q      Was it your understanding at the time that

5   those negotiations were confidential?

6      A      No.

7      Q      Is it your understanding as you sit here

8   today that those negotiations are confidential?

9      A      No.

10      Q      What was the outcome of the negotiations

11   in reference to this incident?

12      A      The police commissioner wanted him fired

13   and I negotiated on his behalf.

14      Q      What kind of deal did you get him?

15      A      I believe it was 20 days suspension.

16      Q      Based upon your experience as the PBA

17   president, what does a 20 day suspension mean?

18      A      Twenty days loss of pay or could be 20

19   calendar days.  It's usually 20 days of pay.

20      Q      Does that mean you have to work those

21   days, you just don't get paid for it?

22      A      They usually, if you have any in the bank,

23   vacation days or personal leave days, they usually

24   draw out of that.  If not, then you would be

J. POGGIOLI

48

1   suspended without pay.  But it's up to the police

2   commissioner's discretion.  It could go either way.

3        Q    At the time that you negotiated that

4   arrangement for Detective D'andrea, was it your

5   belief that he should have been criminally

6   prosecuted?

7        A    As PBA president, my job is not to get

8   anybody fired or criminally prosecuted.

9        Q    Let me rephrase my question.  Based upon

10  the information that you had about this incident,

11  was it your belief that Detective D'andrea should

12  have been criminally prosecuted?

13       A    During negotiations with the police

14  commissioner, I don't know if I was fully told of

15  all the facts so I couldn't make a decision on that.

16       Q    So as you sit here today, do you think

17  that Detective D'andrea should have been prosecuted

18  criminally?

19       A    I don't know.

20       Q    Let's go back to sub paragraph A again.

21  It talks about, when caught, discarding the evidence

22  in the garbage.  What evidence was it that allegedly

23  was discarded in the garbage?

24            MR. LOVETT:  Objection as to form.  Can

J. POGGIOLI

49

1          you read that back.

2                    (Record read back.)

3          A     I believe it was the computer.

4          Q     So was it your understanding that he stole

5     the computer and then put it in the garbage?

6          A     It was my understanding that he signed the

7     computer out of the property clerk's room and he

8     took the computer and brought it home and used it.

9     And then when the person who owned the computer

10    asked for it back, they went to the police

11    department and they couldn't locate it.  And then

12    they found out that he signed it out.  And then when

13    they did their investigation they asked him about

14    it.  And I believe he said that it wasn't

15    functioning and he threw it out.  That's how.

16         Q     So the basis for your belief that the

17    computer got put in the garbage was his statement to

18    you; is that right?

19         A     That's the information that I found out.

20         Q     How did you find that out?

21         A     Through numerous sources.

22         Q     Could you tell us what those sources were?

23         A     Through people that were heard about the

24    case.

J. POGGIOLI

50

1    Q    Could you tell us who those people were?

2    A    I don't recall, no.

3    Q    Did you ever speak to Detective D'andrea

4    directly about this incident?

5    A    Yes.

6    Q    Did you ever ask him what happened?

7    A    My job was to protect him, not to divulge

8    into his personal --

9    Q    I understand.  Did you ever ask him what

10    happened?

11    A    I might have.  I don't recall.

12    Q    Did he ever tell you what happened?

13    A    He might have.  I don't recall.

14    Q    Regarding the second sentence of sub

15    paragraph A, "Subsequently, D'andrea was recruited

16    by defendants to testify against the plaintiff in

17    the disciplinary proceeding, was reassigned as the

18    department's communication supervisor in charge of

19    intradepartmental security systems."

20            When was Detective D'andrea

21    reassigned as the department's communications

22    supervisor?

23    A    Right after that incident.

24    Q    Was that part of the penalty that was

J. POGGIOLI

51

1  imposed?

2      A    Evidently.  The police commissioner

3  reassigned him.

4      Q    Do you recall what year he was reassigned?

5      A    This was four or five years ago.  I don't

6  remember.

7      Q    The incident with the computer was four or

8  five years ago?

9      A    Yes.

10     Q    That would be 2003, 2002; is that right?

11     A    Something like that, yes.

12     Q    Is it your understanding that at that time

13  he was recruited to testify against you in this

14  disciplinary proceeding?

15     A    At that time?

16     Q    Correct.

17     A    No.

18     Q    As far as you know, was there any

19  relationship between the disciplinary action taken

20  against Detective D'andrea and the disciplinary

21  charges that were preferred against you?

22     A    At that time?

23     Q    Correct.  Anytime.  Is there any

24  relationship?

J. POGGIOLI

52

1      A      Detective D'andrea obviously was going to

2   get fired by the police department and he changed

3   his position from general investigation unit to in

4   charge of security systems.  I would think that he

5   owes the police commissioner a lot for not having

6   his job terminated.

7      Q      What is the basis for your belief that

8   anyone recruited him to testify against you?

9      A      Say that again, please.

10     Q      What is the basis for your belief that

11  anyone recruited Detective D'andrea to testify

12  against you in the pending disciplinary proceeding?

13     A      Detective D'andrea owes a lot to the New

14  Rochelle Police Department, he's indebted to them.

15  He must think that any way he could help them, he

16  would.

17                     Can I take a break?

18                     (Short recess taken.)

19                     (Record read back.)

20     Q      Mr. Poggioli, you indicated earlier that

21  you were under the impression that the commissioner

22  wanted to fire Detective D'andrea over this

23  incident; is that correct?

24     A      Yes.

J. POGGIOLI

53

1      Q      What was the basis for your belief that

2  the commissioner wanted to do that?

3      A      He told me.

4      Q      When you negotiated on Detective

5  D'andrea's behalf, with whom did you negotiate?

6      A      Police commissioner.

7      Q      Would it be you and the commissioner?

8      A      Yes.

9      Q      Was anyone else present when you had those

10  negotiations?

11      A      No.

12      Q      How many years were you PBA president?

13      A      Four.

14      Q      In addition to this incident regarding

15  Detective D'andrea, did you have occasion to

16  negotiate with the commissioner on anything else?

17      A      Of course.  I negotiated a lot of things.

18      Q      In that four year period, did you

19  negotiate other disciplinaries other than the one

20  you discussed regarding Detective D'andrea?

21      A      I don't remember if there was other ones

22  right now.

23      Q      What kinds of thing, other than the

24  disciplinaries did you negotiate with the

54

1    commissioner?

2         A      Rules and regulations, manual, procedure,

3    uniforms, work charts, pay off duty, overtime,

4    court.  Anything and everything.

5         Q      When you say overtime, what do you mean?

6         A      If someone was denied overtime for

7    something, then I'd go and see the police

8    commissioner about it.

9         Q      When you say court, what do you mean?

10        A      Court time.  How much time you get for

11   court.  We get a set amount of time when you appear

12   at court.  Even if you use less time than that, you

13   get a set time.  Like show-up time.

14        Q      When you negotiated references regarding

15   court appearances, would that be circumstances where

16   an officer complained that he or she wasn't paid

17   enough?

18        A      Something like they -- the department

19   would say something like you are entitled to only

20   three hours instead of three and a half for

21   traveling time, or something like that.  Because we

22   have grand jury court up in White Plains.  An

23   officer would put down the time that they started

24   and they finished, and sometimes it would get kicked

J. POGGIOLI

55

1    back to a lesser time 'cause they felt they weren't

2    intact for whatever reason.

3        Q    Do you recall which particular years you

4    were PBA president?

5        A    2001 through 2004.

6        Q    Is the PBA president elected on a calendar

7    years basis?

8        A    Yes.

9        Q    So your term would have been up

10   December 2004?

11       A    December 31st, yes.

12       Q    During that four year period --

13       A    Check that on the PBA time as being

14   president.  I don't know if it was 2001 to 2004 or

15   2000 to 2003.  I'd have to check my records on that.

16       Q    One or the other.  You were elected; is

17   that right?

18       A    Yes.

19       Q    When you are elected to be PBA president,

20   what is the term for which you are elected?

21       A    At that time, one year.

22       Q    You were elected four times?

23       A    Yes.

24       Q    You had indicated earlier in your

J. POGGIOLI

56

1   testimony that on a particular occasion Sargent

2   Joseph ran against you for PBA president?

3        A    Yes.  He was -- I don't know if he was a

4   patrolman or detective at that time.

5        Q    Was that the first year you were elected?

6        A    No.

7        Q    What year was that?

8        A    It was -- I think it was in my third year

9   of office.  Second or third year of office.  I think

10  it was my third year.

11       Q    In reference to the other three times that

12  you ran, did you have any opposition?

13       A    Three times I did, one time I didn't.

14       Q    In reference to the three times that you

15  did, who were your opponents?

16       A    It was Detective Danco and I believe it

17  was Officer Letizia, L. E. T. I. Z. I. A.  I think

18  that was the first year.

19       Q    If you go back to Page 5 of your

20  complaint, sub paragraph B, "The city marshal and

21  attorney openly operate a private law practice out

22  of the courthouse using, at taxpayer's expense,

23  on duty city and state employees' services to draft

24  his private complaints, wills and contracts."

J. POGGIOLI

57

1      A      It say clients.

2      Q      Let me start over again.  "The city

3  marshal and attorney openly operates a private law

4  practice out of the courthouse using, at taxpayer's

5  expense, on duty city and state employees' services

6  to draft his private clients' wills and contracts

7  for the sale of real property, stealing in that

8  process government-owned paper, copiers, computer

9  equipment and other office supplies."  Is that

10 accurate?

11             MR. LOVETT:  Objection as to form.

12     A      This is what I discussed with my attorney.

13     Q      Aside from anything that you learned from

14 your attorney, do you ever have any information

15 about this allegation against the city marshal?

16     A      No.

17     Q      Once you became aware of this information,

18 did you report it to anybody?

19     A      No.

20     Q      At the time you became aware of the

21 information, you were a police officer; is that

22 right?

