1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------------------X

4    JOSEPH POGGIOLI, JR.,

5                        Plaintiff,

                                          Civ. No.:

6        -against-                        07/6674

7    PATRICK J. CARROLL,

     INDIVIDUALLY, AND THE CITY OF

8    NEW ROCHELLE, NEW YORK,

9                        Defendants.

     -------------------------------------------X

10

11                     3 Gannett Drive

                       White Plains, New York

12                     October 30, 2007

                       10:17 AM

13

14

15

16

17

18

19          Examination before Trial of Plaintiff,

20   JOSEPH POGGIOLI, held pursuant to Order, at the

21   above time and place, before Susie Cabanas-Diaz, a

22   Notary Public of the State of New York.

23

24

25

<table>
<tr><td>

2

1
2 APPEARANCES:
3    LOVETT & GOULD, LLP
     Attorneys for Plaintiff
     222 Bloomingdale Road
     White Plains, New York 10605-1513
5 BY: DRITA NICAJ, ESQ.
     Email: dnicaj@lovett-gould.com
6
7 WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
     Attorneys for Defendants
8 3 Gannett Drive
     White Plains, New York 10604-3407
9. BY: PETER A. MEISELS, ESQ.
     Email: peter.meisels@wilsonelser.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

</td><td>

4

1
2    JOSEPH POGGIOLI, a
3 Plaintiff, having been first duly sworn by Susie
4 Cabanas-Diaz, a Notary Public of the State of New
5 York, and stating his address as 25 Wyndham Lane,
6 Carmel, New York 10512, was examined and testified
7 as follows:
8    MS. NICAJ: My name is Drita Nicaj. I
9 represent Joseph Poggioli. I would like
10 Mr. Poggioli to have an opportunity to review and
11 correct his deposition transcript once the
12 transcript is available. Will you be providing
13 that, Mr. Meisels?
14    MR. MEISELS: No.
15    MS. NICAJ: Okay. Then we'll a
16 request a copy.
17    MR. MEISELS: And we're requesting a copy
18 as well.
19 EXAMINATION BY
20 MR. MEISELS:
21    Q   Mr. Poggioli, my name is Peter Meisels and
22 I'm going to be asking you some questions about your
23 complaint in this matter. If they're not clear,
24 please tell me and I'll be happy to rephrase them.
25 Fair enough?

</td></tr>
<tr><td>

3

1
2    IT IS HEREBY STIPULATED AND AGREED, by
3 and between the attorneys for the respective
4 parties hereto, that this examination may be
5 sworn to before any Notary Public.
6
7    IT IS FURTHER STIPULATED AND AGREED that
8 the sealing and filing of the said examination
9 shall be waived.
10
11    IT IS FURTHER STIPULATED AND AGREED that
12 all objections to questions except as to form
13 shall be reserved for trial.
14
15
16
17
18
19
20
21
22
23
24
25

</td><td>

5

1    POGGIOLI
2    A   Yes.
3    Q   I'm going to show you what's been
4 premarked as Defendants' A for identification and
5 ask you to review that document and then tell me if
6 you can identify it.
7    (Defendants' Exhibit A, previously marked for
8         Identification.)
9    (Witness Perusing)
10    A   I haven't read each word but it looks like
11 a copy of my complaint. If you want me to read each
12 word --
13    Q   Well, let me ask you a follow-up question
14 before --
15    A   Can I just add something? I never saw
16 these last two pages before.
17    Q   Fair enough. In reference to the first
18 five pages of the document, have you ever seen those
19 first five pages before today?
20    A   Yes.
21    Q   At the time that you saw them prior to
22 today, did you review them?
23    A   Yes.
24    Q   And at the time that you reviewed them,
25 was it your impression that everything in that

</td></tr>
</table>

2 (Pages 2 to 5)

6

POGGIOLI

1
2  document was accurate?
3      MS. NICAJ: Objection. You can answer.
4      A  Like I said, I didn't read each word. If
5  you want me to read each word, I can do that but it
6  looks like it is, yes.
7      Q  Okay. Fair enough. Where are you
8  residing now?
9      A  In Carmel, New York.
10      Q  The same address as you've had for the
11  last several years?
12      A  Yes.
13      Q  How long have you lived there?
14      A  About six years.
15      Q  Okay. And what is your actual address?
16      A  25 Wyndham Lane, Carmel, New York 10512.
17      Q  And how are you presently employed?
18      A  I'm not.
19      Q  And when were you last employed?
20      A  July 20, 2007.
21      Q  Are you presently receiving a pension?
22      A  Yes.
23      Q  And is that in connection with your prior
24  employment as a police officer?
25      A  Yes.

7

POGGIOLI

1
2      Q  And is that received in a regular check?
3      A  I don't understand the question.
4      Q  Let me rephrase it. How do you receive
5  your pension payments?
6      A  I only received one so far and I received
7  it via the U.S. mail by check.
8      Q  Do you know how often you will be
9  receiving pension checks?
10      A  Once a month.
11      Q  And how much was the check that you
12  received?
13      A  I don't know the exact amount.
14      Q  Approximately.
15      A  It was over $3,000.
16      Q  Do you anticipate that the future checks
17  will be approximately in the same amount?
18      A  Yes.
19      Q  So is it correct that you would
20  approximate your pension payments to be $36,000 a
21  year?
22      A  Yes, at least.
23      Q  Okay. Do you have any reason to believe
24  that it may be more than that?
25      A  Well, it was over $3,000. I don't know

8

POGGIOLI

1
2  the exact. It might have been $3,800. It might
3  have been almost $4,000. I don't know the exact
4  amount. I only received one.
5      Q  So would it be correct to say you would
6  anticipate that your annual pension payment would be
7  approximately between $36,000 and $48,000 a year?
8      A  Yes.
9      Q  When was your prior employment terminated?
10      A  July 20, 2007.
11      Q  Since July 20, 2007, have you applied for
12  other employment?
13      MS. NICAJ: I'm going to object to this
14  line of questioning because this is supposed to
15  be a deposition on qualified immunity so I'm
16  trying to ascertain from you, Mr. Meisels, what
17  the purpose of your deposition concerning
18  pension and his applying for other employment
19  is RELEVANT to.
20      MR. MEISELS: I have no objection, if we
21  can agree that I will limit this deposition
22  solely to the question of qualified immunity
23  provided we can agree that I have a right to
24  take a later deposition on the question of
25  damages.

9

POGGIOLI

1
2      MS. NICAJ: Absolutely.
3      Q  Now, Mr. Poggioli, I've asked you to take a
4  look at what's been marked as Defendants' A for
5  identification and particularly refer to the second
6  page and in the middle of the page, you see there's
7  in bold a heading that says, The Facts?
8      A  Yes.
9      Q  And particularly if you would look at
10  Paragraph 7 where it says, "On or about
11  April 24, 2007 in connection with the rigged
12  disciplinary proceeding referenced in the 2000
13  filing"?
14      MS. NICAJ: Objection. That's not what it
15  states.
16      MR. MEISELS: Rigged disciplinary
17  proceeding.
18      MS. NICAJ: Referencing the 2006 filing.
19  You said 2000.
20      MR. MEISELS: I apologize.
21      MS. NICAJ: It's okay. It's not a big
22  deal.
23      Q  Let me start over. In reference to
24  Paragraph 7 which reads, "On or about April 24,
25  2007 in connection with the rigged disciplinary

10

POGGIOLI

1
2  proceeding referenced in the 2006 filing, hearing
3  officer Robert J. Ponzini generated a substantially
4  falsified and/or materially inaccurate report," and
5  it continues.
6          As you sit here today, do you know
7  which disciplinary proceeding is referenced here as
8  being rigged?
9      A   Yes.
10     Q   What was that?
11     A   That was the departmental trial that I had
12 and he was the hearing officer for.
13     Q   What was the basis for your belief that
14 that departmental trial was rigged?
15         MS. NICAJ:  I'm going to object to the
16         extent that any -- your basis is formed as a
17         result of any attorney/client communications,
18         okay?  If it does not, then you can go ahead
19         and answer it.
20     A   Well, the hearing and findings from
21 Mr. Ponzini when it came out, I spoke to my attorney
22 about that so that's attorney/client privilege.
23     Q   Okay.  Other than information that you
24 learned in the course of your attorney/client
25 communications, do you have any basis to believe

11

POGGIOLI

1
2  that the departmental trial was rigged?
3      A   So are you asking me that --
4          MS. NICAJ:  If you don't understand, let
5          him know.
6      Q   Would you like me to rephrase it?
7      A   Yes, please.
8      Q   Sure.  Do you have any basis to believe
9  that the departmental trial was rigged other than
10 information that you learned based upon your
11 attorney/client communications?
12     A   Yes.  By reading the findings and
13 recommendation from the hearing officer,
14 Mr. Ponzini, I found numerous errors and omissions in
15 his findings.
16     Q   Could you tell me what they were?
17     A   They were a lot.  I can tell you some of
18 them, unless I had the findings in front of me.
19     Q   Do you recall any of them?
20     A   Yes, I do.  First of all, he stated in his
21 findings that Officer Edward Hayes was called and
22 testified, which he didn't.  He was refused the
23 opportunity to testify by Mr. Ponzini.
24         Second of all, he stated that he was
25 appointed the hearing officer on December 18 of 2005

12

POGGIOLI

1
2  when the actual trial started on December 15 of
3  2005.
4          Third of all, he didn't sign his name
5  to the findings and recommendation on the last page
6  of the same.
7          Fourth of all, he stated that
8  Sergeant Joseph went to the job site at 2:15 a.m.
9  when Sergeant Joseph wasn't working that day at that
10 time.
11         Fifth of all, he stated that had
12 Sergeant Joseph went to check -- I'm sorry.  I
13 rephrase that.  That he also stated the page numbers
14 on the transcript which stated that he was there at
15 2:15 a.m. and the page numbers were erroneous, were
16 not accurate.  Didn't say anything on those page
17 numbers.
18         Those are the ones I can remember
19 offhand.
20     Q   Continuing on with Paragraph 7, as you
21 sit here today do you have any basis to believe that
22 the report was falsified other than information that
23 you may have learned in attorney/client
24 communications?
25     A   Well, it was falsified because of some

13

POGGIOLI

1
2  things that the information was inaccurate in the
3  report.
4      Q   Are you aware of any inaccuracies other
5  than those to which you've already testified to this
6  morning?
7      A   Yes.
8      Q   Could you tell me what those were?
9      A   I told you there were several.  I just
10 named you five.  If I had the report in front of me,
11 I could name a lot more.
12     Q   As you sit here today, can you think of
13 any others?
14     A   I could just think of those five right
15 now.
16     Q   Of the five that you mentioned --
17 withdrawn.
18         Of the five inaccuracies that you
19 mentioned, is there any basis to conclude that any
20 of those mistakes were actually falsified?
21     A   Could you say that again, please.
22     Q   Yes.  Let me rephrase it.
23     A   Thank you.
24     Q   Is there any basis for you to believe that
25 those inaccuracies were actually falsified?