23     A      Which information?

24     Q      The information about the city marshal.

58

1     A     Oh, in paragraph B.

2     Q     Yes.

3     A     Yes.

4     Q     Did you arrest him?

5     A     No.

6     Q     Was there a reason you didn't arrest him?

7     A     I wasn't doing the investigation on that.

8     Q     Do you know whether or not the city

9   marshal is employed by the police department?

10     A     I believe he's not.

11     Q     Take a look at sub paragraph C.  "One

12   female employed in the court clerk's office openly

13   and admittedly has repeated engaged with impunity in

14   the felonious sale of controlled substances Vicodin

15   and Valium in that office to other employees."

16               As you sit here today, do you believe

17   that to be true?

18     A     I don't know.

19     Q     What was the basis for your belief --

20   withdrawn.

21               Do you have any reason to believe it

22   is true?

23               MR. LOVETT:  If you are answering any

24         question which requires you to disclose other

59

1       privileged communication between you and me,

2       I'm instructing you not to.

3       Q     Other than information that you may have

4  learned from your attorney, do you have any

5  information about this contention that one of the

6  court employees was selling drugs?

7       A     No.

8       Q     After you learned this information, did

9  you make an arrest?

10      A     No.

11      Q     Is there a reason you didn't make an

12  arrest?

13      A     That's not my investigation.

14      Q     Did you report this to anybody in the

15  police department?

16      A     No.

17      Q     Did you report it to anybody anyplace?

18      A     No.

19      Q     Let go to sub paragraph D.  Let me just

20  back up one minute and back to sub paragraph C.

21             One more question concerning the

22  female who is the subject of the allegation, do you

23  have any reason to believe that she's employed by

24  the police department?

J. POGGIOLI

60

1     A     No.

2     Q     Let go to sub paragraph D.  "That same

3  female, while working in the clerk's office has also

4  openly and admittedly engaged with impunity in

5  felony possession of controlled substances Vicodin

6  and Valium that have been feloniously sold to her by

7  certain of her coworkers."

8               As you sit here today, do you believe

9  that allegation to be true?

10    A     This is information between the attorney

11 and myself.

12    Q     Other than information that you learned

13 from your lawyer, do you have any information about

14 anyone in the court possessing drugs?

15    A     No.

16    Q     After you learned the information --

17 withdrawn.

18               Other than information that you

19 learned from your lawyer, do you have any

20 information relating to the identify of the people

21 who are referenced in sub paragraph C and D?

22    A     Repeat that, please.

23    Q     Other than information that you learned

24 from your lawyer, do you have any information as to

J. POGGIOLI

61

1    the identify of the court employees who are

2    referenced in sub paragraph C and D?

3        A    Are you asking me do I know who they are?

4        Q    Right.

5        A    Yes.

6        Q    Who are they?

7        A    This is information between my attorney

8    and myself.

9        Q    Is it correct that the only information

10   that you have about the identity of these people you

11   learned from a lawyer?

12       A    Yes.

13       Q    Going to sub paragraph E.  "That female

14   employee's multiple coworkers who have under oath

15   been identified by name as having engaged in a

16   felony sale of controlled substances to that female

17   have neither been arrested, prosecuted nor subjected

18   to disciplinary charges with a view towards

19   termination."

20            As you sit here today, do you know

21   whether that allegation is true?

22       A    It's client-attorney privileged.

23       Q    Is it correct the only information you

24   have about this -- withdrawn.

J. POGGIOLI

62

1          Would it be correct to say that other

2   than information that you learned from your lawyer,

3   you have no information about this incident?

4          A     Yes.

5               (Short recess taken.)

6          Q     Mr. Poggioli, I'm going to ask you a few

7   more questions about sub paragraph E on Page 5.

8               Do you know whether any of the people

9   who are referenced in sub paragraph E are employed

10  by the police department?

11         A     No.

12         Q     Does that mean your information is that

13  they are not employed by the police department as

14  far as you know?

15         A     To my knowledge they are not.

16         Q     After you became aware of the information

17  in sub paragraph E, did you arrest anybody?

18         A     No.

19         Q     Is there a reason for that?

20         A     It wasn't my investigation.

21         Q     Did you report it to anybody?

22         A     If you consider putting it in my lawsuit

23  reporting, than I would say yes.

24         Q     Other than putting it in your lawsuit, did

J. POGGIOLI

63

1  you call it to anyone's attention?

2      A     My lawsuit got served on the commissioner,

3  the deputy police commissioner, Captain Kealy and

4  Sargent Joseph and the City of New Rochelle and the

5  law department.  Everything that's in here, it's

6  spelled out.  So unless they did not read this, they

7  have to be aware of it.  So yes, I did notify them

8  through this.

9      Q     Your notification came by way of this

10  complaint?

11      A     Yes.

12      Q     Was there any other notification to the

13  department about these incidents, other than the

14  complaint?

15      A     No, there's no need to.

16      Q     If you could turn to page six sub

17  paragraph F.  "Another female employee working in

18  the city court clerk's office has openly and

19  admittedly engaged in grand larceny, stealing in

20  excess of $3000 from funds received by and belonging

21  to the court, later bragging in testimony that she

22  was never charged with that theft."

23          As you sit here today, do you believe

24  that to be true?

J. POGGIOLI

64

1      A    Yes.

2      Q    What is the basis for your belief that

3   that's true?

4           MR. LOVETT:  If answering the question

5           requires you to disclose otherwise priveledged

6           communication between you and me, I instruct

7           you not to answer.

8      Q    Other than information that you learned

9   from your lawyer, do you have any independent basis

10   to believe that the allegation contain in sub

11   paragraph F is true?

12      A    Yes.

13      Q    What is the basis for your belief?

14      A    I believe -- my attorney-client privilege.

15      Q    Let me rephrase the question.  Other than

16   what you may have learned from your lawyer, do you

17   have any independent basis to believe that's what in

18   paragraph F is true?

19      A    Just along with the other things

20   previously mentioned, just hear some gossip.

21      Q    Who did you hear that from?

22      A    Different people.

23      Q    Who are they?

24      A    I can't recall anybody offhand right now.

J. POGGIOLI

65

1    Just talk.

2        Q    What did those people say to you about

3    this?

4        A    Something's going on in court, doing an

5    investigation, stuff like that.

6        Q    In the course of that gossip, did anyone

7    identify who the employee was who did this?

8        A    I don't recall if they mentioned names or

9    not.

10        Q    Other than information that you learned

11    from your lawyer, do you know who did this?

12        A    Through my lawyer?

13        Q    No, I'm asking you other than through your

14    lawyer, do you know who committed this crime?

15        A    No.

16        Q    Once you became aware of this information,

17    did you make an arrest?

18        A    No.

19        Q    Is there a reason you didn't make an

20    arrest?

21        A    It's not my investigation.

22        Q    Am I correct that at some point you became

23    aware that somebody stole $3000 from the court; is

24    that right?

66

1    A    Yes.

2    Q    And you did not arrest that person because

3  it was not your investigation; is that right?

4    A    That's correct, it's not my investigation.

5    Q    In reference to the last phrase of sub

6  paragraph F, "they later bragging in testimony that

7  she was never charged with the theft," what is the

8  basis for your belief that this person gave that

9  testimony?

10         MR. LOVETT:  If answering that question

11      will require him to disclose an otherwise

12      priveledged communication, then don't.

13    Q    Other than information you learned from

14  your lawyer, do you know whether or not this person

15  had ever testified concerning her theft from the

16  court?

17    A    Personally?

18    Q    Yes.

19    A    No.

20    Q    In the gossip that you heard about this,

21  aside from anything that you learned from your

22  lawyer --

23         MR. LOVETT:  Objection.  I don't gossip.

24         MR. MEISELS:  Fair enough.

J. POGGIOLI

67

1      Q    -- aside from anything you got from your

2  lawyer, did anyone tell you that this person had

3  testified about this incident?

4      A    No.

5      Q    Do you know whether or not the New

6  Rochelle Police Department ever investigated this

7  incident?

8      A    I don't know.

9      Q    Did you ever ask?

10     A    No.

11     Q    Concerning sub paragraph G, also on page

12  six, is, "A police detective repeatedly tampered

13  with plaintiff's security door access card for the

14  police department, disabling the card and preventing

15  plaintiff from entering headquarters," does that

16  refer to the incident that you referenced earlier

17  concerning Detective Landau?

18     A    Yes.

19     Q    Let me back up one minute in reference to

20  the person who stole the $3000 from the court.  Do

21  you have -- withdrawn.

22          As far as you know, does that person

23  work for the police department?

24     A    No.

J. POGGIOLI

68

1      Q      She's employed by -- in the city --

2      A      She's employed by the City of New

3  Rochelle.

4      Q      Let's go to sub paragraph H, is "A male

5  court officer employed in the city court has also

6  openly and admittedly engaged in the same grand

7  larceny committed with his now fiance, as a result

8  of which he was never arrested, charged, and never

9  brought up on disciplinary charges with a view

10  towards termination."

11            Question:  As you sit here today, do

12  you believe that to be true?

13     A      Yes.

14     Q      What is the basis for your belief?

15            MR. LOVETT:  Same instructions regarding

16     privilege.

17     Q      Other than information that you learned

18  from your lawyer, do you have any information about

19  this particular male court officer?

20     A      No.

21     Q      After you learned about this incident, did

22  you arrest him?

23     A      No.

24     Q      Is there a reason for that?

1    A    Yes.

2    Q    What's that?

3    A    It wasn't my investigation.

4    Q    Did you report it to anybody?

5    A    Yes, through the lawsuit people were

6  notified.

7    Q    Other than your complaint in this action,

8  did you give any other notice to anyone about this

9  male court officer participating in the grand

10  larceny?