4  (Pages 10 to 13)

14

POGGIOLI

1
2    A    Well, they were not correctly put in his
3 findings and recommendation. During the testimony
4 it was not what he said. Does that explain it to
5 you?
6    Q    Yes. Is that the basis for your belief
7 that they were falsified?
8    A    Yes. During the testimony it was different
9 than what he said.
10    Q    Okay. Can you turn the page and the first
11 full sentence on Page 3 where it says, "Ponzini
12 did so in accordance with his well established and
13 publicly known reputation for always and/or
14 virtually always finding governmental employees
15 guilty."
16        Are you personally aware of any
17 reputation that Mr. Ponzini has in reference to
18 finding governmental employees guilty?
19    A    I do with my attorney/client
20 communication.
21    Q    Okay. Aside from any information that you
22 may have learned through attorney/client
23 communications, do you have any basis to believe
24 that Mr. Ponzini has a reputation for finding
25 governmental employees guilty?

15

POGGIOLI

1
2    A    The only information that I have is with
3 my attorney/client communication.
4    Q    Moving to the second full sentence on the
5 top of Page 3 where it says, "In fact by reason
6 of his established record of convicting such
7 employees, he was appointed to preside over the
8 Poggioli disciplinary since the appointing authority
9 knew that in exchange for pecuniary gain, Ponzini
10 would convict plaintiff regardless of the evidence."
11        Aside from any information that you
12 may have learned in the course of your
13 attorney/client communications, do you have any
14 reason to believe that this statement is true?
15    A    I believe it to be true.
16    Q    And aside from any information that you
17 learned in the course of your attorney/client
18 communications, what is the basis for your belief
19 that it's true?
20    A    Well, he did convict me.
21    Q    Other than that, do you have any other
22 basis to believe that it's true?
23    A    He was asked by my attorney to not hear
24 the case because of previous other indiscretions
25 that he was involved in and he decided not to step

16

POGGIOLI

1
2 down.
3    Q    Could we move on to Paragraph 9 and
4 particularly I'm referring to the first sentence of
5 Paragraph 9 where it says, "On July 20, 2007,
6 Respondents in writing terminated Plaintiff's
7 employment, a termination that was motivated in
8 whole and/or substantial respect by: A) Plaintiff's
9 2006 filing and/or the substantive allegations
10 contained in the complaint."
11        Now your complaint refers to a 2006
12 filing. Are you referencing a lawsuit that you
13 brought in 2006?
14    A    Yes.
15    Q    Okay. And what is the basis for your
16 belief that your termination was motivated as a
17 result of your filing that 2006 lawsuit?
18    A    It's obvious that the police commissioner
19 wasn't happy that I filed another federal complaint
20 against him because I had done so previously in 1994
21 and prevailed. He always thought that I was a thorn
22 in his side being the PBA president previously and
23 this was just a motivation on his part.
24    Q    And when you say that it was obvious that
25 he wasn't happy, okay, how did that manifest itself?

17

POGGIOLI

1
2    A    Well, I don't think anyone would be happy
3 if you file a federal complaint against you,
4 especially that I filed one previously and prevailed
5 against him.
6    Q    You mentioned that, in substance, and I'm
7 not trying to quote you exactly, but he always thought
8 you were a thorn in his side when you were PBA
9 president; is that right?
10    A    Yes.
11    Q    How did that manifest itself?
12    A    My job as PBA president was to look after
13 the welfare of my members in many different ways,
14 and, of course, clashing with the administration was
15 something that I had to undertake to get better
16 equipment, better working conditions for not only my
17 members but also for the public safety.
18    Q    And did it manifest itself in any other
19 way other than what you've already mentioned?
20    A    Well, there was a lot of different things
21 that went on during my four years as PBA president.
22 Contract disputes, television appearances, being on
23 the radio, newspaper. Obviously mentioning the
24 conditions that my members were going through and
25 was getting put on television and in the newspaper

5 (Pages 14 to 17)

18

POGGIOLI

1
2 didn't have a good light on the commissioner.
3      Q   And am I correct that your term of office
4 as PBA president expired on December 31st, 2003?
5      A   I think that was the year, yes, sir.
6      Q   Referring back to Paragraph 9 on Page
7 3 of your complaint, in reference to
8 subparagraph B which reads, "Evidence of corruption
9 rampant in the city government including its court
10 and police department as adduced by Plaintiff and
11 the disciplinary proceedings as presided over by
12 Ponzini." You see that?
13      A   Yes, sir.
14      Q   What evidence of corruption in city
15 government was disclosed at the disciplinary
16 proceeding to which you refer to here?
17           MS. NICAJ:  Objection. You can answer.
18      A   There were numerous incidents that I
19 mentioned during the -- that was mentioned during
20 the trial of theft from departmental employees,
21 criminal mischief and they were mentioned in the
22 trial itself.
23      Q   Okay. Now other than theft and criminal
24 mischief, as you sit here today do you recall any
25 other evidence of corruption in city government that

19

POGGIOLI

1
2 was disclosed during your disciplinary hearing?
3      A   Yes, there was mention of the -- of city
4 court.
5      Q   And do you recall what was mentioned about
6 the city court?
7      A   That was client/attorney communication.
8      Q   Okay. Now I'm not asking you about the
9 substance of any attorney/client communication. I
10 am asking you about what was disclosed on the record
11 at the disciplinary hearing. Was anything in
12 reference to the city court disclosed on the record
13 at the disciplinary hearing?
14      A   Yes.
15      Q   Could you tell me what that was?
16      A   Involving the city marshal.
17      Q   Anything else that you recall?
18      A   Involving the employees of the court.
19      Q   Do you recall which employees?
20      A   Again, this is information that I had with
21 my attorney.
22           MS. NICAJ:  It's whatever you communicated
23      with your attorney, do not disclose to
24      Mr. Meisels, but he, I think, is asking what, if
25      any, information, did you learn through the

20

POGGIOLI

1
2 disciplinary proceeding against you about this
3 city court. You understand?
4           THE WITNESS:  Yes.
5           MS. NICAJ:  At the hearing itself, okay?
6           THE WITNESS:  She explained it.
7           MR. MEISELS:  You got it? Okay.  Good.
8      A   Thank you. Yes, that there was employees
9 involved in use of drugs and larceny in the city
10 court.
11      Q   Do you know whether or not the employees
12 in the city court are employed by the State of New
13 York or the city of New Rochelle or some other
14 entity?
15      A   I know that some of the employees are
16 employees of the State of New York and some of them
17 are employees of the city of New Rochelle. I don't
18 know which ones, though.
19      Q   In reference to the persons who were
20 alleged to have used drugs, do you know whether
21 those persons were state employees or city
22 employees?
23      A   I'm sorry, I don't know.
24      Q   Okay. In reference to the persons who
25 allegedly committed a larceny, do you know whether

21

POGGIOLI

1
2 those persons were state employees or city
3 employees?
4      A   I'm sorry, I don't know.
5      Q   Earlier you had mentioned that during the
6 course of your disciplinary [sic], you became aware
7 that there had been theft in city government, is
8 that correct?
9           MS. NICAJ:  Objection. You can answer.
10      A   Yes.
11      Q   Was that the theft -- withdrawn.
12           Is that theft the same incident that
13 you just referenced concerning a larceny in the city
14 court?
15      A   Could you say that again, please.
16      Q   Sure. The theft that you mentioned
17 earlier, is that the same incident that you just
18 referenced as a larceny and occurring in the city
19 court?
20      A   The theft and the larceny pertaining to
21 the city court.
22      Q   Right. Are they the same?
23      A   Yes.
24      Q   You had mentioned criminal mischief
25 earlier in your testimony this morning. Do you have

6 (Pages 18 to 21)

22

POGGIOLI

1
2  any additional information about that criminal
3  mischief?
4      A  That was pertaining to a -- one of the
5  police department's employees.
6      Q  And which employee did that pertain to?
7      A  That was Detective John Landau.
8      Q  Can you tell me in substance what it is
9  that he's alleged to have done?
10     A  He tampered with my access card.
11     Q  Anything else?
12     A  He previously was charged in and I believe
13  suspended for falsifying a police report.
14     Q  How long was he suspended for, do you know?
15     A  I don't know.  He might have lost days.
16  He might not have received a suspension.  He might
17  have lost days.
18     Q  And did that information come out at the
19  disciplinary hearing?
20     A  Some of it did.
21     Q  What came out at the hearing?
22     A  The tampering of my access card.
23     Q  And in reference to the alleged tampering
24  of the access card, did you ever report that to
25  anybody?