11    A    No, but I think notifying the court

12  counsel, the City of New Rochelle and the police

13  department and the police commissioner and captain

14  and sergeant, I would think that should pretty much

15  do it.

16    Q    Am I correct that this lawsuit was the

17  only notice you gave to anybody about this male

18  court officer participating in the larceny?

19    A    Yes.

20    MR. LOVETT:  Objection as to form.

21    Q    Am I correct that that male court officer

22  is not employed by the New Rochelle Police

23  Department?

24    MR. LOVETT:  Objection as to form.

70

1      A    That's correct.

2      Q    Do you know who he is employed by?

3      A    I would imagine he's employed by the State

4  of New York.

5      MR. LOVETT:  Don't imagine.

6      A    State of New York.

7      Q    Aside from any information that you may

8  have gotten from your attorney, do you know who this

9  officer admitted his responsibility for the grand

10  larceny to?

11      A    Could you repeat that, please.

12      Q    Aside from information that you may have

13  gotten from your attorney, do have any independent

14  information as to whom this male court officer

15  admitted his participation in the grand larceny?

16      A    No.

17      Q    Do you know whether or not the New

18  Rochelle Police Department ever conducted an

19  investigation relating to this male court officer's

20  participation in the grand larceny?

21      A    I don't know.

22      Q    Do you know who the male court officer is

23  who supposedly did this?

24      A    Yes.

J. POGGIOLI

71

1    Q    Who is it?

2    A    That's attorney-client information.

3    Q    Other than information that you may have

4    learned from your attorney, do you have any

5    information related to the identify of the court

6    officer who supposedly did this?

7    A    No.

8    Q    Paragraph 18. "As a proximate result of

9    defendants' conduct, plaintiff has been subjected to

10   retaliation for having engaged in constitutionally

11   protected speech, selectively prosecuted, caused to

12   suffer pecuniary losses, publicly humiliated,

13   publicly embarrassed, suffered irreparable damage to

14   his professional career and reputation, rendered

15   anxious, emotionally upset and otherwise rendered

16   sick and sore."

17                As you sit here today, do you believe

18   that to be true?

19   A    Absolutely.

20   Q    Let's take a look at the first two

21   sentences. "As a proximate result of defendants'

22   conduct, plaintiff has been subjected to retaliation

23   for having engaged in constitutionally protected

24   speech."

72

1          What is your understanding of the

2 constitutionally protected speech that you're

3 referring to in your complaint?

4      A    Numerous times as PBA president I publicly

5 went on television, radio, and in front of city

6 council chambers and criticized the police

7 department, police commissioner, for numerous things

8 during contract negotiations, labor disputes,

9 problems within the police department.  It was

10 public, it was aired on television on several

11 stations, radio stations, in the paper, through the

12 citizens, council chambers.

13     Q    Am I correct that it's your contention

14 that it's that speech for which you are being

15 retaliated against?

16          MR. LOVETT:  Objection as to form.

17     A    Those speeches.

18     Q    Speeches.

19     A    Numerous.

20     Q    Do you have any record of those speeches?

21     A    No, but the City of New Rochelle does.

22     Q    Where would the city have those records?

23     A    Well, the citizens to be heard.  That's

24 all documented.

73

1     Q     Where is that documented?

2     A     In New Rochelle.  City of New Rochelle

3   would have that.  It's all documented when you get

4   in front of a city council and speak.

5     Q     You mean in the minutes of the meetings?

6     A     Yes.

7     Q     Do you recall any particular meeting in

8   which you appeared?

9     A     Several.

10    Q     Can you tell us when they were?

11    A     During the contract disputes, during those

12  years, or during my term as PBA president.

13    Q     So am I correct that these are comments

14  that you made in your capacity as PBA president?

15          MR. LOVETT:  Objection to the form.

16    A     Yes.

17    Q     Was this in the course of negotiating

18  contract on behalf of PBA?

19    A     Sometimes.

20    Q     Were there any other contacts other than

21  contract negotiations where you appeared in front of

22  the city council?

23    A     Yes.

24    Q     What were they?

74

1    A    Just let the city council know the -- what

2    the police department was doing to their membership,

3    members of the PBA.  I advised them.

4    Q    When did that occur?

5    A    During my tenure as PBA president.

6    Q    Am I correct that those speeches were

7    given in your capacity as PBA president?

8        MR. LOVETT:  Objection as to form.

9    A    Yes.

10   Q    They were given while you were PBA

11   president?

12   A    Yes.  I may have given a speech or so when

13   I wasn't PBA president.  I don't recall.  Also.

14   Q    Would that have been before you became PBA

15   president?

16   A    Yes.

17   Q    So that would have been, what, 2000, 2001?

18   A    Yes.  'cause I was on the executive board

19   prior to being president.  Yes, prior to.

20   Q    Referring to paragraph 18 again, "As a

21   proximate result of defendants' conduct, plaintiff

22   has been subjected to retaliation for having engaged

23   in constitutionally protected speech, selectively

24   prosecuted."

J. POGGIOLI

75

1              Could you explain the basis for your

2 belief that you were being selectively prosecuted?

3      A    Well, I got charged for coming to an off

4 duty job an hour late.  Meanwhile, other officers

5 haven't gotten charged for more serious infractions,

6 crimes.

7      Q    Are you aware of any circumstances where

8 other officers have not been charged with more

9 serious crimes, other than those you have already

10 testified to today?

11     A    There might be a few others.  I can't

12 recall.

13     Q    Tell me what they were.

14     A    I can't recall right now.

15     Q    Can you recall the names of the people who

16 were involved in those incidents?

17     A    I already mentioned those to you, the ones

18 that I can recall.

19     Q    It says, "caused to suffer pecuniary

20 losses.  What -- withdrawn.

21             What pecuniary losses have you

22 suffered?

23     A    Can you repeat that.

24     Q    It says, "As a result of defendants'

J. POGGIOLI

76

1    conduct, plaintiff has been subjected to retaliation

2    for having engaged in constitutionally protected

3    speech, selectively prosecuted, caused to suffer

4    pecuniary losses."

5            My question is:  What, if any,

6    pecuniary losses have you suffered as a result of

7    the alleged conduct on behalf of the defendants?

8        A    Can I take a break?

9                (Short recess taken.)

10               (Record read back.)

11       A    The police department is like a big Peyton

12   Place of New Rochelle.  Everybody knows everybody

13   else's business.  And when someone is brought up on

14   charges, everyone knows about it.

15           Since these charges have been brought

16   up against me in May of 2005, everybody has heard

17   something of it, especially the supervisors.  And

18   the supervisors don't want to step on any of the

19   higher-ups.

20           So if there is an opportunity to not

21   give me overtime so I can't make additional money,

22   at times I felt that that was done.

23       Q    Can you identify any specific times where

24   that happened?

J. POGGIOLI

77

1       A       Either July or August of 2006.

2       Q       What happened then?

3       A       There was tremendous amount of overtime on

4   the third tour.  Tremendous.  And I didn't get any

5   of it.

6       Q       Has your income from --

7       A       From the third tour.  From the third tour

8   supervisors.  I don't think I got any overtime at

9   all.

10      Q       In what months was that?

11      A       I think it was either July or August 2006.

12      Q       Other than that particular incident, can

13  you identify any others where this supposedly

14  occurred?

15      A       There is a rule that came out and it was

16  supposed to be uniformed overtime and they were

17  supposed to go on a list, the superior officers were

18  supposed to pick a list, have a list, and give it to

19  the officers in the order of where you are on the

20  list.  And the list is not kept accurately, not kept

21  at all.  Omissions are made, sometimes by my

22  personal line of my jobs that I was put down that I

23  worked and I didn't work.

24      Q       When did that occur?

J. POGGIOLI

78

1      A      Since 2005.  Since this list came out.

2      Q      Was your income from the New Rochelle

3 Police Department in 2005 less than it was in 2004?

4      A      I don't know.  I'd have to look at my

5 records.

6      Q      Was your income from the New Rochelle

7 Police Department in 2006 less than it was in 2004?

8      A      We didn't get our W-2s yet this year so I

9 don't have my accurate amount that I made last year.

10 Even those it's February 1st and you are supposed to

11 get it January 31st.  No one got it.

12     Q      I realize you don't have an exact number,

13 but is it your impression that your income from 2006

14 was less than it was in 2004?

15           MR. LOVETT:  Objection as to form.  You

16      can answer.

17     A      Well, in 2005 we started having our off

18 duty work done through the department.  So in 2005

19 it would be higher than 2004 because all off duty

20 work went through the department.

21     Q      Is it your impression that your --

22 withdrawn.

23           Is it your impression that your

24 income from the New Rochelle Police Department in

J. POGGIOLI

79

1    2006 was less than it was in 2005?

2         MR. LOVETT:  Objection as to form.  You

3    can answer.

4    A    I would think, since there was more off

5    duty in 2006 than 2005, I think my income in higher

6    in 2006 than 2005.

7    Q    Other than the circumstances that you just

8    mentioned, are you aware of any other pecuniary

9    losses that you suffered as a result of the

10   defendants' conduct?

11   A    All monetary income is gained through

12   working off duty overtime, so my contention is that

13   I've been penalized and that's why I didn't make as

14   much as I could have and I wasn't getting the

15   overtime I should have.

16   Q    Other than that circumstances that you

17   identified in July or August of 2005, can you

18   identify any other specific incidents where that

19   occurred?

20   A    That was the only occurrence.  That

21   happened the whole month.

22   Q    Do you have an estimate as to how much

23   income you lost as a result of that incident?

24   A    No.

J. POGGIOLI

80

1      Q      Now, going back to paragraph 18, "As a

2   result of defendants' conduct, the plaintiff has

3   been publicly humiliated."

4              In addition to what you have already

5   referenced about the department being a Peyton Place

6   and everybody knowing about it, have you suffered

7   any other public humiliation as a result of this

8   incident?