23

POGGIOLI

1
2      A  Yes.
3      Q  To whom did you report it?
4      A  Lieutenant Fortunato.
5      Q  Do you know whether or not that was ever
6  investigated?
7      A  Yes, it was.
8      Q  Do you know what the outcome of the
9  investigation was?
10     A  Yes.
11     Q  What was the outcome?
12     A  Nothing was done.
13     Q  Do you know whether or not there was ever
14  sufficient information to conclude that Detective
15  Landau had done what you thought he had done?
16     A  Can I just add something?  Captain Kealy
17  was also notified by myself about that.
18     Q  Do you know whether or not they had ever
19  garnered enough evidence to conclude that Detective
20  Landau had done what you accused him of doing?
21     A  Well, there was only two people that could
22  have possibly done that and the other person was
23  Detective Donald, and Detective Donald is a good
24  friend of mine and he said during the trial that
25  Detective Landau -- if he didn't say it

24

POGGIOLI

1
2  specifically, he mentioned that Detective Landau
3  probably did it.
4      Q  Probably did it.
5      A  He might have said he did it.
6      Q  But let me rephrase my question.  At the
7  time that it was investigated, do you know whether
8  or not the police department garnered sufficient
9  evidence to conclude that Detective Landau did what
10  you accused him of doing?
11     A  There was an investigation and I'm sure
12  they had enough evidence to preclude that, yes.
13     Q  When you say you're sure, what's the basis
14  for your being sure that they had enough evidence?
15     A  Well, there was two, only two people that
16  had the capability of tampering with the access card
17  and one of them was my good friend, Detective
18  Donald.
19     Q  And he denied --
20     A  And Detective Landau did not like me.
21     Q  So is it fair to say from that you would
22  conclude it must have been Detective Landau who did
23  it but not Detective Donald?  Officer Donald.
24     A  Detective Donald would not have done that.
25  He's a friend of mine.

25

POGGIOLI

1
2      Q  Earlier this morning you had referenced
3  information that came out at your disciplinary
4  concerning the city marshal.  What information came
5  out at your disciplinary hearing about the city
6  marshal?
7      A  I don't remember exactly.
8      Q  Let's go to Paragraph 10 --
9      A  Can I just add something?
10     Q  Sure.
11     A  I don't remember now because I don't have
12  the testimony in front of me, transcripts of the
13  information pertaining to the city marshal, if that
14  came out in the trial or not.
15     Q  Okay.
16     A  I apologize.
17     Q  It's okay.  In reference to Paragraph 10
18  of your complaint where it says, "Members of the
19  police department who have engaged in criminal wrong-
20  doing on the job as known by defendants and
21  identified during plaintiff's disciplinary hearing
22  as well as other members of the department who
23  wholesale violated and continue to violate the
24  federal civil rights of the only police officer of
25  Middle Eastern descent employed by the city have

7  (Pages 22 to 25)

POGGIOLI                                        26

1
2  neither been subjected to formal disciplinary
3  charges nor terminated by the city's employ." Okay.
4        Going back to the first line of
5  Paragraph 10 other than what you've testified to
6  already today, are you aware of any other criminal
7  wrongdoing perpetrated by members of the police
8  department?
9     A  There are several of wrongdoings by
10  members of the police department.
11     Q  Could you explain?
12     A  I was waiting for you to say that. You
13  want the whole incidents of the incidents involved
14  or --
15     Q  Yes. Tell me anything that this
16  references when you talk about -- the paragraph
17  talks about, "Member of the police department
18  engaged in criminal wrongdoing on the job."
19        MS. NICAJ:  My suggestion is identify the
20     members and then he can follow up with what
21     he'll follow up with.
22     Q  It's an excellent suggestion.
23     A  Detective Landau, Detective Grosso,
24  G-R-O-S-S-O, Detective D'Andrea, D apostrophe
25  A-N-D-R-E-A. Detective -- he was a patrolman at the

POGGIOLI                                        27

1
2  time, now he's a detective. Torres.
3     Q  How do you spell that?
4     A  T-O-R-R-E-S.
5     Q  Okay.
6     A  Did you have that right?
7     Q  I did actually. Surprisingly.
8     A  Those are the one I can think of offhand.
9     Q  In reference to the person you first
10  mentioned, Detective Landau, is that the incident
11  that you've already described concerning your access
12  card?
13     A  Yes.
14     Q  Okay.
15     A  And the falsifying the police report.
16     Q  Concerning the alleged falsification of
17  the police report by Detective Landau, do you know
18  when that is alleged to have occurred?
19     A  No, but the department has the records on
20  it.
21     Q  Do you know what year it's alleged to have
22  occurred?
23     A  No.
24     Q  Do you know what kind of a report was
25  allegedly falsified?

POGGIOLI                                        28

1
2     A  I'm not sure and please don't hold me to
3  it but I think it was in a drug arrest.
4     Q  And what is the basis for your belief that
5  Detective Landau falsified a police report?
6     A  Because I believe he was suspended.
7     Q  And from whom did you learn that he
8  allegedly falsified a police report?
9     A  Well, the New Rochelle police department
10  is a very small department and word gets around
11  quickly when somebody gets suspended.
12     Q  So this was sort of by word of mouth?
13     A  Yes, everybody knows about it.
14     Q  So by word of mouth you had heard that he
15  got suspended?
16     A  Suspended or lost days. I don't recall.
17  I think it was suspension but I'm not sure on that
18  one.
19     Q  Did you ever talk to him about it?
20     A  No, I'm not friendly with him.
21     Q  Okay. Now earlier you had spoken about
22  the court employees using drugs. How did you learn
23  about that?
24     A  Through my attorney.
25     Q  Okay. Earlier you talked about a larceny

POGGIOLI                                        29

1
2  in the court. How did you learn about that?
3     A  Attorney/client communication.
4     Q  Okay. Any -- earlier you had mentioned
5  that there was some negative information about the
6  city marshal at your disciplinary hearing, is that
7  right?
8     A  I think I corrected myself on that one.
9     Q  Okay. You're not sure if that came out or
10  not?
11     A  Right.
12     Q  Now what is it that Detective Grosso is
13  alleged to have done incorrectly?
14     A  Grosso.
15     Q  Grosso, I'm sorry.
16     A  He was involved in the larceny.
17     Q  And when did the larceny occur?
18     A  I don't recall the time frame. I think I
19  was PBA president at the time. I'm not sure.
20     Q  And what is it that he's alleged to have
21  stolen?
22     A  It's alleged that there were -- his unit
23  was doing a raid on a particular house and that he
24  took the cable box. Took a cable box.
25     Q  And do you know whether that allegation

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                              516-608-2400

30

POGGIOLI

1
2  was ever investigated by the department?
3     A  Yes, it was.
4     Q  And how do you know that?
5     A  He lost his gold shield and was
6  reassigned.
7     Q  And how did you learn that he had been
8  penalized by losing his gold shield and being
9  reassigned?
10     A  He went from a Detective unit into a
11  patrol unit which is, to be nice, a step down I
12  would say.
13     Q  And am I correct that you became aware of
14  that by word of mouth?
15     A  And I think it was during my tenure as PB
16  president.
17     Q  At the time that he was disciplined, did
18  he, as far as you know, have a prior disciplinary
19  record with the department?
20     A  I have no knowledge of that.
21     Q  Did you ever have any direct information
22  about the investigation that was conducted
23  concerning the allegation of stealing the cable box?
24     A  Direct, no.
25     Q  Concerning Detective D'Andrea, what is it

31

POGGIOLI

1
2  he is alleged to have done wrong?
3     A  Detective D'Andrea was a detective in the
4  general investigations unit and he had a case and
5  somehow it involved the confiscation or the taking
6  of computerized evidence.
7     Q  And what is it that he allegedly did
8  wrong?
9     A  The computer was logged into the property
10  clerk's office, room, and he without authorization
11  or permission, signed it out and brought it to his
12  house for his personal use.
13     Q  Do you know if that incident was
14  investigated by the department?
15     A  Yes, it was.
16     Q  Do you know what the outcome of the
17  investigation was?
18     A  He was suspended and reassigned.
19     Q  And what is the basis for your belief that
20  the matter was investigated?
21     A  Because I was PBA president and I was --
22  fought successfully so that he would not get
23  terminated.
24     Q  So in effect you represented him in
25  negotiating with the department?