9              MR. LOVETT:   Objection as to form.   You

10        can answer.

11      A      Well, word gets out when you get written

12   up on charges and it just spreads like wildfire.

13   And everybody knows that and they presume you're

14   guilty prior to the actual outcome.   That's the --

15   the humiliation is obvious.

16              Not only has it been brought to the

17   department, it has been on two years now and no

18   decision has been made -- almost two years.   So

19   that's embarrassing humiliation.

20      Q      Is that humiliation you suffered within

21   the police department?

22      A      Yes, but it spreads out.

23      Q      Can you tell me the basis for your belief

24   that it spread beyond the police department?

J. POGGIOLI

81

1        A      I can't say for sure, but it seems like

2    when you have that feeling that people know that

3    something is going on with you, you kind get a

4    sense, if you will.

5        Q      Has anyone outside the police department

6    ever discussed these disciplinary charges with you,

7    other than your lawyer?

8        A      My wife.

9        Q      Other than your lawyer and your wife.

10       A      I don't think so.  I take that back.

11   There was -- the former mayor of New Rochelle came

12   up to me and he said that he heard there is some

13   kind of charges brought against you.  And I think

14   maybe some attorneys also.  I'm not sure about that.

15       Q      Which former mayor was that?

16       A      Ripley.

17       Q      When did he have that conversation with

18   you?

19       A      I saw him last year sometime.

20       Q      Meaning 2006?

21       A      Yes.

22       Q      Do you recall when in 2006?

23       A      I'm sorry.

24       Q      Can you tell us in words or substance what

J. POGGIOLI

82

1   he said to you and what you said to him in that

2   conversation?

3        A    He said, I hear that the department

4   brought up charges against you, what's going on and

5   why are they doing this.

6        Q    What did you say to him?

7        A    I said, it's typical of New Rochelle

8   Police Department.  He nodded his head and agreed.

9        Q    Was there somebody else who discussed this

10  with you who is outside the police department,

11  besides the former mayor?

12       A    Yes, he's the Commissioner of Veterans

13  Affairs, Ronald Tocher.  He heard also.

14       Q    How did you become aware that he had heard

15  about it?

16       A    He saw me and asked me.

17       Q    When did that occur?

18       A    Last year, I believe.

19       Q    In 2006?

20       A    Yes.

21       Q    Do you recall when in 2006 you had that

22  conversation?

23       A    I'm sorry, I don't.

24       Q    Can you tell me in words or substance what

83

1    Mr. Tocher said to you and what you said to him

2    about it?

3         A    Something like, Joe, I hear that they're

4    coming after you again, some nonsense, something

5    like that.  I don't know the exact words.

6         Q    What did you say to him?

7         A    I said, that's right, Ron, they are.

8         Q    Other than Mayor Ripley and Mr. Tocher,

9    have any other members of the public discussed these

10   charges with you?

11        A    There might have been a few other people.

12   I can't recall right now.

13        Q    Going back to paragraph 18 where it

14   indicates, "As a proximate result of defendants'

15   conduct, the plaintiff had been publicly

16   embarrassed."  Is that public embarrassment the

17   incidents that you just already testified about?

18        A    Yes, it's embarrassing when people come up

19   to you and say, I hear there is charges brought

20   against you.

21        Q    It says, "suffered irreparable damage to

22   his professional career and reputation."  Has your

23   professional career been affected at all by these

24   charges?

J. POGGIOLI

84

1      A      Yes.

2      Q      Could you explain how.

3      A      Well, there's -- obviously the police

4  department is not going to send me to any kind of

5  professional schooling or put me, as they say, on

6  the fast track to a gold shield, put me into a

7  specialized unit.  Obviously it affects my career

8  within the police department in my 27th year.

9      Q      You've been employed by the police

10  department for 27 years?

11      A      I'm in my 27th, so yes.

12      Q      Was your employment with the New Rochelle

13  Police Department the first police department that

14  you worked for?

15      A      Yes, sir.

16      Q      How were you employed before you became a

17  New Rochelle police officer?

18      A      I worked for a New Rochelle water company,

19  which is now called United Water.

20      Q      Did you ever work for the County of

21  Westchester?

22      A      No, sir.

23      Q      Did you ever work for the county police

24  department?

J. POGGIOLI

85

1      A    No, sir.

2      Q    Have you ever been convicted of a crime?

3      A    No, sir.

4      Q    Prior to your employment with the New

5  Rochelle Police Department, you've never been

6  convicted of a crime?

7      A    Not that I can recall, no.

8      Q    Let me go back to your allegation that

9  your professional career has been damaged, have you

10  applied to participate in any professional schooling

11  since these charges were brought against you?

12      A    Yes.

13      Q    What did you apply for?

14      A    Data master school.

15      Q    Anything else?

16      A    Actually, I believe that -- that I applied

17  for other schools that would come up, I don't recall

18  what they are.  But any opportunity to further my

19  education, further my career, I applied.

20      Q    Well, how do you go about applying for

21  these things?

22      A    Usually they ask for something in writing

23  to the person in charge, the captain of the

24  division.

J. POGGIOLI

86

1       Q       Did you provide that?

2       A       Yes.

3       Q       How many specific things did you apply for

4    in writing?

5       A       A few.  I don't know exactly how many.

6    It's kind of like an open-ended thing, any kind of

7    schooling that could further my education and my

8    career in the police department, I would be

9    interested in.

10      Q       You put that all in writing?

11      A       Yes.

12      Q       You still have copies of whatever you put

13   in writing?

14      A       Yes.

15      Q       Did you get a response to your requests?

16      A       No.

17      Q       Did anyone ever tell you they were not

18   going to let you participate in professional

19   schooling?

20      A       Captain Pizola said one time that since my

21   tenure on the police department, they wanted to get

22   more bang for the buck.  So I took that as of

23   because of my age and my time in the police

24   department, that I wasn't going to get any more

J. POGGIOLI

87

```
 1    schooling or any other classes to further my

 2    education and my career.

 3              And furthermore, that was when I

 4    personally did ask him about it and I did request to

 5    go for schooling, that was his response.

 6         Q    When did you have that conversation?

 7         A    After submitting a request to go to the

 8    school.

 9         Q    What school did you request to go to?

10         A    I don't recall.

11         Q    When did you submit the request?

12         A    When it was due.

13         Q    When was it due?

14         A    I don't know the time frame.  It was

15    either 2005 or 2006.  I believe it was 2006.

16         Q    You did that in writing?

17         A    Yes, I did.

18         Q    You still have a copy of it?

19         A    Absolutely.  Another incident, I requested

20    to be a field training officer in which you teach

21    rookies different ways of becoming a police officer

22    in the New Rochelle Police Department.  I requested

23    to be a field training officer and put that in

24    writing to Captain Kealy.
```

J. POGGIOLI

88

1      Q      When did you do that?

2      A      I believe that came out a few months ago.

3   I believe it was September but don't hold me to

4   that.  I have that in writing also.

5      Q      So it was the fall of 2006?

6      A      I believe it was, yes.

7      Q      Did you get a response?

8      A      No.

9      Q      Have you ever discussed it with him?

10     A      He really doesn't talk to me.

11     Q      Have you ever tried to speak to him about

12   it?

13     A      No.

14     Q      Do you know of any other officers were

15   sent for field -- do you know if any other officers

16   were sent for training as a field training officer

17   after you submitted your request?

18     A      Yes.

19     Q      Who was that?

20     A      Officer Vincent Marco and Officer

21   Navarrette, N. A. V. A. R. R. E. T. T. E., and there

22   was another officer, Officer -- I don't know his

23   name.  There was three.

24     Q      What is a field training officer?

J. POGGIOLI

89

1         A    Field training officer is when a rookie

2    gets out of the police academy and goes with the

3    field training officer and the field training

4    officer actually guides the probationary officer.

5    They go on different calls together, they go through

6    all different forms, they go through the different

7    procedures and everything that is expected of a

8    police officer, they try to groom them into what the

9    New Rochelle Police Department wants.

10                  It's interesting to see that they

11   picked three relatively brand new police officers

12   that just got out themselves.

13        Q    Was it your understanding that Officer

14   Navarrette just got on the job?

15        A    Not too long ago, but he hasn't been on

16   too long.

17        Q    Is there any additional compensation

18   involved in becoming a field training officer?

19        A    Yes, there is.

20        Q    What is that?

21        A    I believe it's a $1200 stipend.  I'm not

22   sure on that amount.  $1200 bonus.  Twelve hundred,

23   1500, something like that.

24        Q    Have you ever asked anyone in the

J. POGGIOLI

90

1  department for an explanation as to why you were not

2  assigned to become a field training officer?

3      A    If the request went to Captain Kealy I

4  didn't expect a request for him or an explanation.

5  He hardly talks to me now.  Why would he give me an

6  explanation.

7      Q    Have you ever asked anyone in the police

8  department for an explanation as to why you were not

9  assigned to become a field training officer?

10     A    Well, he picks the field training officers

11  so I knew that I wasn't going to get a reply.  So I

12  knew it was just dead right there.

13     Q    So am I correct that when you made the

14  request, it was your anticipation that it would not

15  be granted?

16         MR. LOVETT:  Objection as to form.

17     A    I figured it wouldn't be granted.

18     Q    So you knew that before you even filed it?

19     A    Well, I mean, I wanted it to be and I took

20  the shot.  I was the most experienced out of the

21  officers that applied, having 26 plus years in the

22  department.  I figured that I would possibly get it

23  so obviously I had to apply for it.

24             And when Captain Kealy came down to

91

1    roll call, he specifically said that he was

2    interested in senior officers applying for it

3    because not enough senior officers applied for it.

4    Myself being a senior officer, I applied for it but

5    three junior officers got it.

6        Q    Do you know why you didn't get it?

7        A    He doesn't like me.  Obviously went by

8    personal views and not by talent, experience.