32

POGGIOLI

1
2     MS. NICAJ:  Objection.  You can answer.
3     A  I represented him as PBA president.
4     Q  And do you recall how much of a suspension
5  he received?
6     A  I believe the commissioner wanted 30 days.
7  I got it down to 20 I think.
8     Q  Twenty?
9     A  Twenty days.
10     Q  Twenty days.  And what was the nature of
11  the reassignment that he received?
12     A  He was put inside and in charge of the --
13  I don't know his exact title, communication
14  supervisor in charge of the communication room and
15  the cameras and things like that.
16     Q  And that assignment that he received, being
17  in charge of communication, was in lieu of some other
18  assignment?
19     MS. NICAJ:  Objection.  You can answer.
20     A  Explain it to me, please.
21     Q  Sure.  Let me rephrase it.  Before he got
22  reassigned, what were his duties?
23     A  He was a detective in the general
24  investigations unit.
25     Q  I see.  And he got reassigned out of

33

POGGIOLI

1
2  general investigations but to the communication
3  unit?
4     A  Yes.
5     Q  Okay.  At the time that this occurred, do
6  you know what his prior disciplinary record was?
7     A  No.
8     Q  You mentioned Detective Torres.  What is
9  it that he is alleged to have done?
10     A  He was involved in a hit and run with
11  injury while being DWI in White Plains off duty.
12     Q  And was that -- let me withdraw that.
13     Do I understand you correctly that
14  the allegation was that he personally hit somebody
15  in White Plains and then they were injured, is that
16  correct?
17     A  Yes, it was a hit and run.
18     Q  Okay.  And he was allegedly the driver?
19     A  He was the driver.
20     Q  He was the driver.  Okay.  And that
21  occurred in White Plains?
22     A  Yes.
23     Q  And he was allegedly drunk at the time?
24     A  Yes.
25     Q  And was that investigated by the New

34

POGGIOLI

1  Rochelle police department?
2      A   I believe and I'm not sure but it was not
3  only investigated by the New Rochelle police
4  department but also by the White Plains police
5  department and the Harrison police department.
6      Q   And what was the outcome of the New
7  Rochelle police department investigation?
8      A   He was suspended.
9      Q   Okay, for how long?
10     A   He was suspended I think for 30 days. I
11 think. I'm not sure on that.
12     Q   And was there any other than penalty
13 imposed?
14     A   I know he was suspended. I don't know if
15 there was anything else, any other penalty imposed.
16     Q   When did this occur?
17     A   I don't know the year.
18     Q   Did it occur after the year 2000?
19     A   No.
20     Q   Before 2000?
21     A   I believe so, yes. Yes, it was.
22     Q   Do you know if it occurred before 1995?
23     A   I'm sorry, I don't know.
24     Q   Would you know if it occurred after 1995?

35

POGGIOLI

1      A   No, I'm sorry.
2      Q   Do you know if it occurred in the 1990s?
3      A   I don't know. Sorry.
4      Q   As far as you know is Detective Torres
5  still employed by the New Rochelle police
6  department?
7      A   Yes, he is.
8      Q   What is the basis for your information
9  about this incident concerning Detective Torres?
10     A   Well, like I said, when something happens
11 in the police department everybody knows about it.
12     Q   Okay, so it's word of mouth?
13     A   Word of mouth.
14     Q   In reference --
15     A   Can I just add something?
16     Q   Sure.
17     A   There were others. I just can't think of
18 them right now.
19     Q   Okay. If you think of them in the course
20 of the deposition, stop me and inform us.
21     A   Okay. Thank you.
22     Q   Mr. Poggioli, were you ever offered a
23 suspension in satisfaction of the charges that
24 ultimately were heard in your disciplinary hearing?

36

POGGIOLI

1      A   I was offered days -- I'm sorry. I was
2  offered to lose days' pay, yes.
3      Q   Do you recall how many days that was?
4      A   I think it was 30 days but I don't know if
5  it was 30 calendar days or 30 paid days.
6      Q   It would be one or the other?
7      A   Yes.
8      Q   And am I correct that you rejected that
9  proposal?
10     A   There was more to it.
11     Q   Okay. What else was involved?
12     A   They also wanted for me to be suspended
13 from off duty work for six months.
14     Q   So am I correct that the offer was that
15 you would lose 30 days either pay or calendar days
16 plus be suspended from off duty employment for six
17 months?
18     A   I think it was -- yes, but I think it was
19 a 30-day suspension now that I -- I think it was 30
20 days' suspension. Suspended for 30 days.
21     Q   So it would be a 30 day suspension plus
22 loss of off duty employment for six months?
23     A   Yes.
24     Q   And when the term off duty employment is

37

POGGIOLI

1  used, does that refer to the special duty
2  employment?
3      A   Yes.
4      Q   And is that the special duty employment
5  that you received through the department?
6      A   Yes.
7      Q   And am I correct that you rejected that
8  proposal?
9      A   Yes.
10     Q   Was there a reason that you rejected it?
11     A   I wasn't guilty.
12     Q   Let's go back to Paragraph 10 of the
13 complaint where we -- withdrawn.
14         Going to back to Paragraph 10 of the
15 complaint where it references, "Members of the
16 department who wholesale violated and continue to
17 violate the federal civil rights of the only police
18 officer of Middle Eastern descent."
19         Can you identify which police officer
20 is responsible for violating the federal civil
21 rights of the only police officer of Middle Eastern
22 descent?
23     A   That's attorney/client communication.
24     Q   Other than communications that you've had

10  (Pages 34 to 37)

38

POGGIOLI

1
2  with your attorneys, do you have any information
3  about the identities of police officers who violated
4  the civil rights of the only police officer of
5  Middle Eastern descent?
6      A    Besides my communications with my
7  attorney?
8      Q    Yes.
9      A    No.
10     Q    So am I correct that your communications
11 with your attorney is the sole basis for your belief
12 concerning this incident?
13     A    Yes.
14     Q    Okay. Do you know who -- withdrawn.
15         Can you identify the officer who
16 allegedly is the only police officer of middle
17 eastern descent?
18     A    P.O. Ali [sic]. I think it's A-L-I, the
19 spelling of his name. I don't know.
20     MS. NICAJ:  You should know it.
21     MR. MEISELS:  But I'm not under oath. I
22 can't testify.
23     A    You know who I mean, though.
24     Q    Okay. So your best understanding of his
25 name is --

39

POGGIOLI

1
2      A    Ali.
3      Q    Okay. Fine. Officer Ali, what -- have
4  you ever spoken to that particular officer about
5  having been discriminated against?
6      A    We had conversations. I don't remember if
7  we spoke anything about pertaining to that.
8      Q    When was the last time you spoke to him?
9      A    It was probably in July of this year.
10     Q    Was it before you were terminated?
11     A    Yes.
12     Q    Am I correct that you've never discussed
13 his complaints about discrimination with him?
14     MS. NICAJ:  Objection.
15     A    I don't think so.
16     Q    Other than communications with your
17 attorneys, do you have any basis to believe that
18 police officers who violated Officer Alali's civil
19 rights were not subjected to disciplinary charges?
20     A    Can you say that again.
21     Q    Yeah, sure. Other than communications
22 with your attorneys, do you have any basis to
23 believe that officers who violated Officer Alali's
24 civil rights were not subjected to disciplinary
25 charges?

40

POGGIOLI

1
2      A    I don't think they were.
3      Q    Other than communications with your
4  lawyers, do you have any basis to believe that?
5      A    No.
6      Q    And turning the page at the first full
7  sentence where it says, "Instead that criminal
8  misconduct and those civil rights violations have
9  been encouraged, condoned and ratified by
10 Defendants." And let me break that down into two
11 parts.
12         In reference to the allegation that
13 criminal misconduct was encouraged, condoned and
14 ratified by the defendants, what is the basis for
15 your belief that the defendants in this lawsuit
16 encouraged, condoned and ratified criminal
17 misconduct?
18     MS. NICAJ:  Objection. You can answer.
19     A    That's attorney/client communication.
20     Q    Other than communications that you had
21 with your attorneys, do you have any basis to
22 believe that the defendants in this case encouraged,
23 condoned and ratified criminal misconduct?
24     A    No.
25     Q    Other than communications with your

41

POGGIOLI

1
2  attorneys, do you have any basis to believe that the
3  defendants in this case have encouraged, condoned
4  and ratified civil rights violations?
5      A    Against who?
6      Q    Against any person.
7      A    You're going to have to rephrase that
8  again, please.
9      Q    Sure. Other than communications with your
10 attorneys, do you have any basis to believe that the
11 defendants in this case have encouraged, condoned
12 and ratified civil rights violations?
13     MS. NICAJ:  Objection. You can answer.
14     A    Against whom?
15     Q    Against any person.
16     A    Against myself.
17     Q    And concerning yourself, are you referring
18 to the alleged civil rights violations in this
19 complaint?
20     A    Yes.
21     Q    Okay. Now, and again referring to the top
22 of Page 4, other than communications with your
23 attorneys, do you have any reason to believe that
24 the defendants in this case have encouraged,
25 condoned and ratified civil rights violations

11 (Pages 38 to 41)

42

POGGIOLI

1    against persons other than you?
2        MS. NICAJ:  Objection.  You can answer.
3        A    No.
4        Q    Other than the city employees that you
5    have already mentioned in your deposition this
6    morning, can you identify any person who you believe
7    was treated better then you were who committed,
8    allegedly committed, acts of misconduct which were
9    the same or more serious then you were accused of
10   committing?
11       A    Can you rephrase that, please.
12       Q    Sure.  Other than the city employees who
13   you've already identified this morning in your
14   deposition, can you identify any person who you
15   believe received better treatment than you did even
16   though they were accused of committing an offense
17   which was either similarly serious to the one you're
18   accused of or more serious than the one you were
19   accused of?
20       MS. NICAJ:  Objection.  You can answer.
21       A    That's a loaded question.
22       Q    Okay.  It wasn't meant to be.
23       A    It was a lot.
24       Q    Okay.