9        Q    Referring back to paragraph 18 concerning

10   the damage to your professional career, am I correct

11   that your income from the New Rochelle Police

12   Department in 2006 was higher than your income from

13   the police department in any other year?

14            MR. LOVETT:  Objection as to form.  You

15       can answer.

16       A    I would probably say yes.  The off duty

17   work.

18       Q    Back to paragraph 18, the last sentence on

19   the page.  "Rendered anxious, emotionally upset and

20   otherwise rendered sick and sore."  Have you sought

21   any treatment for your emotional problems?

22       A    That's a confidential question.

23            MR. LOVETT:  You can answer.

24       A    Professionally?

J. POGGIOLI

92

1     Q     Have you sought treatment for the

2     emotional upset referenced in your complaint?

3     A     Professionally?

4     Q     Any treatment.

5     A     Oh, any treatment.

6     Q     For it, profession or otherwise?

7     A     Yes.

8     Q     Can you explain what that was?

9     A     I speak to God about it.

10    Q     Is that something you do every day?

11    A     Yes.

12    Q     What form does that take?

13    A     It helps me cope.

14    Q     When do you do that?

15    A     When I feel I have to.

16    Q     Does that happen at least once a day?

17    A     Sometimes.

18    Q     Does it happen more than once a day?

19    A     Sometimes.

20    Q     In what form do you do that?

21    A     The privacy of where I'm at.

22    Q     Do you verbalize the conversation?

23    A     Do I speak out loud?

24    Q     Correct.

J. POGGIOLI

93

1       A      No.

2       Q      In addition to speaking to God about it,

3  have you sought any other assistance in reference to

4  your emotional issues?

5       A      No, not yet.

6       Q      Are you planning to do it?

7       A      I'm thinking about it, yes.

8       Q      Have you consulted with anybody about it?

9       A      Just my wife.

10       Q      Now, other than the anxiety that you

11  reference in your complaint, have you suffered any

12  other emotional injuries that you think are related

13  to the disciplinary charges that were preferred

14  against you?

15       A      Could you rephrase that, please.

16       Q      Other than the anxiety that you've

17  referenced in the complaint, have you suffered any

18  other emotional injuries that you believe resulted

19  from the disciplinary charges that were preferred

20  against you?

21       A      Yes.

22       Q      Could you tell us what those were?

23       A      Since this had been hanging over my head

24  since May of 2005 and no action has been taken, it's

J. POGGIOLI

94

1    something that's been detrimental to my family life,

2    to my children, to my wife.  I'm much more

3    irritable.  My wife says that I have less patience

4    with my children, I yell at them a lot, and she

5    feels that this has to do with the possible

6    termination of my employment.

7                    Since I have four children and one

8    wife, one salary, I'm the breadwinner, and it takes

9    an emotional strain on not only myself but my wife

10   and my four children.

11        Q    Other than what you've already mentioned,

12   is there anything else that you suffered in terms of

13   emotional injury?

14        A    I'm obviously very concerned about the

15   outcome of this.  It's something that I occasionally

16   get migraine headaches, affects me with my life in

17   general.

18        Q    Have you sought treatment for the migraine

19   headaches?

20        A    No.

21        Q    Did anyone in the New Rochelle Police

22   Department ever convey to you the department's

23   willingness to settle these disciplinary charges?

24        A    You mean in a penalty?

J. POGGIOLI

95

1      Q      Correct.

2      A      Yes.

3      Q      When did that occur?

4      A      After the charges were served on me.

5      Q      Who conveyed that information to you?

6      A      Lieutenant Fortunato.

7      Q      What did he tell you?

8      A      He wanted a, I believe a thirty day

9   suspension and a six month suspension of off duty

10  work.

11     Q      What did you understand that to mean?

12     A      That it would have been very difficult for

13  me to provide for my family, my four children and my

14  wife, if that happened.

15     Q      What did you understand the thirty days

16  suspension to mean?

17     A      Thirty days loss of pay.

18     Q      Did you have enough accumulated time so

19  that you could provide the thirty days?

20     A      What do you mean by time?

21     Q      Did the department owe you any time at the

22  time they made that offer to you?

23     A      Well, they owe you vacation.  Is that what

24  you're talking about?

J. POGGIOLI

96

1        Q      How much vacation do you get every year?

2        A      20 days.

3        Q      Did you understand that to be calendar

4    days or work days?

5        A      Paid days.

6        Q      You understood it to --

7        A      I'm sorry, calendar days.

8        Q      Thirty calendar days.  And the six month

9    suspension from off duty work, would that mean that

10   you just wouldn't get assigned to any off duty work

11   for six months?

12       A      Yes.

13       Q      Am I correct that that would really relate

14   to off duty work that's assigned through the

15   department?

16              MR. LOVETT:  Objection to form.

17       A      All off duty work is assigned through the

18   department.

19       Q      You are not allowed to do any off duty

20   work unless it's assigned through the department?

21       A      Off duty work, yes, that's correct, unless

22   it comes from the department.

23       Q      Are police officers permitted to have

24   other employment other than departmental employment

97

1   that don't come through the department?

2       A    It has to be approved by the police

3   commissioner.

4       Q    But they are allowed to do; is that

5   correct?

6       A    If it's approved by the police

7   commissioner and only a certain amount of hours per

8   weak.

9       Q    Did you respond --

10          (Discussion held off the record.)

11              Mr. Poggioli, when an officer is

12  suspended in reference to some disciplinary charges,

13  is he permitted to participate in non departmental

14  employment?

15      A    I don't know.

16      Q    Did you ever ask?

17      A    No.

18      Q    I think I have finally gotten through your

19  complaint.  I have some other questions.  It will

20  take about an hour and a half or so.

21          (Discussion held off the record.)

22      Q    Mr. Poggioli, do you know a person by the

23  name of Gina Lapore?

24      A    Yes.

J. POGGIOLI

98

```
1        Q     Who is she?

2        A     She works for the court.

3        Q     Do you know how long she worked for the

4    court?

5        A     No.

6        Q     Did you ever -- withdrawn.

7              Did you have dealings with her in

8    reference to her employment with the court?

9        A     Sure I have.

10       Q     As far as you know, what did she do in the

11   court?

12       A     I don't know her exact title.

13       Q     Do you know what functions she

14   participated in?

15       A     No.

16       Q     You saw her there?

17       A     She worked in the court.

18       Q     Did you ever have occasion to talk to her

19   about any cases that you had on in court?

20       A     I could have.  I don't recall.

21       Q     As -- in reference to cases that you had

22   in court -- withdrawn.

23             Did she ever -- withdrawn.

24             As far as you know, did she have any
```

J. POGGIOLI

99

1    responsibility relating to the cases that you had on

2    in court as a police officer?

3        A    I don't know.

4        Q    Am I correct that in your 27 years as a

5    police officer, you've issued traffic tickets; is

6    that correct?

7            MR. LOVETT:  Objection as to form.

8        A    Yes.

9        Q    Did those cases -- withdrawn.

10            Are those tickets returnable in the

11    New Rochelle city court?

12        A    Yes.

13        Q    In reference to traffic tickets that

14    you've issued as a police officer, have you ever had

15    occasion to talk to Gina Lapore?

16        A    I don't recall.

17        Q    Have you ever had occasion to have to

18    testify in city court in reference to traffic

19    tickets that you've issued?

20        A    Yes.

21        Q    Do you get paid overtime for that?

22        A    If I'm not scheduled to work at that time.

23        Q    Am I correct that you work the third

24    shift; is that right?

J. POGGIOLI

100

1          MR. LOVETT:   Objection as to form.

2     A    Yes.

3     Q    Is that four to 12?

4     A    Yes.

5     Q    How long have you been working the four to

6  12 shift?

7     A    I could only guess.

8          MR. LOVETT:   Don't guess.

9     A    Approximately six or seven years.

10    Q    In that six or seven year period when

11 you've testified in court, would that have been off

12 duty time?

13    A    Not always.

14    Q    Can you explain the circumstances when it

15 would not have been off duty time?

16    A    Sometimes they have trials while you're

17 working or scheduled while you were working.

18    Q    Do you have trials that were scheduled

19 after 4:00 o'clock?

20    A    Usually at 4:00 o'clock.

21    Q    At 4:00 o'clock.

22    A    That's the scheduled time.

23    Q    Am I correct that some of the trials would

24 be scheduled before 4:00 o'clock?

101

1          MR. LOVETT:   Objection as to form.

2     A     Yes.

3     Q     When you had to appear before

4  4:00 o'clock, did you receive overtime?

5     A     If I wasn't scheduled to work that day.

6     Q     If you were scheduled to work that day,

7  would you get overtime if you appeared before

8  4:00 o'clock?

9     A     If I was scheduled to work during the day

10 and the trial was during the day, I would not get

11 overtime.  Sometimes my schedule changed to

12 whatever.

13    Q     In the last six or seven years, did you

14 ever work any other tour of duty other than the four

15 to 12 shift?

16    A     Yes.

17    Q     When was that?

18    A     I don't have the date readily available,

19 but yes.

20    Q     Did you ever talk to Gina Lapore about

21 disciplinary charges that were brought against her?

22    A     I don't think so, no.

23    Q     Did you ever talk to Gina Lapore about the

24 disciplinary charges that had been brought against

J. POGGIOLI

102

1    you?

2        A     No.

3        Q     Did you ever talk to Gina Lapore about her

4    lawsuit against the City of New Rochelle?

5        A     I believe not.

6        Q     Did you ever talk to Gina Lapore about

7    your lawsuit against the City of New Rochelle?

8        A     I believe not.

9        Q     Did you ever talk to Gina Lapore about her

10   termination from employment with the City of New

11   Rochelle?

12       A     I believe not.

13       Q     Over than through conversations with your

14   attorney, did you ever become aware of any testimony

15   that was given at her disciplinary hearing?