43

POGGIOLI

1        MS. NICAJ:  Do you want to have the
2    question read back?
3        A    You just asked a lot of things in one
4    sentence.  I thought anyway.
5        Q    Okay.  Well --
6        A    It was like three parts.
7        Q    -- why don't I make it simpler.
8        A    Thank you.
9        Q    Can you identify any city employee who you
10   think got better treatment than you did?
11       A    Yes.
12       Q    Okay.
13       A    Detective D'Andrea, Detective Grosso,
14   Detective Torres now, Detective Landau, and there
15   are others.  I just couldn't think of the instances.
16   You asked me to think of them.  I couldn't think of
17   them.
18       Q    In reference to the persons you just
19   named, do you have any information about their
20   receipt of better treatment other than what you've
21   already testified to this morning?
22       A    They didn't get terminated, I did.
23       Q    Okay.  Now in the case of the Detective
24   Landau, do you know whether or not he had a

44

POGGIOLI

1    disciplinary hearing?
2        A    I don't know.
3        Q    In reference to Detective Grosso, do you
4    know whether or not there was a disciplinary
5    hearing?
6        A    I don't know.
7        Q    In reference to Detective D'Andrea, do you
8    know if there was a disciplinary hearing?
9        A    No, I don't know.
10       Q    In reference to Detective Torres, do you
11   know if there was a disciplinary hearing?
12       A    I don't know.  I'm sorry.
13       Q    Okay.  Am I correct as you sit here today
14   those are the four names that you can recall?
15       A    Yes.
16       Q    Okay.  Now in reference to Detective
17   Landau, do you know whether or not he was
18   interviewed by the internal affairs department?
19       A    I don't know.
20       Q    Do you know whether or not he was
21   interviewed by anyone concerning the allegation that
22   he had tampered with your access card?
23       A    I know he was interviewed by Captain
24   Kealy.

45

POGGIOLI

1        Q    And do you know what he said during that
2    interview?
3        A    No.
4        Q    Do you know whether Detective Grosso was
5    interviewed in reference to the allegation that he
6    took a cable box?
7        A    He had to be.
8        Q    Do you know what he said during his
9    interview?
10       A    No.
11       Q    In reference to Detective D'Andrea, do you
12   know whether he was interviewed in reference to his
13   alleged improper use of the computer?
14       MS. NICAJ:  Objection.  You can answer.
15       A    He had to be.  There was an investigation.
16       Q    Do you know what he said during that
17   interview?
18       A    No.
19       Q    Okay.  Am I correct the allegation
20   against him was improper use of a computer that was
21   in evidence?
22       MS. NICAJ:  Objection.
23       Q    Is that not correct?
24       MS. NICAJ:  Objection.  You can answer.

12 (Pages 42 to 45)

46

POGGIOLI

1

2    A    Which detective are we talking about?

3    Q    D'Andrea.

4    A    D'Andrea?

5    Q    Yes.

6        MS. NICAJ:  Improper use.

7    A    Improper use of the computer?

8    Q    Right.

9    A    He took the computer.

10   Q    My understanding it was a computer that

11   had been marked into evidence in a case, am I

12   correct?

13   A    Yes.

14   Q    Did I understand correctly, he allegedly

15   took it home and used it?

16       MS. NICAJ:  He stole it.

17   A    And then he destroyed it

18   Q    Okay, well, that part I didn't know.

19   A    I'm sorry.  I didn't tell you that before.

20   Q    In reference to that incident, do you know

21   whether or not he was interviewed?

22   A    Oh, he had to be.  There was an

23   investigation.

24   Q    Do you know what he said during the

25   interview?

---

47

POGGIOLI

1

2    A    No, I don't know.

3    Q    In reference to Detective Torres who you

4    indicated was involved in a hit and run accident, do

5    you know whether he was interviewed in reference to

6    that incident?

7    A    He had to be, yes.

8    Q    Do you know what he said during the

9    interview?

10   A    No.

11       (Brief Recess Taken)

12   MR. MEISELS:  Based upon our understanding

13   that I may continue this deposition on the

14   question of damages, I have no further

15   questions.

16   A    I thought of someone else now.

17   Q    Absolutely.  Okay.

18   A    Officer Finney was --

19       MS. NICAJ:  Can you spell that?

20   A    F-I-N-N-E-Y.  Was caught in a sting

21   operation.

22       MS. NICAJ:  Off the record.

23       (Off the Record)

24   Q    When did that occur?

25   A    It was in the '90s.  That I remember.

---

48

POGGIOLI

1

2    Q    Okay.  And what is it that he allegedly

3    did that he got stung for?

4    A    He was involved in a operation of

5    prostitution and he went down to New York City in

6    which they had a sting and he went and solicited a

7    prostitute and got arrested.

8    Q    Okay.  So am I correct that your

9    understanding is that he was arrested --

10   A    I'm sorry.  He was caught in it.  I don't

11   know if -- I don't know if they arrested him or they

12   reduced the charges.  Something like he -- they

13   caught him in a sting operation, that I know for

14   sure.

15   Q    When you say "they," you mean the City of New

16   York police department?

17   A    Yeah, I think it was a special unit.

18   Q    That happened in New York city in the

19   1990s?

20   A    Yes.

21   Q    And how did you learn about this incident?

22   A    He was suspended for 30 days and

23   Eyewitness News had a truck mounted outside his

24   house, so, with the lights on wanting an interview

25   and his house is right across the street from police

---

49

POGGIOLI

1

2    headquarters so it was very obvious that the news

3    caught on to that.  I think it was Channel 7

4    Eyewitness News.  One of those satellite trucks, you

5    know.

6    Q    So am I -- withdrawn.

7        So what was the basis for your belief

8    that it happened?  Was it word of mouth within the

9    department?

10   A    Well, he was suspended for 30 days.  It

11   was in the newspaper.  Eyewitness News was out there

12   with a satellite truck broadcasting from in front of

13   his house and, you know, kind of --

14   Q    And how did you learn he was suspended for

15   30 days?

16   A    Well, it's common knowledge but his

17   mother -- kind of a sad story.  His mother has or

18   had, I don't know if she is still alive, dementia

19   and she walked over to police headquarters.  I think

20   she was looking for him, but they lived in the same

21   house so that's the sad story about it.  They lived

22   in the same house and I had to escort her back from

23   police headquarters to her house safely because he

24   wouldn't leave his house.  He was suspended and he

25   was obviously embarrassed of the whole situation, so

---

13 (Pages 46 to 49)

50

POGGIOLI

1
2  I was told to bring her back safely to her house,
3  which I did.
4      Q   Do you know whether or not the New
5  Rochelle police department ever conducted an
6  investigation of Officer Finney's arrest in New York
7  City?
8      A   They had some kind of investigation
9  because he was suspended. Like I said, I don't know
10  if he was arrested or he was kind of like released
11  and he just notified our department. I think he was
12  arrested. I'm not sure.
13     Q   Are you saying that you're not certain
14  whether he was arrested or whether he received an
15  appearance ticket?
16     A   It might have been — I think it was
17  dropped down to whatever it was, soliciting a
18  prostitute. Maybe disorderly conduct or something
19  like that. I think through the courts it was
20  eventually dropped down. I don't know what the
21  initial charge was.
22     Q   But do you know whether or not he was
23  arrested or whether he was issued an appearance
24  ticket?
25     A   I don't know.

51

POGGIOLI

1
2      Q   Do you know whether or not the New
3  Rochelle police department ever interviewed him
4  about this incident?
5      A   They had to because they suspended him.
6      Q   Do you know what he said during the
7  interview?
8      A   No.
9      Q   Are there any other incidents you can think
10  of?
11     A   Not offhand but I'd just like to add
12  something else. It's very obvious -- I got to take
13  a correction. It's very obvious that the New
14  Rochelle police department has condoned all of these
15  previous officers that I mentioned by not
16  terminating them, not embarrassing them and
17  humiliating them like they did to me, and their
18  charges and crimes were more serious than mine and I
19  didn't even commit a crime or an act.
20     Q   Do you know if Officer Finney had a
21  disciplinary hearing within the New Rochelle police
22  department?
23     A   I don't know. May I add something else?
24     Q   Sure.
25     A   There was three other officers that they

52

POGGIOLI

1
2  did not commit crimes but they were involved in
3  violations of rules and regulations of the New
4  Rochelle police department and they were -- one was
5  Officer Pitzel, P-I-T-Z-E-L. The other one was
6  Vasquez and the other one was Colotti,
7  C-O-L-O-T-T-I.
8      Q   And what is it that Officer Pitzel was
9  alleged to have done?
10     A   Officer Pitzel went to an off-duty special
11  duty assignment and no one showed up. None of the
12  contractors showed up and he submitted an overtime
13  slip for eight hours and he was paid for that.
14     Q   And when did that occur?
15     A   I don't know the year.
16     Q   Was it before the year 2000?
17     A   No.
18     Q   After 2000?
19     A   Yes, I think — and don't hold me to that,
20  please. I think it was 2005.
21     Q   And what was the basis for your belief
22  that this occurred?
23     A   He told me.
24     Q   And do you know whether or not that
25  incident was ever investigated by the New Rochelle

53

POGGIOLI

1
2  police department?
3      A   I knew that the New Rochelle police
4  department was aware of it.
5      Q   How did you know that?
6      A   Because at first they questioned him and
7  weren't going to pay him, but then they did.
8      Q   So when you indicate they questioned him,
9  do you know who questioned him?
10     A   I think the assignment officer did.
11     Q   So would it be fair to say that that
12  questioning constituted an investigation?
13         MS. NICAJ:  Objection.
14     A   I wouldn't say an investigation.
15     Q   But it was questioned by the assignment
16  officer?
17     A   I understand it to be, yes.
18     Q   And what was the -- how do you -- what was
19  the basis for your belief that it was questioned by
20  the assignment officer?
21     A   I believe Officer Pitzel told me.
22     Q   And did Officer Pitzel tell you what he
23  said to the assignment officer?
24     A   No.
25     Q   Do you know who the assignment officer

54

POGGIOLI

1  was?
2
3    A    Sergeant Mergenthaler,
4  M-E-R-G-E-N-T-H-A-L-E-R.
5    Q    Am I correct Sergeant Mergenthaler is no
6  longer employed by the New Rochelle police
7  department?
8    A    He's retired.
9    Q    You had mentioned an Officer Vasquez?
10   A    Yes.
11   Q    What is it that he allegedly did?
12   A    That was the same exact incident because
13  he was with Officer Pitzel.
14   Q    Am I correct that Officer Vasquez and
15  Officer Pitzel were working together at the same
16  time?
17   A    Yes.
18   Q    And am I correct that the incident had the
19  same result?
20   A    Yes.
21   Q    And lastly you mentioned Officer Colotti.
22  What was he accused of doing?
23   A    Officer Colotti and myself worked a
24  special duty detail and it ended at a certain time.
25  It ended early and the contractor advised myself

55

POGGIOLI

1  that the job was over and Officer Colotti stayed at
2  that job even though we were told to -- that the job
3  was finished, and Officer Colotti put in for extra
4  time that he was there.
5    Q    And when did this occur?
6    A    I believe it was 2005 also.
7    Q    Where was the job?
8    A    On Main Street in New Rochelle.
9    Q    Who was the private employer?
10   A    Con Edison.
11   Q    And how did you learn that Officer Colotti
12  stayed after you left?
13   A    Because he never came in. I mean, we were
14  both told to leave and he stayed there.
15   Q    How did you learn that he put in for extra
16  time?
17   A    I believe I saw him later on in the day
18  and he came in.
19   Q    Do you know whether or not that was ever
20  investigated by the New Rochelle police department?
21   A    I don't know. I did advise Captain
22  Gazzola [ph] of it though.
23   Q    Do you know whether or not Captain Gazzola
24  ever spoke to Officer Colotti about the incident?