16       A     No.

17       Q     Did you ever have any discussions with

18   Gina Lapore in reference to scheduling trials where

19   you were the officer who issued traffic tickets?

20       A     Can you repeat that again, please.

21       Q     Did you ever have any conversations with

22   Gina Lapore in reference to the scheduling of trials

23   concerning traffic tickets that you had issued as a

24   police officer?

J. POGGIOLI

103

1      A    I believe not.

2      Q    I'm going to call your attention to

3  April 20, 2005, the date of the alleged special duty

4  assignment.  Did you sign in for that assignment?

5      A    Yes.

6      Q    Did you sign out for the assignment?

7      A    Yes.

8      Q    Now, on that particular day, were you

9  present at the New Rochelle police headquarters at

10 approximately 1:00 o'clock in the afternoon?

11     A    I don't know the time of the assignment.

12     Q    During the course of the assignment, did

13 you have occasion to come back to the New Rochelle

14 police headquarters?

15     A    I believe you asked me that question.

16     Q    Tell me what the answer is.

17     A    I think I said I believe not.

18     Q    I'm going to show you what's been marked

19 as Defendants' B for identification and ask you if

20 you can identify that document.  Can you identify

21 the document, do you know what it is?

22     A    No.

23     Q    Have you ever seen it before?

24     A    I might have.

J. POGGIOLI

104

1      Q    Do you recall when that was?

2      A    During the departmental trial, if I saw

3  it.

4      Q    Was that the first time you saw it?

5      A    If I saw it, yes.

6      Q    I'm going to show you what's been

7  premarked as Defendants' C for identification.  I'm

8  going to ask you if you can identify that document.

9           (Witness perusing documents.)

10     A    It's a copy of P.D. 37.

11     Q    Have you seen this document before?

12     A    I might have seen it during the trial.

13     Q    Was that the first time you saw it?

14     A    If it was during the trial, yes.

15     Q    You didn't see it before your hearing?

16     A    Before the department trial?

17     Q    Correct.

18     A    No.

19     Q    I'm going to show you what's been

20  premarked as Defendants' D for identification and

21  ask you if you can identify that document.

22     A    It's a copy of the P.D. 59D.

23     Q    What is a P.D. 59D?

24     A    It's an off duty sheet you sign in and

J. POGGIOLI

105

1  sign out.

2      Q    Is this the sheet that you signed in on

3  for -- withdrawn.

4           Is this the sheet in which you signed

5  out for the off duty assignment on April 20, 2005?

6      A    No, not this sheet.

7      Q    I'm sorry.  Let me rephrase the question.

8  Referring to Defendants' Exhibit D for

9  identification, is this a copy of the sheet on which

10  you signed out for your off duty employment on

11  April 20th, 2005?

12      A    A copy, yes.

13      Q    Looking at the third signature from the

14  bottom, is that a copy of your signature?

15      A    Yes.

16      Q    Going across towards the right, under job

17  hours it says 1200 to 1600.  Can you identify that

18  handwriting?

19      A    That's my handwriting.

20      Q    In reference to the -- going back to the

21  left where it says Coligni dash Webster, is that

22  your handwriting as well?

23      A    Yes.

24      Q    Going back to the right under the column

J. POGGIOLI

106

1  that says time out 12:00 o'clock, is that your

2  handwriting?

3      A   Yes.

4      Q   And then continuing to the right where it

5  says time in, 1530, is that your handwriting?

6      A   Yes.

7      Q   Under the column that says radio 116, is

8  that your handwriting?

9      A   Yes.

10     Q   Continuing to the right under the column

11 that says supervisor out, there appears to be

12 nothing in that column.  Do you know why there is

13 nothing in that column?

14     A   No.

15     Q   Continuing to the right, there seems to be

16 a signature under the column that says supervisor

17 in; is that correct?

18     A   Yes.

19     Q   Can you identify that handwriting?

20     A   No.

21     Q   When you signed out for this assignment,

22 was there anybody working the desk that day?

23     A   Oh, I'm sure somebody was working the

24 desk.

J. POGGIOLI

107

```
 1        Q     Under the column where it says supervisor,

 2   what did you understand that to mean?

 3             MR. LOVETT:  Objection.  There are two

 4        such columns.

 5             MR. MEISELS:  Counsel is correct.  I'll

 6        withdraw the question.

 7        Q     Under the column that says supervisor out,

 8   what did you understand that to mean?

 9        A     The supervisor signs off -- signs off on

10   that you came in.

11        Q     Who was the supervisor that day?

12        A     I don't know.

13        Q     How does a person who's working a off duty

14   assignment know who the supervisor is?

15        A     Usually the supervisor's there.

16        Q     When you signed out for that job, was

17   there a supervisor there?

18        A     I didn't see one, no.

19        Q     When you signed in, was there a supervisor

20   there?

21        A     Yes.

22        Q     Do you recall who it was?

23        A     I believe it was Lieutenant Childs, C. H.

24   I. L. D. S.
```

J. POGGIOLI

108

1     Q    I'm going to show you what's been

2  premarked as Defendants' E for identification and

3  ask you if you can identify that document?

4     A    I cannot.

5     Q    Have you ever seen it before?

6     A    I don't recall.  No, I don't think I have.

7     Q    Did you ever learn during the course of

8  your disciplinary hearing or otherwise that the

9  police department had a record indicating that you

10  had entered the back door at approximately

11  1:00 o'clock in the afternoon?

12          MR. LOVETT:  Objection as to form.

13     A    No.  I don't --

14     Q    You never learned that?

15     A    I'm sorry, can you repeat that again.

16     Q    During the course of your disciplinary

17  hearing or at any other time, did you ever learn

18  that the New Rochelle Police Department had a record

19  that suggested that you had entered the back door of

20  the police department at approximately 1:00 o'clock

21  in the afternoon on April 20th, 2005?

22          MR. LOVETT:  Objection as to form.  You

23     can answer.

24     A    They -- I know they have a record of your

J. POGGIOLI

109

1    access card and when that access card is, if it's

2    working right, used when you come in and go out --

3    not when you go out, when you come in.

4        Q    Did you ever learn at any time that the

5    access -- your access card was not working property

6    on April 20th, 2005?

7        A    I don't know if it was working accurately

8    that day.

9        Q    I'm going to show you what has been

10   premarked as Defendants' F for identification.

11       A    Thank you.

12       Q    And ask you if you can identify that

13   document.

14       A    Yes.

15       Q    Tell me what it is.

16       A    It's a form that when -- you sign whether

17   or not you want to waive your right to

18   representation.

19       Q    Look at the lower left hand corner.  Is

20   that a copy of your signature?

21       A    Yes, it is.

22       Q    Do you recall having signed this document?

23       A    Yes.

24       Q    Do you recall when you signed it?

110

1         A     I don't recall, but if we go by the date

2    it was May 6th, 2005.

3         Q     Were you interviewed in reference to the

4    circumstances that led to the pending disciplinary

5    charges?

6         A     Yes.

7         Q     Did that occur on or about May 6, 2005?

8         A     If this form is correct, I would say so,

9    yes.

10        Q     Who was present at the interview?

11        A     Captain Kealy and I believe Sargent

12   Joseph.

13        Q     And yourself of course?

14        A     Yes.

15        Q     There were just three people present?

16        A     Yes.

17        Q     Can you tell me in words or substance what

18   Captain Kealy said to you?

19        A     That they were investigating a complaint

20   and he was doing a investigation.

21        Q     Did he tell you what the complaint was?

22        A     Yes.

23        Q     What did he say?

24        A     Pertaining to my off duty job on April 20,

J. POGGIOLI

111

1     I think he said.

2         Q     Before you met with Captain Kealy and

3     Sargent Joseph, were you aware that there was an

4     investigation?

5         A     No.

6         Q     Was this the first time you learned that

7     there was a question about the off duty assignment?

8         A     Yes.

9         Q     In words or substance, did Captain Kealy

10    say anything to you other than what you've already

11    testified to?

12        A     No, just that he was doing an

13    investigation.

14        Q     Did he ask you for an explanation as to

15    what happened?

16        A     It is pretty much one-sided.  Captain

17    Kealy was pretty much directing the investigation.

18    I was just answering questions.  It's kind of

19    peculiar that the investigation be done 16 days

20    after the initial incident.

21        Q     Did he ask you any questions?

22        A     I'm sure he did, yes.

23        Q     Do you recall what those questions were?

24        A     No, I don't.


J. POGGIOLI

112

1     **Q**    Did you answer the questions?

2     **A**    Of course.

3     **Q**    What answers did you give him?

4     **A**    Whatever questions he asked me.

5     **Q**    As you sit here today, do you recall what

6 you told him about the incident?

7     **A**    I don't remember the questions so I

8 couldn't remember what I told him about the

9 incident.

10    **Q**    Do you know whether or not the

11 conversation was taped?

12    **A**    Two times I was called into his office and

13 one time was definitely taped.  I don't remember

14 which one it was.

15    **Q**    The second time was after May 6th?

16    **A**    I don't remember if this was the first

17 time or the second time.

18    **Q**    Let's go back to the May 6th meeting.  Did

19 Sargent Joseph say anything at the meeting?

20    **A**    No.

21    **Q**    So am I correct that all the conversation

22 was between you and Captain Kealy?

23       MR. LOVETT:  Objection as to form.  You

24    can answer.

J. POGGIOLI

113

1     A     Yes.

2     Q     You were the only two people that said

3  anything; is that right?

4     A     Yes.

5     Q     Other than what you've already testified

6  to, do you recall anything else Captain Kealy said

7  to you during that meeting?

8     A     I remember he asked me for my memo book

9  and I had to go back out and get that.