56

POGGIOLI

1
2    A    I don't know.
3        MR. MEISELS:  No further questions subject
4  to our stipulation about damages.
5        MS. NICAJ:  Sure.
6        THE WITNESS:  Thank you.
7        MR. MEISELS:  Thank you.
8        (Time Noted: 11:47 AM)
9
10       _____
11
12           JOSEPH POGGIOLI
13
14  Subscribed and sworn to before me this _____ day
15  of _____ 2007.
16
17  _____, Notary Public.
18
19
20
21
22
23
24
25

57

POGGIOLI

1
2          I N D E X
3  WITNESS
4  JOSEPH POGGIOLI
5  EXAMINATION BY
6  MR. MEISELS                    4
7
8          E X H I B I T S
9
10  DEFENDANTS'                  PAGE
11
12  A - Previously marked          5
13
14
15
16
17
18
19  Mr. Meisels has retained all exhibits.
20
21
22
23
24
25

58

POGGIOLI

CERTIFICATION

I, SUSIE CABANAS-DIAZ, a Court Reporter
and Notary Public within and for the State
of New York, do hereby certify:

That the witness whose deposition
is herein before set forth, was duly sworn
by me, and that the within transcript is a
true record of the testimony given by such
witness.

I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this      day of          , 2007.

_____

SUSIE CABANAS-DIAZ

---

59

POGGIOLI

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC
1-800-727-6396

200 OLD COUNTRY ROAD          1350 BROADWAY
MINEOLA, NY 11501             NEW YORK, NY 10018

NAME OF CASE:    POGGIOLI VS. CARROLL ET AL.
DATE OF DEPOSITION: OCTOBER 30, 2007
NAME OF DEPONENT:  JOSEPH POGGIOLI
PAGE LINE(S)   CHANGE        REASON

___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____

_____
JOSEPH POGGIOLI

Subscribed and sworn to before me
this _____ day of _____, 2007
_____, Notary Public.

_____
MY COMMISSION EXPIRES:

16  (Pages 58 to 59)

**EXHIBIT 5**

COPY

STATE OF NEW YORK
CITY OF NEW ROCHELLE
. . . . . . . . . . . . . . . . . . . . . . . . X
In the matter of the Disciplinary Charges
Preferred by CAPTAIN KEVIN KEALY,

                        Charging Party,


-against-


POLICE OFFICER JOSEPH POGGIOLI,

                        Charged Party.
. . . . . . . . . . . . . . . . . . . . . . X

                                    May 16, 2006
                                    1:45 p.m.


B E F O R E :    ROBERT PONZINI, ESQ.,
                        Hearing Officer


A P P E A R A N C E S :

            LAW OFFICE OF VINCENT TOOMEY
            Attorneys for the Charging Party
            3000 Marcus Avenue
            Lake Success, New York 11042
            BY:  KEVIN T. KEARON, Esquire,
                  of Counsel

            LOVETT & GOULD, LLP
            Attorneys for the Charged Party
            222 Bloomingdale Road
            White Plains, New York 10605
            BY:  JONATHAN LOVETT, Esquire,
                  of Counsel

A L S O   P R E S E N T :
            JOSEPH POGGIOLI
            EDWARD HAYES

1                              Hayes - Direct

2          A.     15 years and a little over six months.

3          Q.     How long have you been employed in total by the

4     city in the capacity as a police officer?

5          A.     The same, 15 years, six months, and a couple of

6     days.

7          Q.     Do you know Kevin Kearon who's seated to your

8     left?

9          A.     Yes, I do.

10         Q.     Do you recall that Tom Marcoline was at this

11    proceeding, other than today?

12         A.     Yes, I do.

13         Q.     Did you know either or both of them prior to

14    the commencement of this disciplinary?

15         A.     Yes, I did.

16         Q.     In what connection?

17         A.     In the capacity of working as the Police

18    Officers Association president here in the City of New

19    Rochelle for the Police Officers Association.

20         Q.     Are you the president of the association?

21         A.     Yes, I am.

22         Q.     How long have you held that position?

23         A.     This is my second year.

24         Q.     Did you ever have occasion to observe Mr.

25    Marcoline, Mr. Kearon and a member of the police department

```
1                          Hayes - Direct
2     engage in any conversation about Joe Poggioli and this
3     disciplinary?
4               MR. KEARON:  Objection, relevance.
5               THE HEARING OFFICER:  Is there an offer of
6          proof on this?
7               MR. LOVETT:  Yes.  Mr. Kearon said to a
8          high-ranking member of the department in a hallway in
9          headquarters, "How are they going to explain going
10         after Poggioli when other people have done the same
11         thing?"
12              THE HEARING OFFICER:  Objection sustained.
13              MR. LOVETT:  Excuse me?
14              THE HEARING OFFICER:  Objection sustained.
15              MR. LOVETT:  On what theory?
16              THE HEARING OFFICER:  I don't believe there's
17         any relevance to this proceeding.
18              MR. LOVETT:  Oh, come on.
19              THE HEARING OFFICER:  That's an opinion of
20         counsel.  It has nothing to do with what the city --
21              MR. LOVETT:  He's talking with his client and
22         he asked the client the question.
23              THE HEARING OFFICER:  Sustained.
24              MR. LOVETT:  Then I'll call Kevin Kearon.  I'm
25         going to make a record, Mr. Ponzini, with or without
```

Hayes - Direct

1
2    you.

3            THE HEARING OFFICER:  You can make the record.

4    You have your objection.  If I'm wrong, I'm wrong.  I

5    don't believe that that's relevant or material.  You

6    can call somebody perhaps in I guess what I would

7    call the administration of the New Rochelle Police

8    Department.  If you want to try and make out a

9    selective prosecution case, to the extent that it's

10   relevant, that other people in similar circumstances

11   haven't been prosecuted.  But I think clearly a

12   conversation between Mr. Kearon and/or a member of

13   the police department is not relevant and material

14   for the purpose of this hearing.

15           MR. LOVETT:  It goes to the selective

16   prosecution and their awareness of it.  And I intend

17   to ask others about others who have done exactly what

18   my client is alleged to have done.

19           THE HEARING OFFICER:  It may be more

20   appropriate for those witnesses.  But I think a

21   secondhand conversation between the attorney and a

22   member of the administration I'm not going to allow.

23           MR. LOVETT:  It's not secondhand.  This witness

24   was there and he heard them.

25           THE HEARING OFFICER:  I'm not going to allow

1                          Hayes - Direct

2          it.  But if you want to try and introduce it in some

3          other way when you have other witnesses, you can make

4          an inquiry.

5                  MR. KEARON:  Before you continue.  I just want

6          to make a record on this point.

7                  I want the record to reflect that my silence in

8          not responding to this allegation of sorts is in no

9          way intended to be a concession that such a statement

10         was made.

11                 I'm not going to address the merits of the

12         allegation or the statements attributed to me here.

13                 THE HEARING OFFICER:  You have your record.

14         Q.    When you heard the conversation about which

15   you're now forbidden to testify, was there anybody from the

16   police department brass, if you will, who was present with

17   Mr. Marcoline and Mr. Kearon?

18                 MR. KEARON:  Same objection.

19                 THE HEARING OFFICER:  Overruled.

20         A.    Yes.

21         Q.    Who?

22         A.    Captain Kevin S. Kealy.

23                 MR. LOVETT:  Thank you.

24                 I have nothing further.

25                 THE HEARING OFFICER:  Any questions, Mr.

**EXHIBIT 6**

**COPY**

STATE OF NEW YORK
CITY OF NEW ROCHELLE
. . . . . . . . . . . . . . . . . . . . . . . . X
In the matter of the Disciplinary Charges
Preferred by CAPTAIN KEVIN KEALY,

                    Charging Party,

-against-

POLICE OFFICER JOSEPH POGGIOLI,

                    Charged Party.
. . . . . . . . . . . . . . . . . . . . . . . . X

                              June 19, 2006
                              10:30 a.m.