10    Q     Can you explain what a memo book is.

11    A     A memo book is a book that consists of 50

12 pages that we write down date, time, job duties,

13 calls, officers and so on and so forth, and he

14 requested that.

15             And then I brought it into him and he

16 looked at it and then he shut the tape recorder off

17 and Sargent Joseph went out and made a copy of it

18 and came back.

19    Q     So there was a tape recorder?

20    A     Yes, but I don't remember which time,

21 whether it was the first or second time.

22    Q     Other than what you've testified to, was

23 there any other conversation with Captain Kealy at

24 that meeting?

J. POGGIOLI

114

1  A  Like I said, he asked me questions and I

2 answered them.

3  Q  But you don't remember what they were?

4  A  No.

5  Q  I'm going to show you what's been

6 premarked as Defendants' Exhibit G for

7 identification and ask you if you can identify that

8 document?

9  A  Yes.

10  Q  What is it?

11  A  It's a copy of my pages from my memo book.

12  Q  Are these the pages that refer to

13 assignments that you received on April 20th, 2005?

14  A  No.

15  Q  What do they refer to?

16  A  It refers to on -- looks like April 11, my

17 tour on duty.

18  Q  If you could turn to the second page of

19 the exhibit, does the second page of the exhibit

20 refer to assignments that you received on April 20,

21 2005?

22  A  Yes, when I was working.  Yes.

23  Q  Is this your handwriting?

24  A  Yes.

J. POGGIOLI

115

1      Q      Could you read what the notations say

2   under April 20th, 2005?

3      A      Yes.

4      Q      Could you read and would you?

5      A      It says, April 20th, '05.  Wednesday,

6   third tour, 1600 to 2400.  Sector seven and then

7   radio car seven, radio number seven and meal at 1900

8   hours, 1749 hours, Rose Hill Avenue, animals call,

9   and 1915 hours, 1063.  That's a code.  Then 1945

10  hours, 1098, that's a code that came back to

11  service.  And then 2253 hours Webster and Parcot,

12  P. A. R. C. O. T., personal welfare.  Then 2345,

13  it's N. F. T. R., nothing further to report, and

14  then I scribbled my name.

15     Q      Am I correct there is no notation as to

16  any off duty assignment?

17            MR. LOVETT:  Object as to form.

18     A      Correct.

19     Q      At the time that you maintained this memo

20  book back in April 2005, what was your understanding

21  as to whether or not off-duty assignments should be

22  noted in your memo book?

23     A      I don't recall.

24     Q      Was it your practice in 2005 to note off

J. POGGIOLI

116

1    duty assignments in your memo book?

2        A    I don't recall.

3        Q    Do you still have the memo book?

4        A    Yes.

5        Q    I'm going to show you what's been

6    premarked as Defendants' H for identification.

7        A    Thank you.

8        Q    Can you identify that document?

9        A    Yes, it's a copy of the overtime slip.

10       Q    Looking at the upper third on the right

11   hand side, is that a copy of your signature?

12       A    Yes.

13       Q    Is this a request that you submitted to

14   the department?

15       A    Yes.

16       Q    Am I correct that you requested

17   compensation for three and a half hours of time?

18            MR. LOVETT:  Objection to form.  You can

19       answer.

20       A    Yes.

21       Q    Referring to the upper third of the

22   Exhibit A -- of Exhibit H, is that -- in reference

23   to the top-third, is everything that's handwritten

24   done in your handwriting?

J. POGGIOLI

117

1       A     On the top half?

2       Q     The top third.

3       A     The top third.

4       Q     Yes?

5       A     Yes.

6       Q     So in terms of time where it says from

7   12:00 p.m. to 1530 p.m; is that your handwriting?

8       A     Yes.

9       Q     Looking in the fourth line down, it says,

10  "appeared in" and then there is something written.

11  What does that say?

12      A     Pre-staffed.

13      Q     Is that your handwriting?

14      A     Yes.

15      Q     What does that mean?

16      A     I was assigned to that.

17      Q     Your shield number is 5801?

18      A     No.

19      Q     Who wrote in 5801?

20      A     I did.

21      Q     Why would you have written in a number

22  that's not your shield number?

23      A     Because we use our employee number to get

24  paid in that.

J. POGGIOLI

118

1      Q      That's your employee number?

2      A      Yes, these forms were never changed so we

3   use those.

4      Q      Going to the middle of the page, there's a

5   line that said verified by court/desk officer.

6      A      Yes.

7      Q      Do you recognize the person who signed

8   that?

9      A      I believe it's Lieutenant Childs.

10      Q      Then under that it says verified by

11   division commander, do you recognize that

12   handwriting?

13      A      I would think it would be Captain Cozolla.

14   No, it couldn't be.  It looks like an L. T.  It's

15   lieutenant something.  I don't know what it is.

16      Q      I'm going to show you what has been

17   premarked as Defendants' I for identification.  Can

18   you identify that document?

19      A      Yes.

20      Q      What is that?

21      A      These are the charges and the

22   specifications from Captain Kealy against myself.

23      Q      Are these the charges and specifications

24   in reference to which you had a hearing?

119

1       A      I'll going to have to read it over.

2       Q      Okay.

3       A      Do you want me to read it?

4       Q      Sure, take a look.

5       A      But I don't know if this is exactly what I

6   was charged with.

7       Q      Even if you read it over now, you wouldn't

8   know if this was the same thing?

9       A      Right.

10      Q      Were you given a copy of the charges?

11      A      Yes.

12             (Discussion held off the record.)

13      Q      I'm going to show you what's been

14  premarked as Defendants' J for identification.

15      A      Thank you.

16      Q      And ask you if you can identify that

17  document.

18             (Witness perusing documents.)

19      A      This is something, a copy of something

20  that Mr. Troetti, T. R. O. E. T. T. I., which is the

21  PBA attorney, sent back as a reply.  I have to read

22  it.

23      Q      Have you ever seen it before?

24      A      I probably have.  I just don't remember

J. POGGIOLI

120

1    it.  There's so many papers involved.  I'm sure I

2    saw it but I don't know if this is a true copy.

3        Q    Do you know whether you saw this answer

4    before it was sent back by Mr. Troetti?

5            MR. LOVETT:  Objection as to form.  You

6        can answer.

7        A    Clarify.  Before Mr. Troetti sent it?

8        Q    Correct.

9        A    I might have.  He might have sent me a

10   copy prior to.  I don't remember.

11       Q    I'm going to show you what has been

12   premarked as Defendants' K for identification and

13   ask you if you can identify that document.

14            (Witness perusing documents.)

15       A    This is a P.D. 37, copy of a P.D. 37.

16       Q    Have you ever seen it before?

17       A    I saw it at the trial.

18       Q    Was that the first time I saw it?

19       A    I believe so, yes.  Yes, I'm pretty sure

20   that was the first time.

21       Q    In reference to your special duty

22   assignment on April 20, 2005, who was the person in

23   charge of the Persico contracting job site?

24       A    Of that particular job site it was

J. POGGIOLI

121

1    Mr. Canaro.

2        Q    Prior to April 20th, 2005, had you met

3    Mr. Canaro before?

4        A    This is wrong.  It doesn't say Canaro on

5    here.

6        Q    I'm asking for your recollection.  Don't

7    get confused by the documents.  I'm asking for your

8    recollection.

9        A    I don't know if this document is correct,

10   because it doesn't have Mr. Canaro's -- .

11            MR. LOVETT:  Answer his question.

12       Q    Let me ask it again.  Prior to April 20th,

13   2005, had you met with Mr. Canaro?

14       A    I don't recall.

15       Q    Had you worked a special duty assignment

16   for Persico Contracting before April 20th, 2005?

17       A    Probably, yes.

18       Q    Did there ever come a time that you

19   prepared a letter for Mr. Canaro to sign?

20       A    Yes.

21       Q    Did you talk to him about the substance of

22   the letter before you prepared it?

23       A    Yes.

24       Q    What did you say to him and what did he

J. POGGIOLI

122

1    say to you about that letter?

2        A    I said that the department's alleging that

3    I came here late to the job site and that I'm going

4    to -- I got to answer it so I'm going to type

5    something up.  If you think it's accurate, if you

6    would sign it.

7        Q    When did you have that conversation with

8    him?

9        A    I don't recall the date.

10       Q    Obviously after April 20th, am I correct?

11       A    Yes.

12       Q    Was it after you had disciplinary charges

13   preferred against you?

14       A    I don't think so, no.

15       Q    Before that?

16       A    Yes.

17       Q    At the time you had that conversation with

18   him, were you in uniform?

19       A    I might have been, I don't remember.

20       Q    Do you recall the time of day you had that

21   conversation with him?

22       A    Time of day, no.

23       Q    After that conversation you then prepared

24   the letter; am I correct?

J. POGGIOLI

123

1      A    Yes.

2      Q    Did you type it yourself?

3      A    Yes.

4      Q    You did that at home?

5      A    I don't recall where I did it.

6      Q    Then you brought the letter to him?

7      A    Yes.

8      Q    At the Persico Contracting site?

9      A    Might have been.  I don't remember exactly

10  where.

11     Q    Have you ever met with him in any place

12  other than the Persico Contracting site in New

13  Rochelle?

14     A    Maybe.  I don't remember.

15     Q    Other than your dealings with him on

16  April 20th, 2005 and your conversations concerning

17  this letter, have you had any other dealings with

18  him?

19     A    I worked for the company but I don't think

20  I worked for him directly.

21     Q    When did you work for the company?

22     A    I don't know.  Department records would

23  have that.

24     Q    These were all special duty assignments?

J. POGGIOLI

124

1      A    Yes.

2      Q    Was the job site the same place, at

3  Webster and Coligni?

4      A    No.

5      Q    What other job sites did you work at?

6      A    It could be anywhere in New Rochelle,

7  anywhere that they needed someone.

8      Q    When you returned with the letter, were

9  you in uniform?