B E F O R E :     ROBERT PONZINI, ESQ.,
                    Hearing Officer

A P P E A R A N C E S :

          LAW OFFICE OF VINCENT TOOMEY
          Attorneys for the Charging Party
          3000 Marcus Avenue
          Lake Success, New York 11042
          BY:  KEVIN T. KEARON, Esquire,
               of Counsel

          LOVETT & GOULD, LLP
          Attorneys for the Charged Party
          222 Bloomingdale Road
          White Plains, New York 10605
          BY:  JONATHAN LOVETT, Esquire,
               of Counsel

A L S O   P R E S E N T :
          JOSEPH POGGIOLI
          EDWARD HAYES

1                    Carroll - Direct

2              You may inquire, Mr. Lovett.

3    DIRECT EXAMINATION

4    BY MR. LOVETT:

5         Q.    By whom are you employed?

6         A.    The City of New Rochelle.

7         Q.    In what capacity?

8         A.    Police Commissioner.

9         Q.    Is that an appointed position?

10        A.    It is.

11        Q.    How long have you held that title?

12        A.    12 and a half years.

13        Q.    Are you generally familiar with the police

14   department's rules, policies and procedures?

15        A.    Yes.

16        Q.    Do you have an internal affairs unit?

17        A.    Yes, I do.

18        Q.    And staffed by whom?

19        A.    Lieutenant James Fortunato.

20        Q.    And he's been in charge of internal affairs for

21   approximately how long?

22        A.    Let's see --

23        Q.    Roughly.

24        A.    Five years maybe.

25        Q.    And his responsibility is what?

1                          Carroll - Direct
2          A.     His responsibility is to conduct sensitive
3     investigations, look into confidential matters that I may
4     direct him to.  He reports directly to me.  And it could be
5     sometimes a minute investigation involving a civilian
6     complaint, it could be somewhat sensitive or not.
7          Q.     Are there any instances where a complaint
8     against a member of the police department, that is a sworn
9     member, is required to be investigated by somebody other
10    than Lieutenant Fortunato?
11         A.     Yes.
12         Q.     And what are they?
13         A.     It could be forms of misconduct, forms of
14    violating the manual of procedures.  It could be a civilian
15    complaint.  There's probably quite a variety, depending on
16    the seriousness of it, the confidentiality, the timing.
17    All those would take part in deciding the immediacy of the
18    investigation.
19         Q.     Who makes the decision as to whether Fortunato
20    does the investigation or not?
21         A.     It could be me or it could be the captain in
22    charge of the unit.
23         Q.     Does the Deputy Commissioner have any role in
24    deciding who does the conduct of an investigation where
25    there's an allegation of misconduct against a sworn member

HEARING

```
 1                        Carroll - Direct
 2   of the department?
 3        A.     He may at times, yes.
 4        Q.     With respect to this case, are you aware that
 5   disciplinary charges were filed by Captain Kealy?
 6        A.     Yes, I am.
 7        Q.     When were you first aware of that?
 8               MR. KEARON:  Objection, relevance.
 9               THE HEARING OFFICER:  Overruled.
10               You can answer it.
11        A.     I really don't know the time frame.  Is that
12   what you're looking for?
13        Q.     Let me rephrase the question.
14               Were you aware that charges were going to be
15   filed by the captain against Poggioli before the charges
16   were actually filed?
17        A.     Yes.
18        Q.     Did you have any occasion to discuss the
19   charges, whether proposed or drafted, with Captain Kealy
20   before the charges were filed?
21               MR. KEARON:  Objection to relevance.
22               THE HEARING OFFICER:  Overruled.
23               If you know.
24        A.     I'm not sure.
25        Q.     Did you discuss the charges with Deputy
```

HEARING

1                      Carroll - Direct

2    Commissioner Murphy?

3         A.    Yes.

4         Q.    Was that before or subsequent to the point in

5    time when the charges were filed by Kealy?

6         A.    I'm not sure.

7         Q.    Looking at the charges which have a date --

8    would looking at the charges potentially refresh your

9    memory as to the time frame?

10        A.    It might, yes.

11             MR. LOVETT:  Could we have Hearing Officer

12        Exhibit 2?

13             THE HEARING OFFICER:  I didn't bring all the

14        exhibits with me.  I don't have the originals.

15             MR. LOVETT:  I have a copy.

16             MR. KEARON:  I think I do have the originals

17        but I didn't bring them with me.

18             THE HEARING OFFICER:  I didn't bring them.

19             MR. LOVETT:  I have a copy that I'll show the

20        Commissioner.

21        Q.    Does that jog your memory as to whether you

22    spoke with Deputy Commissioner Murphy before or after the

23    charges were filed?

24        A.    I would have to answer most likely before the

25    charges were filed.

```
 1                      Carroll - Direct
 2        Q.   Do you have a police officer on the job named
 3   John Young?
 4        A.   Yes.
 5        Q.   How long have you known him?
 6        A.   I guess the 12 and a half years I'm employed.
 7        Q.   Are you aware that he from time to time works
 8   an off-duty assignment?
 9             MR. KEARON:  Objection, relevance.
10             THE HEARING OFFICER:  Overruled.  I'll allow it
11        to go a little further.
12        A.   I'm not aware, no.
13        Q.   Are you aware of a situation where both he and
14   Joe Poggioli worked an off-duty assignment, a claim was
15   made that they had not worked all of the hours they were
16   supposed to, and they were told to redraft their
17   documentation showing a reduction in time?
18             MR. KEARON:  Same objection.
19             THE HEARING OFFICER:  Overruled.
20        A.   I'm not aware.
21        Q.   Has anybody, prior to now, ever indicated to
22   you, in words or substance, that Officer Young submitted a
23   request for compensation for working an off-duty job where
24   it was subsequently determined that he had not worked the
25   amount of time indicated in his documentation?
```

HEARING

Page 584

```
 1                    Carroll - Direct
 2        A.    I'm not aware, no.
 3        Q.    What is the protocol in your department for
 4   having somebody in the traffic division do an internal
 5   affairs investigation?
 6             MR. KEARON:  Objection.
 7             THE HEARING OFFICER:  I'm going to sustain it
 8        as to form.
 9        Q.    Are you aware that a sergeant assigned to
10   traffic actively participated in the investigation of Joe
11   Poggioli in this case?
12             MR. KEARON:  Objection.
13             THE HEARING OFFICER:  Overruled.
14        A.    No, I'm not.
15        Q.    Are there any answers that you've given that
16   you want to change at this point?
17             MR. KEARON:  Objection.
18             THE HEARING OFFICER:  Overruled.
19             You can answer it.
20        A.    To my knowledge, I'm not aware.
21             MR. LOVETT:  Fine.  Thank you.
22             THE HEARING OFFICER:  Mr. Kearon, did you want
23        to ask the Commissioner any questions?
24             MR. KEARON:  No.
25             THE HEARING OFFICER:  Thank you very much,
```

1                          Carroll - Direct

2        Commissioner.  You're excused.

3                  (Witness excused)

4                  (Recess)

5            THE HEARING OFFICER:  Let's go back on the

6        record.

7                We had an off-the-record discussion.  Mr.

8        Kearon, on behalf of the Commissioner, indicated that

9        he was contacted by the Commissioner, who, after

10       reviewing his testimony in his mind, thinks he may

11       have made one statement that he would either like to

12       amplify and/or correct.  So we're going to give him

13       the opportunity to come back and to either sua sponte

14       make a statement, and then I'll allow each of the

15       attorneys ask a follow-up question or two, if

16       necessary.

17               Commissioner Carroll, we're on the record

18       again.  You're still under oath as having been

19       previously sworn.

20               We were informed by Mr. Kearon, the attorney

21       for the City of New Rochelle, that there was

22       something in your direct testimony that you either

23       wanted to amplify, correct or in some way modify.

24               I'll give you the opportunity to make a

25       statement, and then, perhaps, if either Mr. Lovett or

```
 1                      Carroll - Direct
 2        Mr. Kearon have a follow-up question, they may ask
 3        you so.
 4               THE WITNESS:  Thank you.
 5               THE HEARING OFFICER:  You may proceed.
 6               THE WITNESS:  I believe I was asked if I was
 7        aware of certain things.  And at some point probably
 8        I was in the past, and I'm not aware of them now.
 9               Probably my correct answer would be I don't
10        recall rather than say I'm not aware because
11        probably, if I read something, it might refresh my
12        memory and I would be aware.  Because I sign many
13        things, I handle many papers.  And probably the
14        better answer would be I don't recall.
15               THE HEARING OFFICER:  Did you want to follow up
16        with a question or two, Mr. Lovett?
17               MR. LOVETT:  Yes.
18   DIRECT EXAMINATION (Continued)
19   BY MR. LOVETT:
20        Q.    Is the testimony you just gave related to my
21   inquiry about Police Officer John Young?
22        A.    No.
23        Q.    What does it relate to?
24        A.    The traffic sergeant, I believe you asked, if I
25   was aware.
```

```
 1                        Carroll - Direct
 2          Q.    So you think you may have been aware at some
 3    point in time but you don't presently, however, recall?
 4          A.    That's correct.
 5                MR. LOVETT:  Okay.  Thank you.
 6                MR. KEARON:  I want to make sure that we're
 7          talking about the same question.  And the question,
 8          as I recall it, is at some point in time did you
 9          become aware that either a traffic supervisor or
10          sergeant -- I think it was sergeant -- I don't think
11          any name was given -- but that a traffic sergeant
12          played some role in the investigation of Officer
13          Poggioli.
14                THE HEARING OFFICER:  Yes, I believe that's the
15          question, and it's clear in my mind.
16                Thank you, Commissioner.
17                (Witness excused)
18    A N T H O N Y   M U R P H Y,    having been first duly
19          sworn by the Hearing Officer, was examined and
20          testified as follows:
21                THE HEARING OFFICER:  Good morning, sir.
22                THE WITNESS:  Good morning.
23                THE HEARING OFFICER:  Can we have your name and
24          business address for the record.
25                THE WITNESS:  Anthony Murphy, 475 North Avenue,
```