10      A    You asked me that already.

11      Q    No, I asked you when you first discussed

12  the letter were you in uniform.  Now my question is

13  separate:  When you came back with the letter after

14  you prepared it, were you in uniform?

15      A    I don't recall.  I don't recall.

16      Q    When you came back with the letter, tell

17  me in words or substance what you said to him and

18  what he said to you?

19      A    I said, I typed this up, if you think it's

20  accurate, if you don't mind signing it.  Please sign

21  it.  And he read it, he said, I have no problem with

22  this, it's all accurate, and he signed it.

23      Q    What did you do with the letter after he

24  signed it?

J. POGGIOLI

125

```
 1        A     I eventually gave it to Captain Kealy.

 2        Q     Do you recall when Mr. Canaro signed the

 3   letter?

 4        A     No.

 5        Q     Do you recall when you gave it to Captain

 6   Kealy?

 7        A     It was shortly thereafter.  I don't know.

 8   I'm sorry.

 9        Q     Referring back to April 20th, 2005, were

10   you in fact present at police headquarters at

11   approximately 1:00 o'clock in the afternoon?

12        A     No.  I was at the job site.

13        Q     During the disciplinary hearing, did you

14   view a video of what occurred at the front desk of

15   the New Rochelle Police Department on April 20th,

16   2005?

17        A     It wasn't the front desk, but yes.

18        Q     Where was it of?

19        A     It was the booking desk.

20        Q     I apologize.  I'm sorry.

21              Were you depicted in that video?

22        A     It looks like me.  But I usually wear a

23   hat, I didn't see a hat.

24        Q     I'm going to show you what's been
```

J. POGGIOLI

126

1   premarked as Defendants' L for identification and

2   ask you if you can identify that document.

3           (Witness perusing documents.)

4       A    It's a copy of an overtime slip that's cut

5   off on the top.

6       Q    I'm going to ask you if you can compare

7   that to what we already showed you as Defendants' H

8   for identification.  Do you have that?

9       A    Yes.

10      Q    I notice on Defendants' L there is no

11  stamp.  It says special P.D.P. 148.3, while on H

12  there is.  Do you have any information as to why

13  that one has that stamp and the other one doesn't?

14      A    No, I have no knowledge of that.

15      Q    In reference to Defendants' L, the last

16  one that I gave you, if you look at the upper-third

17  of the page, is that a copy of your signature?

18      A    Yes.

19          (Short recess taken.)

20      Q    Mr. Poggioli, this morning you testified

21  in reference to the police department's practices

22  relating to special duty assignments.  Is there a

23  maximum amount of time that a police officer is

24  permitted to work overtime?  Is there any limit on

J. POGGIOLI

127

1    the amount of overtime you are allowed to work?

2            MR. LOVETT:   Objection as to form.   You

3        can answer.

4        A      There is a difference between departmental

5    overtime and special duty overtime.

6        Q      Could you explain to me what the

7    differences are?

8        A      Departmental overtime would be if there is

9    a staff shortage.

10       Q      Is there a limit on how much departmental

11   overtime a police officer is permitted to work?

12       A      No.

13       Q      In terms of special duty assignments, is

14   there a limit on how much overtime police officers

15   are permitted to work?

16       A      Yes.

17       Q      What is that?

18       A      Twenty hours per week.

19       Q      How long has that limitation been in

20   effect?

21       A      I don't know.

22       Q      It would be more than a few years?

23       A      Yes.

24       Q      Can you recall back to a time when that

J. POGGIOLI

128

1    limitation did not apply?

2        A    It pretty much only came into play when we

3    started to get a lot of off duty.  Many years ago we

4    didn't have the off duty jobs that we have now

5    there.

6        Q    Do you recall approximately when it came

7    into play?

8        A    It may have always been there, but I don't

9    know.

10       Q    Now, in 2006, how many hours of special

11   duty assignments did you receive?

12       A    Did I receive or did I work?

13       Q    Did you work?

14       A    I don't keep records of that.  The police

15   department has records of that.

16       Q    Do you know whether or not you averaged

17   close to 20 hours a week?

18       A    Some weeks, yes.

19       Q    So there was some weeks when you got the

20   max?

21       A    Yes.

22       Q    Would it be correct that you received the

23   max most weeks?

24            MR. LOVETT:  Objection as to form.  You

J. POGGIOLI

129

1    can answer.

2        A    I don't know if that would be correct, no.

3        Q    Do you know of anybody in the department

4    who received more special duty assignments than you

5    did?

6        A    I don't have people's records.  I don't

7    know.

8        Q    Do you know if anybody in the department

9    in 2006 worked more special duty assignments than

10   you did?

11       A    No, I have no knowledge of that.

12       Q    Do you know for 2006 if anyone in the

13   department worked more special duty hours than you

14   did?

15       A    I have no knowledge of that.  I don't have

16   those records.  The police department has those

17   records.

18       Q    In reference to 2005, did you use any sick

19   days?

20       A    None.

21       Q    In reference to 2006, did you use any sick

22   days?

23       A    None.

24       Q    Did you receive any compensation or bonus

130

1    for not using sick days in 2006?

2         A    Yes, there's a contractual stipulation on

3    that.

4         Q    Do you recall what that was?

5         A    It's about a thousand dollars.  It might

6    be 12 hundred, I'm not sure.  It's in the contract.

7         Q    Did you receive any compensation for not

8    using sick days in 2005?

9         A    Yes.

10        Q    Do you recall what that was?

11        A    It was -- I think it was pretty much the

12   same amount, like a thousand, 1200, something like

13   that.

14        Q    In reference to the special duty

15   assignment that you received on April 20th, 2005,

16   when were you first aware of the assignment?

17        A    I believe I was called that morning.  It

18   was like a last minute detail.

19        Q    Do you recall who called you?

20        A    I'm pretty sure it was Sargent

21   Mergenthaler, M. E. R. G. E. N. T. H. A. L. E. R.

22        Q    Is Sargent Mergenthaler retired?

23        A    Yes.

24        Q    Did he call you at home?

J. POGGIOLI

131

1      A     I don't remember if he called me at home

2   or on my cell phone.

3      Q     Where were you when you received the call?

4      A     In New Rochelle.  Wait a minute.  It

5   couldn't have been in New Rochelle because I don't

6   live in Rochelle.  I don't recall.  He either called

7   me at home or on my cell phone, and if he called me

8   on my cell phone, I might even have been home.  But

9   I don't recall.

10     Q     Where do you live?

11     A     Carmel.

12     Q     How long does it take you to get from your

13  home to the New Rochelle police headquarters?

14     A     About 40, 45 minutes.

15     Q     You don't recall what time he called?

16     A     No.

17     Q     Can you tell me in words or substance what

18  he said to you when he did call you?

19     A     Something like there is an off-duty job

20  today.  I think he called me that day.  Maybe he

21  called me the day before.  He pretty much gave me

22  the specifics of the job, where it was, what job it

23  was, location.

24     Q     Did he say anything else to you other than

J. POGGIOLI

132

1    give you the specifics?

2        A    He asked me if I would take it.

3        Q    What did you say to him?

4        A    I said yes.

5        Q    Did he say anything about having

6    difficulty about filling the job or anything of that

7    sort?

8        A    I recall something like it just came in.

9    It was a last minute job.  He always called me

10   because I'd take anything.  I was very reliable.

11   Something like it just came in or he has to fill it

12   tomorrow or something.  I don't remember.

13            MR. MEISELS:  I need five minutes with my

14        clients and we may be finished.

15                (Short recess taken.)

16            MR. MEISELS:  No further questions.

17                (Time noted: 3:05 P.M.)

18

19

20

21

22

23

24

J. POGGIOLI

133

**WITNESS CORRECTION SHEET**

PAGE \ LINE \ CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

JOSEPH A. POGGIOLI

Subscribed and sworn to before me

this 19 day of March , 2007

_____ Notary Public

JANICE M. CONFALONE
Notary Public, State of New York
No. 4569868
Qualified in Westchester County
Commission Expires November 13, 2009

134

1   STATE OF NEW YORK        )

2                            )    SS:

3   COUNTY OF WESTCHESTER)

4            I, JOSEPH A. POGGIOLI, a PLAINTIFF, do

5   hereby certify that having been first duly

6   sworn to testify to the truth, the whole truth,

7   and nothing but the truth, gave the above

8   deposition, which was recorded stenographically

9   and reduced to this original transcript.

10           I FURTHER CERTIFY that the foregoing

11  transcript of the said deposition is a true and

12  correct transcript of the testimony given by me at

13  the time and place specified herein before.

14           I FURTHER CERTIFY that any corrections

15  or changes to this testimony have been made by me on

16  the page provided for that purpose captioned

17  "Witness's Correction Sheet," which has also been

18  signed by me before a Notary Public.

19

20           JOSEPH A. POGGIOLI

21  Subscribed and sworn to before me this _19_ day

    of _March_ 2007.

22

23                                    Notary Public.

                          JANICE M. CONFALONE
                       Notary Public, State of New York
24                              No. 4958908
                        Qualified in Westchester County
                     Commission Expires November 13, 20_09_

VERITEXT/NEW YORK REPORTING COMPANY

J. POGGIOLI

135

1                C E R T I F I C A T I O N

2

3        I, RUTHAYN SGAGLIO, a Court Reporter

4   and Notary Public within and for the State

5   of New York, do hereby certify:

6            That the witness whose deposition

7   is herein before set forth, was duly sworn

8   by me, and that the within transcript is a

9   true record of the testimony given by such

10  witness.

11           I further certify that I am not

12  related to any of the parties to this action

13  by blood or marriage, and that I am in no way

14  interested in the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto

16  set my hand this 28th day of February, 2007.

17

18

19

20           _____

21               RUTHAYN SGAGLIO

22

23

24

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                  516-608-2400

**EXHIBIT 4**