**EXHIBIT 7**

595

```
1    STATE OF NEW YORK
     CITY OF NEW ROCHELLE
2    . . . . . . . . . . . . . . . . . . . . X
3    In the matter of the Disciplinary Charges
     Preferred by CAPTAIN KEVIN KEALY,
4
                         Charging Party,
5
     -against-
6
     POLICE OFFICER JOSEPH POGGIOLI,
7
                         Charged Party.
8    . . . . . . . . . . . . . . . . . . . . X
9
                              July 7, 2006
10                            2:45 p.m.
11
12   B E F O R E :    ROBERT PONZINI, ESQ.,
                      Hearing Officer
13
14   A P P E A R A N C E S :
15            LAW OFFICE OF VINCENT TOOMEY
              Attorneys for the Charging Party
16            3000 Marcus Avenue
              Lake Success, New York 11042
17            BY:  KEVIN T. KEARON, Esquire,
                   of Counsel
18
19            LOVETT & GOULD, LLP
              Attorneys for the Charged Party
20            222 Bloomingdale Road
              White Plains, New York 10605
21            BY:  JONATHAN LOVETT, Esquire,
                   of Counsel
22
23
24   A L S O   P R E S E N T :
25            JOSEPH POGGIOLI
```

COPY


**LEGALINK**
A MERRILL COMPANY

420 Lexington Ave
Suite 2108
New York, NY 10170

tel (800) 325-3376
fax (212) 692-9171

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

<pre>
 1                        Proceedings
 2            THE HEARING OFFICER:  Good afternoon.  We're on
 3       the record.
 4            This is the continuation of the hearing of
 5       Officer Poggioli.
 6            Could each side please note their appearance.
 7            MR. KEARON:  For the charging party, the Law
 8       Office of Vincent Toomey, by Kevin Kearon.
 9            Good afternoon.
10            MR. LOVETT:  For the charged party, Jonathan
11       Lovett of Lovett & Gould.
12            THE HEARING OFFICER:  Let the record reflect
13       that the charged party is present with his attorney.
14       Unfortunately, his union representative couldn't make
15       it, he had a prior commitment.
16            But I understand you're still willing to
17       proceed in his absence, is that correct, Mr. Lovett?
18            MR. LOVETT:  Yes.
19            THE HEARING OFFICER:  Thank you.
20            You can call your next witness, Mr. Lovett.
21            MR. LOVETT:  We call Police Officer John Young.
22  J O H N   F.   Y O U N G ,   having been first duly sworn
23       by the Hearing Officer, was examined and testified as
24       follows:
25            THE HEARING OFFICER:  Can we have your full
</pre>

1                              /    Proceedings
2    name and business address for the record?
3           THE WITNESS:  Full name is John F. Young.  My
4    address is 475 North Avenue, New Rochelle, New York.
5           THE HEARING OFFICER:  Officer Young, my name is
6    Robert Ponzini, I'm the Hearing Officer assigned to
7    these proceedings.
8           You're going to be asked a series of questions,
9    first by Mr. Lovett on behalf of his client and
10   perhaps by Mr. Kearon on cross-examination.
11          When you hear the question, please respond in a
12   loud and clear voice so everyone in the room can hear
13   you, most of all our stenographer.
14          Only a verbal answer is acceptable.  If you nod
15   your head or shrug your shoulders, we can't put that
16   in the record.
17          If you hear one of the attorneys say
18   "objection" or "I object," wait until I rule on it
19   and I'll tell you whether you should answer the
20   question or not.
21          If you need a break, don't understand
22   something, anything of that nature, let me know and
23   I'll accommodate you.
24          Do you understand my instructions?
25          THE WITNESS:  Yes.

```
 1                        Proceedings
 2              THE HEARING OFFICER:  You may proceed, Mr.
 3       Lovett.
 4   DIRECT EXAMINATION
 5   BY MR. LOVETT:
 6         Q.    Officer, by whom are you employed?
 7         A.    New Rochelle Police Department.
 8         Q.    And your job position is what?
 9         A.    Patrol officer.
10         Q.    How long have you been employed in that
11   capacity by the city?
12         A.    12 years and two months.
13         Q.    Do you know Joseph Poggioli, who is seated to
14   my left?
15         A.    Yes, I do.
16         Q.    Who do you know him to be?
17         A.    An officer with the department.
18         Q.    Have you ever had occasion to work an off-duty
19   job with him within the City of New Rochelle?
20         A.    Yes, I have.
21         Q.    Did you ever have occasion to work an off-duty
22   job with Joe Poggioli where the job was supposed to run
23   from 9:00 a.m. to 5:00 p.m. and, in fact, it ran late?
24              MR. KEARON:  Objection.
25              THE HEARING OFFICER:  Overruled.
```

Young - Direct

THE WITNESS:  Yes, I have.

Q.    Do you know for whom that job was run?

A.    I don't remember the contractor's name offhand.

Q.    Do you know where the location of the job was?

A.    The location of the job was Potter and Pierce Street in New Rochelle.

Q.    Potter?

A.    Potter and Pierce.

Q.    Did you and Officer Poggioli, in fact, arrive at 9:00 a.m.?

A.    I arrived about 9:05 and Officer Poggioli arrived between 9:10 and 9:15.

Q.    And approximately how late did you work that job?

A.    Approximately 5:45 that day.

Q.    And subsequent to performing that work, was any document submitted by you and Officer Poggioli with respect to the hours that you had worked?

A.    We submitted overtime sheets from 9:00 o'clock to 5:00 o'clock and a separate sheet from 5:00 o'clock to 6:00 o'clock for the extra hour that we were there.

Q.    And after you submitted those documents, did anybody, in effect, return them or either of them back to you to be changed?

Young - Direct

A.    Yes.

MR. KEARON:  Same objection.

THE HEARING OFFICER:  Overruled.

Q.    And who was that?

A.    It was brought back to our attention from my captain, Captain Gazzola, that we needed to redo our overtime hours.

Q.    And what, if any, reason were you given for that?

A.    One of the contractors told them that we got there about 9:30 and the job was over about 5:30.

Q.    And based on the request to redo the submissions, did you, in fact, redo them?

A.    Yes, I did.

Q.    To reflect what time of arrival and what time of departure?

A.    I put arrival time 9:30 and departure 5:30.

Q.    As a result of that change, was there time that you and Officer Poggioli actually worked that job for which you weren't paid?

A.    Yes.  There was an extra 15 minutes that we did, until 5:45 or 5:40, and we didn't get paid for that. And I was there since 9:05 and I didn't get paid from 9:00 o'clock to 9:30, so I was missing that.

601

1                              Young - Direct

2          Q.    And following the submission of the corrected

3    or changed overtime requests, were you brought up on

4    disciplinary charges with respect to the incident?

5          A.    No, I was not.

6                MR. LOVETT:  Thank you very much.

7                I have nothing further.

8                THE HEARING OFFICER:  Mr. Kearon?

9                MR. KEARON:  Briefly.

10   CROSS-EXAMINATION

11   BY MR. KEARON:

12         Q.    My name is Kevin Kearon.

13               Good afternoon, officer.

14         A.    Good afternoon.

15         Q.    Would you please describe for me the nature of

16   your relationship, if any, with Police Officer Joseph

17   Poggioli?

18         A.    He's an officer on the job with me.  I knew him

19   for about the same 12 years I've been here.  That's about

20   as far as that goes.

21         Q.    How, for the first time, did you learn that you

22   would be called as a witness in this case?

23         A.    Maybe about two months ago or something like

24   that, he says that I might be getting a subpoena in regards

25   to the job that we did on Pierce and Potter.

Young - Cross

Q.    When you say he, are you speaking of Officer Poggioli?

A.    Officer Poggioli.

Q.    And where did that conversation take place?

A.    Headquarters.

Q.    And after he told you what you've just told us, did you have any conversation with him about that job?

A.    No, not necessarily.  He just told me -- you know, he asked me, do I remember the job.  And I said yes.  He said, "When you go to the hearing, just tell them what happened, tell them the truth."

Q.    And did you, in fact, work the hours that you represented you had worked when you submitted your original request for overtime?

A.    In regards to 9:00 o'clock exactly -- I got there 9:05 and I did put down 9:00 o'clock.

But with regards to 6:00 o'clock, yes, because the job was over at 5:45.  But by the time we got back to headquarters, it was about 6:00 o'clock.

Q.    And were you ever the subject of an interview with superiors that was tape recorded in connection with your submission of those overtime request?

A.    No, not that I'm aware of.

Q.    If, in fact, you had worked the hours that you

Young - Cross

1
2    had claimed, with the possible exception of the five-minute

3    issue raised earlier, why then did you agree to modify your

4    overtime request to delete the request for that additional

5    hour?

6         A.    Actually, the half hour or 45 minutes wasn't

7    worth the hassle.  So I said, forget about it, I'll just

8    put the time on it that they wanted.

9                   MR. KEARON:  No further questions.

10                  Thank you.

11                  MR. LOVETT:  Can I have a second?

12                  THE HEARING OFFICER:  Yes.

13                  (Recess)

14                  MR. LOVETT:  I have nothing further.

15                  THE HEARING OFFICER:  You're excused, Officer.

16                  Thank you very much.

17                  (Witness excused)

18                  THE HEARING OFFICER:  Off the record.

19                  (Discussion off the record)

20                  THE HEARING OFFICER:  We've had a brief

21              discussion off the record with the attorneys and with

22              the charged party present.

23                  Mr. Lovett, do you rest at this time?

24                  MR. LOVETT:  Yes, I do.

25                  THE HEARING OFFICER:  Is there any rebuttal